# No. 26-7 (L), 26-222 (XAP)

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

GWA, LLC,
MICHELE M. LANZONI, TAX MATTERS PARTNER
*Petitioners / Appellants / Cross-Appellees,*
v.
COMMISSIONER OF INTERNAL REVENUE,
*Respondent / Appellee / Cross-Appellant.*

On appeal from the
United States Tax Court

## PAGE PROOF BRIEF ON BEHALF OF APPELLANTS

*Counsel information on inside cover*

Bryan Killian
Sheri A. Dillon
James G. Steele, III
Eric J. Albers-Fiedler
Brendan J. Anderson
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T: 202-739-3000
bryan.killian@morganlewis.com

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Michele M. Lanzoni, as Tax Matters Partner of GWA, LLC, states that no publicly held entity owned an interest in GWA, LLC during the tax years at issue in this appeal, *i.e.*, 2009 and 2010.

# CONTENTS

Corporate Disclosure Statement ........ i

Contents ........ ii

Authorities ........ v

Glossary ........ xi

Jurisdiction ........ 1

Questions Presented ........ 2

Introduction ........ 3

Background ........ 8

I. Statutory and Regulatory Background ........ 8

A. Derivatives and options ........ 8

B. The limits of prime brokerage accounts and margin loans ........ 9

C. Sections 1234A and 1234(a) ........ 10

II. Factual Background ........ 11

A. GWA's quest for leverage ........ 11

B. The BOCs ........ 12

1. Term ........ 13

2. Premium ........ 13

3. Payment obligations—cash settlement ........ 14

4. Trading restrictions ........ 15

5. Voting ........ 15

6. Dividends ........ 16

C. DB's ownership of the Basket Securities ........ 16

D. Summary ........ 18

E. GWA's accounting methods ........ 20

F. Termination and tax treatment of the BOCs ........ 20

III. Procedural History ........ 21

Summary of Argument ........ 23

Argument ........ 29

I. The Tax Court committed legal error in recasting GWA's ownership of BOCs as ownership of the underlying securities ........ 29

A. The Tax Court rewrote Section 1234A and Section 1234(a) via the substance-over-form doctrine ........ 31

1. The Tax Court's substance-over-form analysis stems from false assumptions about options and derivatives ........ 32

2. Sections 1234A and/or 1234 apply ........ 35

a. Section 1234A applies to the BOCs ........ 35

b. Section 1234(a) applies to the BOCs ........ 37

B. The Tax Court misapplied substance-over-form ........ 39

1. The court disregarded GWA's business purpose and rendered the transactions unlawful ........ 39

2. Substance-over-form cannot disaggregate a transaction ........ 43

C. The Tax Court's reliance on the investor-control doctrine was legally erroneous ........ 45

II. The Tax Court erred in finding a change in accounting method ........ 47

A. Section 481 does not apply here ........ 48

B. Regulations explicitly confirm that Section 481 does not apply ........ 53

1. A judicial recasting of a transaction is not a change in accounting method ........ 54

Case: 26-7, 04/20/2026, DktEntry: 40.1, Page 6 of 88




2. Regardless of what it owned, GWA already had established methods for its items and did not change its accounting method .................................. 56

3. No change in accounting method occurred because the recasting changed GWA's lifetime income ............................................................ 57

C. The Tax Court's approach renders the statute of limitations meaningless ........................................................ 60

III. The Tax Court erred in imposing accuracy-related penalties...... 62

A. The Tax Court erroneously applied penalties to an issue of first impression ....................................................... 63

B. The Tax Court erroneously determined that GWA acted negligently ............................................................ 65

C. The Tax Court committed legal error in determining that GWA lacked substantial authority .............................. 68

D. GWA also had a reasonable basis for its tax positions ....... 71

E. The Tax Court erred in holding that accuracy-related penalties apply to Section 481(a) adjustments relating to involuntary changes in an accounting method ............... 71

Conclusion ......................................................................................... 73

Certificate of Compliance ................................................................... 74

Certificate of Service .......................................................................... 75

# AUTHORITIES

Page(s)

CASES

*Altria Grp., Inc. v. United States*,
658 F.3d 276 (2d Cir. 2011) .......... 32

*Analytical Survs., Inc. v. Tonga Partners, L.P.*,
684 F.3d 36 (2d Cir. 2012) .......... 8

*Badaracco v. CIR*,
464 U.S. 386 (1984) .......... 61

*Basic Eng'g, Inc. v. CIR*,
T.C. Memo. 2017-026 .......... 72

*Benenson v. CIR*,
910 F.3d 690 (2d Cir. 2018) .......... 31, 43

*Boise Cascade Corp. v. United States*,
329 F.3d 751 (9th Cir. 2003) .......... 40

*Boynton v. Pedrick*,
228 F.2d 745 (2d Cir. 1955) .......... 72

*Cannon Corp. v. CIR*,
135 A.F.T.R.2d 2025-662 (2d Cir. 2025) (Summary Order) .......... 59

*Cap. One Fin. Corp. v. CIR*,
659 F.3d 316 (4th Cir. 2011) .......... 71

*Chechele v. Sperling*,
758 F.3d 463 (2d Cir. 2014) .......... 34

*Chock Full O'Nuts Corp. v. United States*,
453 F.2d 300 (2d Cir. 1971) .......... 24, 43, 44, 45

*CIR v. First Sec. Bank of Utah, N.A.*,
405 U.S. 394 (1972) .......... 39

*Comdisco, Inc. v. United States*,
756 F.2d 569 (7th Cir. 1985) .......... 40

*Curcio v. CIR*,
689 F.3d 217 (2d Cir. 2012) .......... 29

*Diebold Found., Inc. v. CIR*,
736 F.3d 172 (2d Cir. 2013) .......... 29

*DJB Holding Corp v. CIR*,
803 F.3d 1014 (9th Cir. 2015) .......... 29

*Est. of Kluener v. CIR*,
154 F.3d 630 (6th Cir. 1998) .......... 69, 70

*Est. of McKelvey v. CIR*,
148 T.C. 312 (2017) .......... 43, 52

*Everson v. United States*,
108 F.3d 234 (9th Cir. 1997) .......... 63

*Fed. Home Loan Mortg. Corp. v. CIR*,
125 T.C. 248 (2005) .......... 38

*Federated Dep't Stores, Inc. v. CIR*,
51 T.C. 500 (1968) .......... 54, 55, 70

*Frank Lyon Co. v. United States*,
435 U.S. 561 (1978) .......... passim

*Gimbel Bros. v. United States*,
535 F.2d 14 (Ct. Cl. 1976) .......... 57

*Holmes v. CIR*,
T.C. Memo. 1978-437, 37 T.C.M. (CCH) 1825 (1978) .......... 37

*Honeywell Inc. v. CIR*,
87 T.C. 624 (1986) .......... 44

*Huffman v. CIR*,
126 T.C. 322 (2006) .......... 49

*Hyatt Hotels Corp. v. CIR*,
T.C. Memo. 2023-122 .......... 49, 58, 60, 61

*I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*,
936 F.2d 759 (2d Cir. 1991) .......... 70

*In re Sep. 11 Litig.*,
751 F.3d 86 (2d Cir. 2014) .......... 53

*Knight-Ridder Newspapers, Inc. v. United States*,
743 F.2d 781 (11th Cir. 1984) .......... 58

*Kuper v. CIR*,
533 F.2d 152 (5th Cir. 1976) .......... 43

*Kushner v. DBG Prop. Invs., Inc.*,
793 F. Supp. 1161 (S.D.N.Y 1992) .......... 70

*Magma Power Co. v. Dow Chem. Co.*,
136 F.3d 316 (2d Cir. 1998) .......... 33

*Matthies v. CIR*,
134 T.C. 141 (2010) .......... 64, 68

*Mazzei v. CIR*,
998 F.3d 1041 (9th Cir. 2021) .......... 32

*N. States Power Co. v. United States*,
151 F.3d 876 (8th Cir. 1998) .......... 56, 57

*Nat'l Can Corp. v. CIR*,
520 F. Supp. 567 (N.D. Ill. 1981) .......... 44

Case: 26-7, 04/20/2026, DktEntry: 40.1, Page 10 of 88



*Neonatology Assocs., P.A. v. CIR*,
299 F.3d 221 (3d Cir. 2002) .......... 63

*Newman v. CIR*,
902 F.2d 159 (2d Cir. 1990) .......... 39

*Patel v. CIR*,
138 T.C. 395 (2012) .......... 63

*Pilgrim's Pride Corp. v. CIR*,
779 F.3d 311 (5th Cir. 2015) .......... 10, 35

*Primo Pants Co. v. CIR*,
78 T.C. 705 (1982) .......... 58

*Rankin v. CIR*,
138 F.3d 1286 (9th Cir. 1998) .......... 60

*Schuster's Express, Inc. v. CIR*,
66 T.C. 588 (1976) .......... 48, 58

*Standard Oil Co. (Indiana) v. CIR*,
77 T.C. 349 (1981) .......... 56, 57, 70

*Summa Holdings, Inc. v. CIR*,
848 F.3d 779 (6th Cir. 2017) .......... 32

*Wayne Bolt & Nut Co. v. CIR*,
93 T.C. 500 (1989) .......... 58, 60

*Webber v. CIR*,
144 T.C. 324 (2015) .......... 45, 46, 63

*Welter v. CIR*,
T.C. Memo. 2003-299 .......... 72

STATUTES

26 U.S.C.
§318 .......... 37

Case: 26-7, 04/20/2026, DktEntry: 40.1, Page 11 of 88



§446 .......... 70, 71
§481 .......... passim
§734 .......... 59
§754 .......... 59
§817 .......... 46
§1001 .......... passim
§1221 .......... 35
§1222 .......... 36, 64, 69
§1234 .......... passim
§1234A .......... passim
§1260 .......... 37
§6226 (1997) .......... 1
§6501 .......... 47, 60
§6662 .......... 72
§7442 .......... 1
§7482 .......... 1

## Rules & Regulations

Rev. Rul. 2003-91, 2003-2 C.B. 347 .......... 46

Treas. Reg.
§1.446-1 .......... passim
§1.481-1 .......... 49
§1.1001-1 .......... 52
§1.6662-2 .......... 71
§1.6662-3 .......... 71
§1.6662-4 .......... 68, 69, 71

## OTHER AUTHORITIES

*Black's Law Dictionary* (12th ed. 2024) .......... 35

CFTC, Futures Glossary: A Guide to the Language of the Futures Industry, https://perma.cc/4V5S-8P5H (last visited Apr. 10, 2026) .... 8

Kolbrenner, *Derivatives Design and Taxation*, 15 Va. Tax Rev. 211 (1995) .......... 33

Case: 26-7, 04/20/2026, DktEntry: 40.1, Page 12 of 88



Staff of J. Comm'n on Tax'n, 110th Cong., *Present Law and Analysis Relating to the Tax Treatment of Derivatives*, JCX-21-08 (Mar. 4, 2008) .......... 64

Staff of J. Comm'n on Tax'n, 112th Cong., *Present Law and Issues Related to the Taxation of Financial Instruments and Products,* JCX-56-11 (Dec. 2, 2011) .......... 51

Warren, *Financial Contract Innovation and Income Tax Policy*, 107 Harv. L. Rev. 460 (1993) .......... 33

*Websters New Int'l Dictionary* (2d ed. unabr. 1953) .......... 37

*Websters New Universal Unabridged Dictionary* (1996) .......... 37

# GLOSSARY

| | |
|---|---|
| Basket Securities | the collection of securities underlying the BOCs |
| BOCs | the Barrier Option Contracts at issue that GWA owned |
| Code | Title 26 of the United States Code |
| DBAG London | Deutsche Bank, AG, London Branch |
| DB | Deutsche Bank |
| FPAA | Notice of Final Partnership Administrative Adjustment |
| GWA, LLC or GWA | the Appellant, GWA, LLC |
| IRS | Internal Revenue Service |
| MAPS Trading Accounts | DBAG London's proprietary accounts |
| Margin Regulations | Federal Reserve Board Regulation T (12 C.F.R. §220) and Regulation U (12 C.F.R. §221) |
| "Section #" | Title 26 of the United States Code, as amended and in effect during the years at issue |
| "Treas. Reg. §#" | Code of Federal Regulations, Title 26, in effect during the years at issue |

# JURISDICTION

The Tax Court had jurisdiction pursuant to 26 U.S.C. §§6226(f) (1997) and 7442. The court entered its final decision on October 7, 2025. JA_[[Order and Decision]]. GWA filed a timely notice of appeal on December 30, 2025. JA_[[Notice of Appeal]]. This Court has jurisdiction pursuant to 26 U.S.C. §§6226(g) (1997) and 7482(a)(1).

# QUESTIONS PRESENTED

GWA owned BOCs, complex derivatives whose values were tied to baskets of securities. When the contracts terminated, GWA reported all income it earned, and its partners paid tax at the long-term capital gains rate—in accordance with Sections 1234A and 1234(a), which provide tax rules for options and derivatives.

Without considering either statute's text, the Tax Court recast GWA's ownership of BOCs as ownership of the Basket Securities, plus a loan that would have violated the Margin Regulations. The court then held that, owing to its recast of the transaction, GWA necessarily changed its accounting method for the transaction, which enabled the court to apply Section 481 to take income GWA recognized in 2009 and 2010, reallocate it to tax years for which the statute of limitations had closed, and tax it at higher rates.

The questions presented are:

1. Whether the Tax Court erred in recasting the BOCs.
2. Whether the Tax Court erred in applying Section 481.
3. Whether penalties are inappropriate.

# INTRODUCTION

All sophisticated investors know that leverage is the key to earning above-market profits. Take a $100 investment expected to earn $5. For an unleveraged investor who fronts $100, that's a respectable 5% return. For a leveraged investor who fronts, say, $10 and finances the other $90, that's an incredible 50% return.

This case arises from GWA's successful effort to find leverage to transform an investment strategy with modest returns into a smashing success. The Margin Regulations capped the leverage available in prime brokerage accounts, so investors needing greater leverage had to seek it out. GWA, like countless others, found the leverage it needed in derivatives—*i.e.*, contracts through which parties assign rights and obligations linked to underlying assets.

Starting in 2003, after significant research and due diligence, GWA entered into a series of highly negotiated and highly complex derivatives with DB. These derivatives, known as Barrier Option Contracts or BOCs, linked to a bundle of securities known as Basket Securities. Most importantly, these derivatives offered GWA leverage up to 20 times its initial investment—10 times more than GWA could access through a highly regulated prime brokerage account.

When the BOCs terminated in 2009 and 2010, GWA reported *every penny* of its profits on its federal income tax returns. Furthermore, GWA allocated *all* that income to its partners, who paid long-term capital-gains tax on it. Because the BOCs enabled GWA to earn leveraged profits, the income reported was orders of magnitude greater than if GWA invested without leverage.

At the urging of the IRS, the Tax Court viewed this case very, very differently. In pursuit of a flawed vision for proper enforcement of *the Margin Regulations*, the court twisted and broke fundamental principles of *tax* law. This appeal concerns those threshold questions of law, from which the Tax Court's erroneous holdings flow.

The Tax Court's foundational error was to jump, right past the Code, to the substance-over-form doctrine, which the court used to recast GWA's rights under the BOCs as ownership of the underlying Basket Securities financed by an unlawfully high margin loan. From there, the Tax Court recast GWA's income from the BOCs in 2009 and 2010 (subject to lower tax rates) as income from the Basket Securities earned from 2003 to 2010 (subject to higher tax rates). The court's substance-over-form analysis is deeply flawed, for, among other errors, the court assumed that the BOCs could not be derivatives unless they had the substance of

Case: 26-7, 04/20/2026, DktEntry: 40.1, Page 18 of 88



vanilla options. Derivatives are diverse; few resemble vanilla options; and all are defined by their form, not their substance.

By itself, the Tax Court's egregious misapplication of the substance-over-form doctrine cannot sustain the IRS's adjustments because the Code's three-year statute of limitations blocks the IRS from assessing any underpayments from 2003 through 2008. So the court improperly invoked Section 481, a limited exception to the statute of limitations for times when a taxpayer changes its method of accounting for a taxable item. Here, however, GWA never changed its method of accounting for the BOCs—the Tax Court changed the BOCs into Basket Securities and related items.

This is *not* an appeal about *vanilla options*, their risk profile, and other substantive characteristics. This appeal concerns the fundamental legal errors embedded in the Tax Court's approach to taxing *derivatives*—an approach that is so fundamentally misguided that it puts the entire derivatives industry at risk. The court's views of optimal policy cannot trump the Code's text. Sections 1234A and 1234(a) of the Code specifically address the tax treatment of options and derivatives and respect their form. Options and derivatives are inherently formal contracts that provide rights and obligations with respect to property. When the

court elevated the substance-over-form doctrine above the Code, it committed legal error. The court's overzealous invocation of the substance-over-form doctrine conflicts with the Code and with Supreme Court precedent precluding illegal recasts and other precedent precluding the bifurcation of a single derivative into its component parts.

This is also *not* an appeal about *omission of income*—GWA fully reported all income it earned from BOCs. The issue is whether the Tax Court, after recasting the BOCs, can reallocate the income GWA reported in 2009 and 2010 as income from 2003 to 2008. Viewed rightly, the answer to that question is clear, too: the Tax Court's limited power to adjust income retroactively based on a change in accounting method isn't triggered where, as here, the Tax Court uses substance-over-form to change the underlying facts.

Finally, this is *not* a case where the taxpayer lacked authority for the way it reported the BOCs. The Tax Court's nearly 150-page opinion confirms an abundance of authority. Penalties are not warranted when the proper tax treatment of a transaction turns on a question of first impression. While GWA believed it was not negligent and that it had substantial authority for its return position, a decision to the contrary means that

this case is one of first impression—neither the court nor the IRS identified any directly applicable precedent. Either way, penalties do not apply.

For its part, the Tax Court either ignored the most important legal questions in this case, flubbed them, or relegated them to footnotes. The bulk of the court's lengthy opinion is driven by the court's use of incorrect frameworks and rules. Instead, the opinion primarily relates to complicated *factual* issues that are downstream of the court's mistaken answers to those threshold *legal* questions.

The Tax Court's judgment should be reversed.

# BACKGROUND

## I. Statutory and Regulatory Background.

### A. Derivatives and options.

This case concerns the taxation of derivatives. Derivatives are called "derivatives" because they derive their value from something else. *See Analytical Survs., Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 48 (2d Cir. 2012) (quoting *Magma Power Co. v. Dow Chem. Co.*, 136 F.3d 316, 321 (2d Cir. 1998)). A derivative is any financial instrument or contract, the value of which is "directly dependent upon (*i.e.*, derived from) the value of one or more underlying securities, equity indices, debt instruments, commodities, other derivative instruments, or any agreed upon pricing index or arrangement." CFTC, Futures Glossary: A Guide to the Language of the Futures Industry, https://perma.cc/4V5S-8P5H (last visited Apr. 10, 2026). The underlying asset may be myriad things: a stock, a bond, or another security; a basket of securities; a portfolio or an index; a commodity (such as wheat or gold); a currency; an interest rate; a tangible asset; or even another derivative. JA_[[Ex. 2100-P ¶5]]. As such, the universe of derivatives is vast, *see* JA_[[Op. 70 n.23]], and runs a gamut from common, standardized, and over-the-counter instruments to negotiated, one-of-a-kind instruments.

One type of derivative is an option. Options provide leverage, afford asymmetric exposure (*e.g.*, profit potential with limited loss potential), and can manage risk. JA_[[Ex. 2100-P ¶15]]. One particular benefit is that an option holder's downside is limited to the premium. JA_[[Tr. 219:7-14, 372:10-13, 1980:23-1981:1; Ex. 2300-P ¶¶43-44]].

There is no standard over-the-counter option because any option can be customized. JA_[[Tr. 1563:14-18]]. This includes options written over a basket of securities. JA_[[Tr. 2116:13-16; Ex. 52-J at GWA-00012985 (defining "Index Basket Option Transaction" and "Share Basket Option Transaction")]].

### B. The limits of prime brokerage accounts and margin loans.

Investors turn to derivatives for many reasons. JA_[[Ex. 2100-P ¶8]]. One important reason is that they may provide an investor access to greater leverage than that available through a prime brokerage account, which is an account offered to sophisticated clients that often includes securities lending, leveraged trade execution, and cash management. *See* JA_[[Ex. 48-J]]. Since "the 1930s, rules issued by the Federal Reserve Board—[the Margin Regulations]—placed limits on the amount of leverage that prime brokers and other lenders could offer customers." JA_[[Op. 10]]. During the years GWA held the BOCs, the Margin

Regulations set the minimum margin at 50%, limiting leverage to two times the investor's capital (*e.g.*, the owner of a prime brokerage account with $100 in capital could obtain only $200 of securities with a margin loan). JA_[[Tr. 152:5-13; Ex. 2300-P ¶¶38-39]].

Margin loans carry risk. While margin loans can greatly increase profits, they can also greatly increase losses. JA_[[Tr. 150:16-18]]. They are full recourse loans. JA_[[Tr. 151:18-24, 437:14-19]]. They are also potentially subject to margin calls, which occur when the equity in a prime brokerage account does not meet the bank's collateral requirements, whether regulatory or bank imposed. *See* JA_[[Tr. 437:1-3, 2031:18-24]].

### C. Sections 1234A and 1234(a).

Within the Code's subchapter on "Capital Gains and Losses," an entire part prescribes "Special Rules for Determining Capital Gains and Losses." *See* 26 U.S.C. §§1231-1260. Several of those special rules apply to derivatives.

One of those special rules, Section 1234A, applies to any "right or obligation … with respect to property which is … or on acquisition would be … a capital asset in the hands of the taxpayer." *Id.* at §1234A(1). Courts recognize that Section 1234A's "plain terms" clearly cover "derivative or contractual rights." *Pilgrim's Pride Corp. v. CIR*, 779 F.3d 311,

315 (5th Cir. 2015). Under Section 1234A "[g]ain or loss attributable to the cancellation, lapse, expiration, or other termination" of a derivative "shall be treated as gain or loss from the sale of a capital asset."

Another special rule, Section 1234(a), provides similar tax treatment for "options."

> Gain or loss attributable to the sale or exchange of, or loss attributable to failure to exercise, an option to buy or sell property shall be considered gain or loss from the sale or exchange of property which has the same character as the property to which the option relates has in the hands of the taxpayer (or would have in the hands of the taxpayer if acquired by him).

# II. Factual Background.

## A. GWA's quest for leverage.

GWA focused on relative value long/short investment strategies. JA_[[Op. 8]]. This was a strategy "in which pairs of stocks, typically from the same industry, were bought and sold in roughly equal dollar amounts." JA_[[Op. 7-8]]. While successful, the strategy led to modest returns—around 6%. JA_[[Tr. 148:4-12, 494:21-24]].

GWA needed around a 12% return to break even. JA_[[Tr. 149:23-150:3]]. GWA understood that obtaining and increasing leverage was therefore critical to its profitability. *See* JA_[[Op. 9]]. But, when GWA

entered into the BOCs, the Margin Regulations limited leverage in prime brokerage accounts. JA_[[Op. 10]].

To increase leverage, GWA sought investments that legally provided more leverage than the Margin Regulations allowed. This included becoming an alternate specialist on the Philadelphia Stock Exchange and investing in derivatives sold by Royal Bank of Canada. JA_[[Op. 10-12, 16-19]]. But not all investment vehicles are created equal, and GWA quickly found that these alternatives provided varying leverage, risks, costs, and administrative burdens. *See* JA_[[Op. 11, 20-21]].

## B. The BOCs.

In 2003, GWA pursued an investment with better leverage and terms, offered by DB—the BOCs. JA_[[Op. 20-21]]. The leverage embedded in the BOCs (up to 20 times leverage) was much greater than that which GWA could have legally borrowed to finance direct ownership of securities through a prime brokerage account. *See* JA_[[Op. 19, 21, 90]]. After significant research and diligence, GWA concluded that the BOCs could satisfy its leverage needs while complying with the Margin Regulations. *See* JA_[[Op. 12]]. GWA ultimately entered into ten BOCs—numbered BOC 1 through BOC 10; only BOC 1 and BOCs 7 through 10 are at issue.

The terms and characteristics of the BOCs were set forth in contracts executed by GWA and DB. *See* JA_[[Exs. 23-J, 29-J-32-J]]. In exchange for a premium payment, the BOCs provided GWA with the right to receive a cash payment based on the performance of the Basket Securities over time. DB had the corresponding obligation to make that cash payment. The BOCs' terms and characteristics were far different than those GWA could obtain through a prime brokerage account.

1. Term.

The BOCs had a term of 12 years. JA_[[Op. 5]]. The long-dated maturities of the BOCs allowed GWA to lock in leverage over an extended period of time. *See* JA_[[Tr. 239:22-240:13]]. For prime brokerage arrangements, a lender could change margin terms (leverage) on a daily basis, never to exceed the Margin Regulations' limitations. *See* JA_[[Op. 10; Tr. 438:15-21]].

2. Premium.

GWA paid a premium for each BOC. For example, GWA paid a $50 million premium for its first BOC, roughly half of GWA's capital at the time. JA_[[Tr. 218:16-19]. That investment provided GWA initial access

to $1 billion of exposure—$500 million on the long and short sides—and limited its loss to its premium. JA_[[Op. 21; Tr. 218:20-23, 219:7-14]].

An investor in a prime brokerage account does not pay a premium and, by contrast, has unlimited loss. The prime broker can recoup amounts in excess of the investor's investment because the account is fully recourse. JA_[[Tr. 151:18-24, 437:14-16]]. The investor must also make interest payments on the margin loan.

### 3. Payment obligations—cash settlement.

Upon termination or exercise, DB would make a cash payment to GWA only if the Basket Securities performed well over time. JA_[[Op. 19, 22, 25]]. Because the BOCs were cash-settled, DB did not have to acquire the Basket Securities. It did so, however, and held title to them and transferred them at will. JA_[[Op. 22; Tr. 457:19-459:3, 952:10-953:10]]. GWA had no right or ability to obtain the Basket Securities in lieu of the cash payment. *See* JA_[[Op. 19, 25]]. If the Basket Securities were held in a prime brokerage account, GWA would have owned them and been able to transfer them at will. JA_[[Tr. 453:6-12]].

### 4. Trading restrictions.

Because DB held title to the Basket Securities, it prohibited the advisor responsible for trading the securities from selecting securities on a "Trade Restricted List," which "was to ensure that DB did not violate any conflict-of-interest rules." JA_[[Op. 23]]. The advisor was also prohibited "from trading securities designated 'hot issues.'" *Id.* DB enforced those restrictions. JA_[[Tr. 235:2-18, 386:12-23]].

If the Basket Securities were held in a prime brokerage account that GWA owned, DB's trade restrictions would not have applied. JA_[[Tr. 182:19-23, 391:23-392:1, 1829:25-1830:4, 1995:8-24, 2029:17-22, 2030:13-17, 2030:25-2031:3; Ex. 2300-P ¶48]].

### 5. Voting.

"As the holder of record title to [the Basket Securities], Deutsche Bank automatically had the right to vote the shares." JA_[[Op. 82]]. Occasionally, GWA recommended how DB should vote, though DB wasn't required to follow that advice. JA_[[Op. 22, 82]].

If the Basket Securities were held in a GWA-owned prime brokerage account, GWA would have had the right to vote those shares. JA_[[Tr. 1687:16-21, 1688:24-1689:2]].

### 6. Dividends.

DB received all dividends paid on the Basket Securities. JA_[[Op. 59 ("GWA had no right to any dividends paid on shares held in the reference baskets.")]].

If the Basket Securities were held in a GWA-owned prime brokerage account, GWA, as the record owner would have received dividends and been able to withdraw dividends as cash payments. JA_[[Ex. 2300-P ¶51]].

## C. DB's ownership of the Basket Securities.

DBAG London owned the Basket Securities and held them (at least initially) in its own proprietary accounts, the MAPS Trading Accounts. JA_[[Op. 19, 22; Tr. 374:20-23, 389:24-390:20, 391:6-10, 421:22-25, 949:10-13, 1997:23-1998:21]]. The MAPs Trading Accounts were a series of accounts on DBAG London's books that held hedges to derivative products like the BOCs. JA_[[Tr. 948:7-15]]. The MAPs Trading Accounts were noncustomer (DB proprietary) accounts, which DBAG London owned, and were operationally supported by DB's equity operations team. JA_[[Tr. 945:23-946:14, 948:3-9]]. The securities in the MAPs Trading Accounts were commingled with DB's other proprietary assets in the DBAG London account at Deutsche Bank Securities, Inc. JA_[[Tr. 962:8-

17]]. The securities making up the DBAG London accounts were held in DBAG London's name. JA_[[Op. 12, 19]].

DB earned revenues from the Basket Securities, internalized and hypothecated them, and made them available to its creditors. JA_[[Op. 20; Tr. 374:20-375:4, 457:19-459:3, 949:14-22, 951:7-953:2, 1790:21-1791:7]].[1]

If the Basket Securities were held in a GWA-owned prime brokerage account, DB's ability to internalize securities would have been limited.

1 The Tax Court incorrectly found that "[n]o evidence was submitted at trial to establish that [DB] in fact lent or 'hypothecated' to short sellers any shares held in any of the Barrier Contract reference baskets." *See* JA_[[Op. 81]]. Several DB employees testified, contrary to that finding, that DB did use, lend, and hypothecate the basket securities. *See, e.g.*, JA_[[Tr. at 949:15-22 ("[O]perationally, what could DBAG, London do with the securities in the DBAG, London account? A They were considered part of their excess pool. They would be used to loan out the securities to help finance the business. They would be used to internalize shorts that other clients potentially were—were doing—transacting in."), 952:19-25 ("And how would you describe the securities that were held in the MAPs trading account? A Those were noncustomer securities and were not part of the lock-up process and were used by the business to help support their daily activities."), 374:20-375:1 ("[S]ince these were proprietarily owned portfolios, the securities were owned by the bank and therefore could be used by the bank. And the way banks would typically use securities within their balance sheet, they could lend them out, we could hypothecate them[.]")]].

Case: 26-7, 04/20/2026, DktEntry: 40.1, Page 31 of 88



JA_[[Tr. 441:2-14, 2031:4-10]]. In a customer's prime brokerage account, the prime broker can only internalize securities up to 140% of the margin loan. JA_[[Tr. 957:21-958:2]].

The Basket Securities were fully available to DB's creditors and not available to GWA's creditors. JA_[[Tr. 390:11-17, 458:1-17, 950:20-22, 951:7-952:9]]. GWA stood as an unsecured creditor of DB, whereas if GWA owned the Basket Securities in a prime brokerage account, GWA would have been a secured creditor. JA_[[Tr. 242:5-20]].

## D. Summary.

As illustrated in the table below, GWA's and DB's legal rights, obligations, and economic interests were far different from GWA's investment in the BOCs as compared to what would exist if GWA had instead invested in a prime brokerage account with DB in 2003 and 2006.

| | Prime Brokerage | BOCs |
|---|---|---|
| **Payment Obligations** | GWA owes DB an amount equal to any margin loan along with periodic interest payments. | GWA has a single payment obligation to DB (the premium).<br><br>DB has a single payment obligation to GWA (any positive cash settlement amount). |

Case: 26-7, 04/20/2026, DktEntry: 40.1, Page 32 of 88



| | Prime Brokerage | BOCs |
|---|---|---|
| **Leverage** | 2 times GWA's capital. Limited by law. | Up to 20 times GWA's premium. Limited by DB's view of risk. *See* JA_[[Tr. 739:19-740:5]]. |
| **Leverage Term** | DB can change terms overnight, at its discretion. | GWA receives a 12-year committed term, and DB could terminate at 3-year intervals. *See* JA_[[Ex. Ex. 23-J at GWA-00002916]]. |
| **Downside Risk** | GWA's loss is not limited to its capital. | GWA's loss is limited to its premium. |
| **Counterparty Risk** | GWA is a secured creditor. | GWA is an unsecured creditor. |
| **DB's Revenues (Rehypothecation)** | DB's use of securities is limited to 140% of any margin loan. | DB's use of securities is unlimited. |
| **Termination Rights** | DB or GWA can terminate at will. | GWA has no termination rights. |
| **Investment Control** | DB cannot impose investment guidelines and no restrictions applicable. JA_[[Tr. 182:19-23]]. | DB can and did impose rigid investment guidelines and restrictions. |
| **Cash Withdrawals** | GWA is permitted to withdraw cash. JA_[[Ex. 2300-P ¶51]]. | GWA is not permitted to withdraw cash. JA_[[Tr. 242:21-243:4]]. |
| **Margin Call** | DB must issue a margin call if regulatory or bank limits are violated. | Not subject to margin calls. |
| **Voting** | GWA has the right to vote the securities held in the account. | GWA has no right to vote the Basket Securities. |
| **Dividends** | GWA has an unrestricted right to dividend distributions. | GWA has no current right to dividend distributions. |

| | Prime Brokerage | BOCs |
|---|---|---|
| **Rights to the Securities** | GWA can transfer securities to another account at will. | GWA has no right or ability to transfer the securities in settlement of any obligation under the contract. |

## E. GWA's accounting methods.

Before the years at issue, GWA adopted the Section 1001/accrual methods of accounting. *See* JA_[[Ex. 151-J at GWA-00178695]]. GWA filed its returns for 1998 through 2010 using those methods. *See* JA_[[Op. 118 ("GWA is an accrual method taxpayer."); Exs. 151-J, 153-J-160-J, 1125-P-1128-P]].

In 1998 through 2010, GWA accounted for interest income, interest expense, dividends, transaction charges, short rebates, and fees, among other items, using the accrual method. *See* JA_[[Exs. 151-J, 153-J-160-J, 1125-P-1128-P]]. As required under Section 1001, GWA also recognized gains and losses realized on the sale or exchange of stocks and derivatives it owned. *See* JA_[[Exs. 153-J at GWA-00178721, 155-J at GWA ADMIN 00082874, 160-J at GWA ADMIN 00083743]].

## F. Termination and tax treatment of the BOCs.

Before 2009 and 2010, GWA did not recognize any gain or loss on the BOCs because no realization event had occurred. Before termination of

each BOC, DB made no payment to GWA under the BOCs. *See* JA_[[Op. 19, 22, 25]].

In 2009, DB terminated BOC 1. JA_[[Op. 37]]. On its 2009 Form 1065, GWA recognized $334,142,118 in long-term capital gain. JA_[[Op. 37]]. In 2009, GWA did not recognize any gain or loss on BOCs 7 through 10 because no recognition event occurred.

In 2010, the parties agreed to terminate BOCs 7 through 10. JA_[[Op. 38-39; Tr. 259:1-13]]. On its 2010 Form 1065, GWA recognized $192,679,910 in long-term capital gain. JA_[[Op. 40]].

## III. Procedural History.

The IRS issued FPAAs to GWA on December 3, 2018, for GWA's 2009 and 2010 tax years. JA_[[Exs. 161-J, 162-J]]. The FPAAs were based on the IRS's position that "the [BOCs] were not 'options' and that GWA was, in substance, the owner of the basket securities," such that GWA should have paid taxes on gains from the sale of the Basket Securities, as opposed to gains on the termination of the BOCs. JA_[[Op. 6]]. The IRS determined that the recast constituted a change in accounting method that necessitated a Section 481 adjustment. JA_[[Op. 6]]. The IRS also determined that accuracy-related penalties applied. JA_[[Op. 127]]. GWA

disagreed and petitioned for readjustment of the partnership items. The case went to a bench trial.

The Tax Court sided with the IRS. The court's voluminous opinion contains three main parts. First, the court relied on extra-statutory doctrines to recast GWA's ownership of the BOCs as, instead, direct ownership of the Basket Securities, financed by a margin loan that would have violated the Margin Regulations. Next, the court determined that its recast triggered a change in accounting method, which permitted the IRS to adjust GWA's taxable income in 2009 based on tax years outside of the statute of limitations. Finally, the Tax Court imposed accuracy-related penalties.

# SUMMARY OF ARGUMENT

## The Recast

The BOCs were bespoke derivatives: DB owned the underlying Basket Securities, and GWA owned a contractual right linked to the Basket Securities' cumulative performance. When DB terminated the BOCs in 2009 and 2010, GWA properly paid tax on its income from the BOCs in accordance with Sections 1234A and 1234(a). GWA's compliance with those sections is not seriously disputed; the Tax Court itself admitted that Section 1234A "would presumably govern" absent its recast of the BOCs.

The issues on appeal all revolve around the Tax Court's recast of the BOCs. The court legally erred in using substance-over-form to disregard the BOCs and treat GWA as if it owned the underlying Basket Securities, financed by an unlawful margin loan. The court's substance-over-form analysis rests on false assumptions about options and derivatives and ignores statutory text. At bottom, the Tax Court misapprehended that options and derivatives are defined by their formal, contractual nature (not by their substance, like their quantum of risk) and that Sections 1234A and 1234(a) respect that form. By using substance-over-form without first engaging with statutory text, the court used substance-over-

form, not as a tool of statutory interpretation, but to displace Congress's detailed scheme for taxing instruments like the BOCs.

Even assuming that substance-over-form applies, the Tax Court's application of it violates binding precedent, including *Frank Lyon Co. v. United States*, 435 U.S. 561 (1978) and *Chock Full O'Nuts Corp. v. United States*, 453 F.2d 300 (2d Cir. 1971). Precedents sharply restrict the doctrine. Courts cannot recast transactions compelled by business or regulatory realities, imbued with tax-independent considerations, and not shaped solely by tax avoidance. Nor can courts break integrated transactions into theoretical components or recast transactions into forms that would be illegal. The Tax Court erred as a matter of law in treating those restrictions as mere factors to consider rather than clear limits.

GWA needed substantial leverage to implement its investing strategy profitably, but GWA could not obtain that much leverage with a prime brokerage account because of the Margin Regulations. The BOCs achieved the needed leverage while complying with those regulations. The BOCs may have been unique, but the strategy was not; as the Tax Court admitted, investors frequently and legitimately use derivatives to replicate investing with significant leverage. Accordingly, the Tax Court

could not, as a matter of law, disregard the BOCs, let alone recast them as a 10-to-1 margin loan that would have violated the very regulations GWA was trying to comply with.

The Tax Court's reliance on substance-over-form and on the made-up investor-control doctrine requires reversing the judgment below.

## Change In Accounting Method

Because GWA reported all income from the BOCs in 2009 and 2010, the Tax Court's recast of the BOCs is legally insufficient to support the IRS's entire proposed adjustment. The IRS can collect additional tax if, and only if, the income recognized in 2009 and 2010 can be reallocated to earlier tax years (2003 through 2008) and subjected to higher tax rates for ordinary income and short-term capital gains. But 2009 and 2010 are the only "open" tax years; the government's limitations period for earlier tax years is closed.

A narrow exception to the three-year statute of limitations, Section 481, authorizes adjusting current years' income to make up for past years' deficiencies in a discrete scenario. It is aimed solely at ensuring consistency over time, not at correcting errors or rejecting positions the IRS dislikes. By its terms, Section 481 applies only when an accounting method the taxpayer used in the past is different from the method used

in the present and only when the adjustment is solely attributable to that change.

Section 481 does not apply here, as a matter of law, because GWA never changed its accounting methods. GWA consistently used the Section 1001/accrual methods to account for its income from securities generally and the BOCs specifically. And, as to the Basket Securities (assuming they are the relevant item), GWA never established a method for them because GWA did not believe it owned them.

The Tax Court purported to find a change in method here, but the only thing that changed was either *the transaction* or *the item*, but in neither case, *the method*. Even then, the change was because of the Tax Court's recast, so the Tax Court's Section 481 adjustment cannot, as a matter of law, be due *solely* to an accounting method change, as the statute requires.

Treasury regulations expounding upon statutory text confirm these conclusions. Section 481 adjustments are not available for changes in underlying facts. Section 481 adjustments are not available for misapplications of an established method—*i.e.*, the "Some but Not All Rule" (because a taxpayer who applies a method to some but not all of the items in a class simply makes a mistake and has not changed its method as to

the excluded items). And Section 481 adjustments are not available to changes that increase lifetime income (because Section 481 is concerned solely with timing). Here, the Tax Court ignored all of these limitations.

## Accuracy-Related Penalties

The Tax Court's penalty judgment is independently erroneous. As a threshold matter, penalties are inappropriate for issues of first impression. The Tax Court also made a clear logical error in imposing penalties. After accusing GWA of negligently ignoring developments *in 2009 and 2010*, the court based its penalty on amounts GWA supposedly omitted *from 2003 to 2008*. GWA never hid any income—it reported it all in 2009 and 2010—and obtained competent tax advice before filing its 2009 and 2010 returns. GWA exercised more than ordinary care through due diligence, professional preparation and review, and multiple legal memoranda.

Here, the Tax Court's nearly 150-page opinion, including its acknowledgement that GWA complied with Section 1234A, assuming that section applied, is incompatible with the court's conclusion that GWA's position was unreasonable. The statutory text and legal precedents are substantial authority and a reasonable basis for GWA's positions; the Tax Court's dismissal of these authorities was untenable.

Separately, penalties cannot, as a matter of law, be imposed based on a Section 481 adjustment arising from an involuntary change. Penalties are only for amounts "required to be shown on a return," but taxpayers are not "required" to make Section 481 adjustments unilaterally. They cannot, in fact.

# ARGUMENT

"In an appeal from the Tax Court," this Court "review[s] legal conclusions *de novo* and findings of fact for clear error." *Diebold Found., Inc. v. CIR*, 736 F.3d 172, 182-183 (2d Cir. 2013). "[M]ixed questions of law and fact are reviewed *de novo*, to the extent that the alleged error is in the misunderstanding of a legal standard." *Id.* As for accuracy-related penalties, the Tax Court's factual findings are reviewed for clear error, *see Curcio v. CIR*, 689 F.3d 217, 225 (2d Cir. 2012), and its legal conclusions, such as whether substantial authority supported the taxpayer's position, are reviewed *de novo*, *see DJB Holding Corp v. CIR*, 803 F.3d 1014, 1022 (9th Cir. 2015).

## I. The Tax Court committed legal error in recasting GWA's ownership of BOCs as ownership of the underlying securities.

GWA's BOCs were bespoke derivatives, akin to complex options. The parties and their experts agreed on that much. *See* JA_[[Tr. 361:17-362:9, 1080:23-24, 1783:13-21; Exs. 2300-P ¶¶12, 14, 2100-P ¶4, 3013-R ¶109 ("The [BOCs] are illiquid derivatives ....")]]. For a premium paid to DB ($50 million), GWA obtained a contractual right to a payout based on the performance of the Basket Securities (up to $1 billion of underlying

securities) over a period of up to twelve years. Upon termination or expiration, the contract would be cash-settled, and GWA's gain or loss would be determined by reference to—*i.e.*, derived from—the cumulative performance of the Basket Securities. *See* JA_[[Op. 25-27]].

GWA contended that its treatment of income from the BOCs was correct under Sections 1234A and 1234(a), both of which articulate the same basic rule for taxing "right[s] or obligation[s] … with respect to property," a.k.a. derivatives (Section 1234A) and "options" (Section 1234(a)). The Tax Court short-circuited GWA's contentions by applying, at the outset, the substance-over-form doctrine and holding that GWA didn't actually own the BOCs. *See* JA_[[Op. 45-88]].

- First, the court held that the BOCs lacked the substance of vanilla options. JA_[[Op. 6, 87-88]].
- Then, the court asserted that the BOCs could not be derivatives if they are not vanilla options. JA_[[Op. 70 n.23]].
- Finally, after disregarding the BOCs, the court concluded that GWA owned the Basket Securities, financed by an unlawfully leveraged margin loan—even though DB, *inter alia,* owned, voted, and hypothecated the securities; held them on its balance sheet; and made them available to its creditors. *See* Factual Background *supra* at II.C.

The Tax Court's application of the substance-over-form doctrine was erroneous for multiple reasons. *First*, the court falsely assumed that, if the BOCs were not substantively identical to vanilla options, they could not be options or derivatives. *Second*, the court improperly used the doctrine without regard to statutory text. *Third*, the doctrine does not apply to a transaction for which the taxpayer had legitimate business reasons, and the court cannot recast a transaction into an illegal transaction.

### A. The Tax Court rewrote Section 1234A and Section 1234(a) via the substance-over-form doctrine.

Back when the Code was simpler, the substance-over-form doctrine was a powerful tool for developing fair tax policy via open-ended statutory terms (like "income" and "debt"). *See Benenson v. CIR*, 910 F.3d 690, 699 (2d Cir. 2018). Today, the Code is "highly reticulated": Congress has enacted lots of provisions, using "lots of language, with nearly mathematic precision," addressing lots of transactions, facts, and circumstances. *Id.* (quoting *Summa Holdings, Inc. v. CIR*, 848 F.3d 779, 789 (6th Cir. 2017)). As the Code waxed, the substance-over-form doctrine waned and has become one of many "tool[s] of statutory interpretation." *Id.*

The doctrine no longer grants courts a roving license to recast transactions, but applies, if at all, as an interpretive aid. Substance-over-form

cannot *change* statutory text or *countermand* Congress's instruction for how to tax a transaction. "[E]xpress statutory language" incompatible with substance-over-form can "negate[]" the doctrine entirely, such as when Congress prescribes that "form—and form alone—determines the tax consequences of a transaction." *Mazzei v. CIR*, 998 F.3d 1041, 1054-55 (9th Cir. 2021) (citation marks omitted); *see Altria Grp., Inc. v. United States*, 658 F.3d 276, 284 (2d Cir. 2011); *Summa Holdings*, 848 F.3d at 786.

The Tax Court deployed substance-over-form the old way. The structure of the opinion confirms it: the court applied substance-over-form *before* and *apart from* the statutes and paid no heed to statutory text. *See* JA_[[Op. 45-47 ("The *first question we must decide* is whether the 'option' form of the [BOCs] should be disregarded ....") (emphasis added)]]. The court blinded itself to the fact that options and derivatives are *formal* instruments and that the Code respects their formal elements.

### 1. The Tax Court's substance-over-form analysis stems from false assumptions about options and derivatives.

The Tax Court rested its substance-over-form analysis on a false assumption. In comparing the substance of the BOCs with the substance of vanilla options, the court assumed that *all* derivatives—from vanilla

options to complex derivatives—have the same economic substance and are defined by that substance. But options and derivatives are fundamentally *formal*—contractual rights with respect to something else, usually property.

Options and derivatives are defined, not by their economic substance,[2] but by their formal relationship to the assets from which they derive their value. Accordingly, options and derivatives can often be substantively recast as other instruments because "virtually any instrument is replicable via another instrument or combination of instruments." Kolbrenner, *Derivatives Design and Taxation*, 15 Va. Tax Rev. 211, 227 (1995); *see* Warren, *Financial Contract Innovation and Income Tax Policy*, 107 Harv. L. Rev. 460, 467 (1993) ("[P]ut-call parity in theory permits the construction of identical financial positions that are taxed differently."). Accordingly, options and derivatives even can be substantively recast as the underlying assets, for "holding derivative securities is functionally equivalent to holding the underlying equity securities," *Magma Power Co.*, 136 F.3d at 321 (citation omitted), and there are countless ways one can formally

2 Indeed, the IRS never disputed that the BOCs had economic substance—that GWA earned more profit, and its partners paid more tax than they would have if GWA didn't invest in BOCs.

structure that relationship. *See Chechele v. Sperling*, 758 F.3d 463 (2d Cir. 2014).

In asking whether the BOCs were, in substance, "true" or "genuine" options, *e.g.*, JA_[[Op. 46]], the Tax Court was asking a question divorced from reality and from the relevant statutory text. Section 1234A applies, not to vanilla options, but to any "right or obligation … with respect to property." And Section 1234 applies to *all* "options," not just vanilla options. Sections 1234A and 1234(a) include a wide range of investments, not just vanilla options.

The Tax Court justified focusing on vanilla options by faulting GWA for "fail[ing] to identify what other type of financial instrument [the BOCs] could be." JA_[[Op. 70 n.23]]. That accusation is false. As the court elsewhere admitted, GWA identified the BOCs as "specially tailored financial instruments" that offered leverage GWA could not obtain through a prime brokerage account. JA_[[Op. 12]]. GWA did not have to identify the BOCs as a familiar type of derivative for Section 1234A to apply—because Section 1234A applies to *any* "right or obligation … with respect to property." By insisting that GWA give the BOCs a familiar label, the Tax Court imposed a requirement that Congress chose not to put into Section 1234A's text.

### 2. Sections 1234A and/or 1234 apply.

Considering the statutory text with a right understanding of options and derivatives, it is evident that Section 1234A and/or Section 1234(a) include the BOCs.

#### a. Section 1234A applies to the BOCs.

Section 1234A's textual reference to "a right … with respect to property" plainly has formal elements. It incorporates a formal distinction between property and a right with respect to that property. As such, Section 1234A's text tracks the ordinary definition of the word "derivative." *See* "*Derivative*," *Black's Law Dictionary* (12th ed. 2024) ("A financial instrument whose value depends on or is derived from the performance of a secondary source such as an underlying bond, currency, or commodity."); *cf.* 26 U.S.C. §1221(b)(1)(B)(i) (similarly defining "commodities derivative financial instrument" as "any contract or financial instrument with respect to commodities"). Courts therefore recognize that Section 1234A's "plain terms" include "derivative or contractual rights." *Pilgrim's Pride*, 779 F.3d at 315.

The BOCs created economic rights "with respect to" the Basket Securities and so fit squarely within Section 1234A.[3] Section 1234A commands that the BOCs be respected and that GWA's gain on termination be treated as a capital gain. Under Section 1222, that is long-term gain, and under Section 1001, that is recognized (reported on a tax return) when realized (when the instrument is sold or terminated). *See* 26 U.S.C. §§1001, 1222.

For its part, the Tax Court admitted that Section 1234A "would presumably govern" if the court didn't apply substance-over-form. JA_[[Op. 45 n.14]]. By applying substance-over-form and recasting the transaction, the Tax Court sidestepped Section 1234A's formal elements and reached a result contrary to Section 1234A's text. Statutory context confirms the court's error. In the tax context, when Congress wants to ignore a derivative and treat its owner as owning the underlying property, Congress says so expressly. For example:

- Section 1260 prescribes rules for deferring and taxing gains from "constructive ownership transactions," defined to include an array of

3 In granting GWA economic rights *with respect to* the Basket Securities, the BOCs did *not* grant GWA all rights *in* or *of* the Basket Securities. *See* Factual Background *supra* at II.C.

derivatives for which Congress wants contract holders to be treated as owning the underlying asset. *See* 26 U.S.C. §1260; and

- In *certain* situations, courts must ignore *certain* options to acquire stock and treat their owner as owning the underlying stock. *See* 26 U.S.C. §318(a)(4).

By applying the substance-over-form doctrine without first examining the text of Section 1234A, the Tax Court rejected Congress's detailed statutory scheme for taxing options and other derivatives.

### b. Section 1234(a) applies to the BOCs.

The Code uses the word "option" without defining it, so the word takes it ordinary meaning. In the financial sense—the sense Congress invoked—"option" means simply "the right to buy or sell designated securities or commodities." *Websters New Int'l Dictionary* 1711 (2d ed. unabr. 1953); *see Websters New Universal Unabridged Dictionary* 1360 (1996) ("a privilege acquired, as by the payment of a premium or consideration, of demanding, within a specific time, the carrying out of a transaction upon stipulated terms; the right, as granted in a contract or by an initial payment, of acquiring something in the future"). *Accord Holmes v. CIR*, T.C. Memo. 1978-437, 37 T.C.M. (CCH) 1825, at 1828 (1978) ("[A]n option is a contract by which the owner of property agrees with another that he

shall have the right to buy the property at a fixed price within a time certain." (citing 1 Williston Law of Contracts §61A (3d ed. 1957)); *Fed. Home Loan Mortg. Corp. v. CIR*, 125 T.C. 248, 261 (2005) ("(A) the option [but not the obligation] to buy or sell, (B) certain property, (C) at a stipulated price, (D) on or before a specific future date or within a specified time period, (E) for consideration").

Definitionally, the elements of an "option" are few, and the BOCs have them. In consideration of a premium payment, GWA bought the right to a Cash Settlement Amount, which was derived from the cumulative performance of the Basket Securities and which was calculable at any point in time, to be paid after twelve years unless DB terminated the transaction earlier. *See* JA_[[Exs. 23-J at GWA-00002916, -00002918, 2300-P ¶14]]. All the necessary elements are present—consideration, future performance, certain property, set period, and price.

In holding that the BOCs were not options, though the Tax Court *said* that they lacked the "essential" elements of "genuine options," JA_[[Op. 70]], the court rested that on a substance-over-form analysis that focused on *other* things, *see* JA_[[Op. 46-70]]. The court, in other words, muddled the analysis. What's more, the court focused on one, substantive difference between the BOCs and vanilla options—the risk borne by GWA and

DB. Nearly every page of the court's ownership analysis discusses "risk." But risk is not an element of an option, nor is it a component of the formal elements of an option. And focusing on DB's risk, something outside of GWA's control, cannot logically be relevant to what GWA owns. JA_[[Ex. 2101-P ¶33]]. The Tax Court's lengthy, risk-focused discussion of the *differences* between BOCs and "true options" only obscures that BOCs and "true options" are *identical* in the few ways that definitionally matter.

## B. The Tax Court misapplied substance-over-form.

### 1. The court disregarded GWA's business purpose and rendered the transactions unlawful.

A court cannot recast a transaction whose form is "compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped *solely* by tax-avoidance features that have meaningless labels attached." *Frank Lyon*, 435 U.S. at 583-84 (emphasis added); *see also Newman v. CIR*, 902 F.2d 159, 163 (2d Cir. 1990). Moreover, a court cannot recast a transaction into a form that would have been illegal, for complying with the law is a legitimate nontax purpose. *See Frank Lyon*, 435 U.S. at 575 (taxpayer had genuine nontax purpose for a complex transaction when a simpler transaction "was legally unavailable"); *see also CIR v. First Sec. Bank of Utah, N.A.*,

405 U.S. 394 (1972) (refusing to recast a transaction into a form that would have been prohibited); *Boise Cascade Corp. v. United States*, 329 F.3d 751 (9th Cir. 2003) (holding that the IRS could not recast a trustee's ownership of convertible preferred stocks as beneficially owned by employee stock ownership plan participants because those participants were not legally allowed to own such stocks); *Comdisco, Inc. v. United States*, 756 F.2d 569 (7th Cir. 1985) (refusing to recast a multiparty transaction into a form that would have violated Regulation Y).

GWA had genuine, nontax reasons for acquiring the BOCs pegged to the Basket Securities rather than directly acquiring the Basket Securities and a margin loan. GWA needed substantial leverage to be profitable. But because of the Margin Regulations, GWA could not have legally obtained enough leverage to buy the full amount of the Basket Securities financed with debt, or be profitable. *See* JA_[[Op. 19, 21, 90; Ex. 2202-P ¶¶18-21]]. The BOCs solved the dilemma: they offered substantial leverage and compliance with the Margin Regulations. JA_[[Op. 10-11, 19, 21]].

At trial, the Tax Court acknowledged the validity of GWA's business purpose and went so far as to instruct the parties not to argue about it: "I completely agree they could not have done this in a prime brokerage

account." JA_[[Tr. 2214:10-15]]; *see also* JA_[[Tr. 2211:22-2212:4 (finding that obtaining more leverage was a major motivation for GWA)]]. Yet in its Opinion, the Tax Court pivoted. It criticized GWA's purpose of seeking leveraged returns as "questionable behavior" inconsistent with the spirit of the Margin Regulations, JA_[[Op. 90-91]], but then used substance-over-form to recast the BOCs into a transaction that violates those regulations—direct ownership financed by "a margin loan at 10-to-1 leverage." JA_[[Op. 47]].

Despite criticizing GWA, the Tax Court correctly found that leveraged returns *are* legitimate, JA_[[Op. 91]], that investors *regularly* use derivatives to earn leveraged returns without loans, JA_[[Op. 91]], that GWA genuinely wanted increased leverage, JA_[[Op. 14]], and that the BOCs *increased* GWA's leverage, JA_[[Op. 92]]. At that point, the court could not, as a matter of law, recast the transaction, let alone recast it into an unlawful transaction.[4] The court disagreed, concluding that a legitimate business purpose is merely "one of many factors" in the substance-over-

4 The court's recast not only assumes GWA violated the law (by financing securities ownership with excessive leverage); it also assumes DB violated the law (by using GWA's securities in its business). *See* JA_[[Tr. 441:2-14, 957:21-958:2, 2031:4-10]].

Case: 26-7, 04/20/2026, DktEntry: 40.1, Page 55 of 88



form analysis, rather than a dispositive, triggering factor. *See* JA_[[Op. 91]].

That conclusion flips substance-over-form on its head. Substance-over-form may involve "a fact-intensive analysis into 'the objective economic realities of a transaction.'" JA_[[Op. 92 n.29 (citing *Altria Grp., Inc.*, 658 F.2d at 284)]]. But that speaks only to *how* to apply the doctrine, not *when* to apply it. The totality of the circumstances come into play if and only if a transaction *lacks* "business or regulatory realities," *is not* "imbued with tax-independent considerations," and *is* "shaped *solely* by tax-avoidance features that have meaningless labels attached." *Frank Lyon*, 435 U.S. at 583-84 (emphasis added). Here, none of those conditions was triggered: the BOCs were real (the IRS never disputed they had economic substance); they had tax-independent motivations; they were compelled by business and regulatory realities; and they were not shaped *solely* by tax avoidance.

In all events, even if *Frank Lyon*'s threshold triggers were just some of many applicable factors, they dominate *Frank Lyon*'s other factors. Since recasts are reviewed *de novo*, *see Frank Lyon*, 435 U.S. at 581 n.16, the Court should still reverse.

### 2. Substance-over-form cannot disaggregate a transaction.

The Tax Court separately erred by *disaggregating* the BOCs into theoretical components. Substance-over-form is for *aggregating* formally distinct transactions and treating them as a unit. *See Chock Full O'Nuts*, 453 F.2d 300; *see also Kuper v. CIR*, 533 F.2d 152, 153 (5th Cir. 1976) (applying the doctrine when taxpayers "have taken a circuitous route to reach an end more easily accessible by a straightforward path") *cf. Benenson*, 910 F.3d at 701-02 (explaining that the "step doctrine, which serves the substance-over-form doctrine," is used "to view linked transactions as one"). The doctrine does not work in reverse because there are countless ways to disaggregate a single transaction into parts. Accordingly, in *Chock Full O'Nuts*, this Court refused to use the doctrine to bifurcate (1) a corporate bond convertible into stock into (2) a bond, issued at a discount, and an option or warrant to purchase stock. Substance-over-form, the Court held, cannot split apart an "indivisible unit." 453 F.2d at 305.[5]

---

5 Others recognize the anti-disaggregation rule. *See Est. of McKelvey v. CIR*, 148 T.C. 312, 324 n.15 (2017) (rejecting respondent's argument that variable prepaid forward contracts should be disaggregated into three component parts because those derivative instruments "are comprehensive financial products, and [the]

(footnote continued on next page)

The BOCs were similarly indivisible investments. GWA had no right or obligation to contribute additional funds to the BOCs, either to delever the account by paying down the leverage, or to fund the purchase of additional securities. JA_[[Ex. 2300-P ¶37]]. Moreover, GWA could not transfer its derivative interest in the underlying securities without also transferring the embedded leverage. JA_[[Ex. 23-J at GWA-00002926]]. And, GWA's derivative rights with respect to the Basket Securities and the embedded leverage terminated simultaneously. JA_[[Ex. 23-J at GWA-00002918]]. These features demonstrate the BOCs' integrated nature.

Another problem with using substance-over-form to disaggregate is that it entails imposing new legal duties on participants. *Chock Full O'Nuts* warned against this and refused to recast an indivisible transaction into two transactions: under the actual deal, "the issuer has but one obligation to meet," but under the disaggregated deal, "the issuer incurs

decedent did not have the ability to transact separately in discount loans or call and put options."), *rev'd and remanded on other grounds*, 906 F.3d 26 (2d Cir. 2018); *Honeywell Inc. v. CIR*, 87 T.C. 624 (1986); *Nat'l Can Corp. v. CIR*, 520 F. Supp. 567 (N.D. Ill. 1981), *aff'd*, 687 F.2d 1107 (7th Cir. 1982).

two separate and independent obligations, and both may have to be fulfilled." *Chock Full O'Nuts*, 453 F.2d at 305.

So too here. The BOCs obligated DB to pay GWA a cash settlement amount when the contracts terminated. But under the Tax Court's recast, GWA had to pay DB interest and pay off the hypothetical loan.

### C. The Tax Court's reliance on the investor-control doctrine was legally erroneous.

To recast the BOCs, it wasn't enough for the Tax Court to *negate* them; the court had to say what they *affirmatively* were. To bolster its conclusion that the BOCs were loan-supported prime brokerage accounts, the court also rests on the "investor control doctrine." *See* JA_[[Op. 70-87]]. That doctrine is inapplicable.

Investor-control is not a standalone doctrine. No federal appellate court has ever cited or applied it beyond the insurance or annuities context. Only the Tax Court has—and even then, only in cases involving insurers because the IRS-invented doctrine originated in Revenue Rulings concerning insurer-issued annuities. *See Webber v. CIR*, 144 T.C. 324, 353-357 (2015).

The Tax Court unmoored the doctrine from its origins. The court claimed *Webber*, an opinion written by the same judge, already held that

the doctrine is not limited to insurance. *See* JA_[[Op. 72 n.24]]. *Webber* only declined to limit the doctrine to *annuities* and held that the doctrine applies to *other forms of insurance*. *Webber*, 144 T.C. at 371 ("To the extent the 'investor control' doctrine seeks to limit misuse of tax-favored investment assets, there is no good reason to limit its application to annuities. In the case of both annuities and insurance contracts, ownership is determined by which party has 'significant incidents of ownership' over the underlying assets."). *Webber* thus confirmed that the IRS-invented doctrine is insurance-specific and has no application to derivatives.

The Tax Court reasoned that the investor-control doctrine should apply to the BOCs because the "logic underpinning" the doctrine isn't limited to insurance. *See* JA_[[Op. 72 n.24]]. That is demonstrably false. Investor-control is the IRS's effort to apply a Code provision (now codified as Section 817(d)) concerning annuities and life-insurance contracts. *See Webber*, 144 T.C. at 353-356. Revenue Rulings characterize the investor-control doctrine as a specific application of the general substance-over-form doctrine, even citing *Frank Lyon* and other substance-over-form cases. *See* Rev. Rul. 2003-91, 2003-2 C.B. 347. The "logic underpinning" investor-control is just substance-over-form. At best, the Tax Court's reliance on investor-control amounts to a circuitous reliance on substance-

Case: 26-7, 04/20/2026, DktEntry: 40.1, Page 60 of 88



over-form and thus fails to sustain the court's recast of the BOCs for the same reasons that substance-over-form fails. At worst, the court's reliance on investor-control adds nothing to the court's reliance on substance-over-form: the court's discussion of investor-control, JA_[[Op. 70-87]], is as focused on "risk" as its discussion of substance-over-form. JA_[[Op. 46-70]]. By combining both doctrines, the Tax Court created an echo chamber to amplify the court's concern that the BOCs weren't risky enough.

## II. The Tax Court erred in finding a change in accounting method.

A firm, three-year statute of limitations limits the Commissioner's power to assess unpaid tax. *See* 26 U.S.C. §6501(a). In this case, the natural expiration of that limitations period shields all returns GWA filed before the 2009 tax year. Because 2009 and 2010 were the years when the BOCs terminated, GWA realized (*i.e.*, received proceeds) and recognized (*i.e.*, reported) *all* income from the BOCs in those years, and its partners paid tax on *all* of its long-term capital gains.

On the IRS's theory that GWA owned the Basket Securities, much of the income GWA recognized in 2009 and 2010 should have been recognized earlier and subject to higher tax rates. That theory falters on the

Case: 26-7, 04/20/2026, DktEntry: 40.1, Page 61 of 88



Code's three-year statute of limitations. So, the IRS invoked a limited exception, Section 481, which allows the IRS to assess tax in a current year for amounts that should have been included in a prior year—but only if there is a "change in the method of accounting" and the assessments are "solely" attributable to that change. 26 U.S.C. §481.

Both requirements must be met for Section 481 to apply. *Schuster's Express, Inc. v. CIR*, 66 T.C. 588, 594-98 (1976), *aff'd*, 562 F.2d 39 (2d Cir. 1977). Here, neither is met.

## A. Section 481 does not apply here.

Section 481 does not allow the IRS to sidestep the three-year limitations period for mistakes. *See* JA_[[Op. 116 (Section 481 "is not meant to provide a means to correct errors of past years.")]]. Section 481 is narrowly focused on ensuring consistency of accounting methods across time. Once a taxpayer selects an accounting method for an item, he cannot opportunistically change the method after the limitations period closes and thereby mix-and-match methods in different tax years to jury-rig favorable tax treatment. In those infrequent cases, the IRS can adjust the taxpayer's *current* return (*e.g.*, the first open tax year) to include income the taxpayer would have recognized in limitations-protected closed years,

had the taxpayer used the "new" accounting method for the item throughout the entire period.

Section 481 does not define its focal point—"method of accounting." Regulations do. *See* Treas. Reg. §1.481-1(a)(1) (cross-referring to Treas. Reg. §1.446-1(e)). An accounting method is "the overall plan of accounting for gross income or deductions or … the treatment of any material item used in such overall plan." Treas. Reg. §1.446-1(e)(2)(ii)(a). An accounting method is the way in which a taxpayer computes income for a specific item or a class of items. *See Huffman v. CIR*, 126 T.C. 322, 340-341 (2006), *aff'd*, 518 F.3d 357 (6th Cir. 2008).

Section 481 applies only when an accounting method *changes*, so Section 481 isn't triggered in at least two scenarios. One, if the taxpayer used one accounting method for an item or class of items, there can be no change in method (even if the taxpayer misapplied that method to an individual item). Two, if the taxpayer never established an accounting method for an item or never even recognized the item, there can be no change in method. *See Hyatt Hotels Corp. v. CIR*, T.C. Memo. 2023-122, at *35 n.30. Moreover, Section 481 applies only when adjustments are "necessary *solely by reason* of the change." 26 U.S.C. §481(a) (emphasis added).

However the Court looks at this case, Section 481 does not apply.

1. If securities (as a class) are the relevant item, GWA's accounting method never changed. — A common method of accounting for investments is the "Section 1001" method, referring to Section 1001, which provides the general "recognition" rule for tax purposes: "the entire amount of the gain or loss, determined under this section, on the sale or exchange of property shall be recognized." 26 U.S.C. §1001(c). The gain or loss is the difference between the "amount realized" and the taxpayer's "adjusted basis" in the property. 26 U.S.C. §1001(a). As the Joint Committee on Taxation explained, the Section 1001 method applies to all manner of investments, including ordinary securities and derivatives:

> Income is recognized for *most financial instruments* on a wait-and-see basis whereby the execution of the contract has no immediate income tax consequences. Instead, the taxpayer includes amounts in income when they are "realized." *For example*, although a taxpayer has income in an economic sense when the price of a *share of stock that the taxpayer owns* increases, the taxpayer does not have taxable income from that price appreciation until there is a realization event in respect of the stock—that is, until the taxpayer sells the stock .... *Income from an option or a forward or futures contract is also generally taxed on a realization basis.* As with stock, the returns on these derivative financial instruments are contingent.

Staff of J. Comm'n on Tax'n ("JCT"), 112th Cong., *Present Law and Issues Related to the Taxation of Financial Instruments and Products,* JCX-56-11, at 17 (Dec. 2, 2011) (emphasis added).

After recasting the BOCs, the Tax Court concluded that GWA had to account for gains and losses on the Basket Securities using the Section 1001/accrual methods. *See* JA_[[Op. 117-18]]. GWA has no quarrel with that conclusion; what GWA disputes is the court's assumption that the Section 1001/accrual methods amount to a *change* in GWA's methods. For, throughout the entire period at issue, GWA used the Section 1001/accrual methods—*both* for securities it directly owned *and* for the BOCs. *See* JA_[[Exs. 153-J at GWA-00178721, 155-J at GWA ADMIN 00082874, 160-J at GWA ADMIN 00083743]]. GWA accounted for its securities-related items of income and expense using the accrual method. JA_[[Exs. 153-J-160-J; Op. 118]]. And when the BOCs terminated in 2009 and 2010 (*i.e.*, the "realization" events), GWA recognized gains—in accordance with the Section 1001 method.

Whether GWA owned a single BOC or numerous Basket Securities, its accounting method for securities investments stayed the same.

<u>2. Alternatively, if the Basket Securities (and all other items of income and expense associated with them) are the relevant "items," GWA did not</u>

adopt a method for them during 2003 through 2008. — The Tax Court concluded that a change occurred because the court treated the Basket Securities and all other items of income and expense associated with them as the relevant items and concluded that, from 2003 to 2008, GWA had used "what might be called the 'open transaction'" method of accounting for the Basket Securities.[6] JA_[[Op. 117-20]]. But because GWA hadn't even recognized the Basket Securities, it never had a method of accounting for them. Fundamentally, the Tax Court confused its recast of GWA's *investment* with a change in GWA's *method of accounting* for that investment. The Tax Court changed the item, not the method.

The Tax Court's position is not bolstered by arguing that the investment and accounting methods are intertwined; Section 481 permits adjustments only when a change in method is the *sole* cause for the adjustment. Sole cause is a demanding legal standard. "The sole cause standard

6 The open transaction method *is* the Section 1001 method. Under Section 1001, income is recognized when gain or loss from a transaction can be determined. The same is true under the open transaction method. To determine gain or loss, a taxpayer needs to readily ascertain both an amount realized and the adjusted basis of property sold, disposed of, or exchanged. *See* 26 U.S.C. §1001; Treas. Reg. §1.1001-1(a). The uncertainty of either variable postpones the recognition event until the gain can be determined. *See Est. of McKelvey*, 148 T.C. at 326.

certainly requires more than just proximate and but for causation"; it requires proof that one cause "overwhelmed all other causes." *In re Sep. 11 Litig.*, 751 F.3d 86, 93 (2d Cir. 2014). As a matter of law, the Tax Court could not find that a change in accounting method is the sole cause of the Section 481 adjustment. At least one reason—if not the *sole* reason—for the adjustment is the court's recasting of the BOCs. Without that, no change in accounting method is even *arguably* presented.

## B. Regulations explicitly confirm that Section 481 does not apply.

Consistent with the text of Section 481, applicable regulations are explicit that adjustments for a change in accounting method aren't available when there is only (1) "a change in treatment resulting from a change in underlying facts"; (2) "correction of mathematical or posting errors, or errors in the computation of tax liability"; or (3) "adjustment of any item of income or deduction that does not involve the proper time for the inclusion of the item of income or the taking of a deduction." Treas. Reg. §1.446-1(e)(2)(ii)(b). This case fits within those situations.

### 1. A judicial recasting of a transaction is not a change in accounting method.

A change in the treatment of an item resulting from "a change in underlying facts" is not a change in accounting method. Treas. Reg. §1.446-1(e)(2)(ii)(b). "Fundamentally, the item itself must be basically the same as an item previously accounted for with the present method of accounting differing from the prior treatment. Unless the transactions are basically the same, the accounting treatment would not be [a] 'change' of accounting but only a 'new' accounting method for a different transaction." *See Federated Dep't Stores, Inc. v. CIR*, 51 T.C. 500, 513-14 (1968), *aff'd*, 426 F.2d 417 (6th Cir. 1970).

The Tax Court failed to distinguish *Federated*. The court described the case as involving different transactions—financing-driven sales of accounts receivable in earlier tax years and a "true sale" in the last tax year—and contrasted that with the court's view that the BOCs changed in no "relevant way between 2003 and 2009." JA_[[Op. 126 n.59]]. That misses the point. The point is that an IRS-proposed accounting-method change to a transaction that factually differs from another transaction is not a change in accounting method, but "only a 'new' accounting method for a different transaction." *See Federated*, 51 T.C. at 514. GWA believed it owned derivatives between 2003 and 2010. According to the Tax Court,

GWA owned the Basket Securities and a margin loan. That is a different transaction, factually and legally, and if GWA is treated as using a different accounting method for the recast transaction, that would be a *new method* for a *new transaction*, not a change in accounting method. *See id.*

Furthermore, the Tax Court's superficial analysis of *Federated* fails to account for Treas. Reg. §1.446-1(e)(2)(ii)(b)'s clear directive that "a change in underlying facts" is not a change in accounting method. The court's recasting here is, in the regulation's words, a fundamental "change in facts," going from ownership of one item to ownership of thousands of securities each with related gain, loss, income and expense, resulting in eleven different adjusted items under Section 481. The court's Decision shows exactly this—eleven separate adjusted items. *See* JA_[[Order and Decision]].

The Tax Court's efforts to undermine *Federated* also fail. *See* JA_[[Op. 126 n.59]]. The cases the court cited in its footnote did not involve the recasting of a single transaction and item into multiple transactions and items resulting in multiple Section 481 adjustments. Instead, the courts in those cases simply "relabel[e]d" the existing item.

2. Regardless of what it owned, GWA already had established methods for its items and did not change its accounting method.

Applying the regulations, *Standard Oil Co. (Indiana) v. CIR*, 77 T.C. 349 (1981), held that, if a taxpayer has established a method of accounting for an item, the method doesn't change when the taxpayer misapplies that method to some but not all components of an item. *See id.* at 383 (citing Treas. Reg. §1.446-1(e)(2)(ii)(b)); *see also N. States Power Co. v. United States*, 151 F.3d 876, 883 (8th Cir. 1998) (holding the taxpayer did not change its method when it "corrected an error in its pre-existing method of accounting" for the item at issue). For example, a taxpayer with an adopted method for deducting an item, such as drilling costs, does not change its method when it erroneously capitalized *some* of the drilling costs. This is the "Some but Not All Rule."

GWA relied heavily on the "Some but Not All Rule" and cited *Standard Oil* more than 30 times in its briefs. Tellingly, the Tax Court failed to mention it even once. The court had no response because, as a matter of law, the "Some but Not All Rule" defeats the IRS's case.

GWA had an established accounting method for securities it owned. *See* JA_[[Ex. 155-J at GWA_ADMIN00082874]]. It reported those securities when it sold or exchanged those securities—pursuant to the Section

1001/accrual methods. *Id.* GWA used those methods for all items of income and expense related to its securities. *See* JA_[[Ex. 159-J at GWA_ADMIN_00083524]].

If, as the Tax Court held, GWA owned the Basket Securities, a margin loan, and the items of related gain, loss, income and expense, then GWA did not *change* its accounting methods; rather, GWA simply *misapplied* (or failed to apply) its established accounting methods to the Basket Securities and associated items. In other words, GWA at most made an error by applying the Section 1001/accrual methods to some but not all of its securities. The Tax Court's correction of that error is not, as a matter of law, a change in accounting method. *See* Treas. Reg. §1.446-1(e)(2)(ii)(b); *Standard Oil*, 77 T.C. 349; *N. States Power*, 151 F.3d at 883; *Gimbel Bros. v. United States*, 535 F.2d 14, 23 (Ct. Cl. 1976).

### 3. No change in accounting method occurred because the recasting changed GWA's lifetime income.

The regulations apply to accounting method changes for material items, and a "material item is any item that involves the proper time for the inclusion of the item in income or the taking of a deduction." Treas. Reg. §1.446-1(e)(2)(ii)(a). An accounting method, in other words, is a method for determining *when* to record income and pay tax. *See*

*Schuster's Express, Inc.*, 66 T.C. at 595; *Primo Pants Co. v. CIR*, 78 T.C. 705, 722 (1982); *see also Knight-Ridder Newspapers, Inc. v. United States*, 743 F.2d 781, 798 (11th Cir. 1984) (stating a material item "determines the timing of income or deductions"). Because accounting methods are essentially timing rules, any Section 481 adjustment that changes the amount of total lifetime income, not just the timing of income, cannot be based solely on a change in accounting method. *See* Treas. Reg. §1.446-1(e)(2)(ii)(b); *Wayne Bolt & Nut Co. v. CIR*, 93 T.C. 500, 510 (1989); *Hyatt Hotels*, T.C. Memo. 2023-122; JA_[[Op. 117]].

Here, the parties agreed that the Section 481 adjustment increases GWA's lifetime income by $537,855. By recasting the BOCs as ownership of the Basket Securities plus a margin loan, the ensuing changes to GWA's income are *not* purely matters of timing—not simply a question of *when* GWA should have reported income. The changes *increase* income as well. This undisputed fact alone defeats the Tax Court's use of Section 481.

The Tax Court tied itself in knots to minimize that problem. The court agreed that "the principal focus should be on the *partnership's* lifetime income with respect to the adjusted items." JA_[[Op. 119 n.50 (emphasis in original)]]. The court also accepted that the IRS's proposed adjustment

Case: 26-7, 04/20/2026, DktEntry: 40.1, Page 72 of 88



increases the partnership's lifetime income (owing to a Section 734(b) adjustment resulting from a Section 754 election). *See id.* But instead of rejecting the proposed Section 481 adjustment for that reason, the court reframed the inquiry and considered the impact on the "*partners'* lifetime income." JA_[[Op. 124 (emphasis added)]]. That's not the right frame, as the court itself admitted elsewhere. *See* JA_[[Op. 119 n.50 ("[T]he possibility of tangential changes to an individual partner's lifetime income is irrelevant.")]]. What's more, when GWA pointed out that the recast changes *partner-level* lifetime income too (owing to the dividends received deduction and ownership of passive foreign investment company stock), the Tax Court deemed those differences irrelevant because the "'lifetime income' concept is properly applied at the partnership, not the partner, level." *See* JA_[[Op. 125, n.58]]. The Tax Court's ever-shifting, fatally-circular focus confirms the court's fundamental error. *cf. Cannon Corp. v. CIR*, 135 A.F.T.R.2d 2025-662 (2d Cir. 2025) (Summary Order) (rejecting the taxpayer's argument that the "combined" impact on lifetime income between a building owner and a building designer should be considered).

The Tax Court flipped "lifetime income" on its head. *See* JA_[[Op. 123-25]]. The court claimed that lifetime income is *one* means to assess the

materiality of an adjustment that affects timing, not the *only* means of assessing materiality. In the court's view, "'[l]ifetime income' is not an inflexible, extra-statutory test divorced from the investigation into the items' materiality." JA_[[Op. 123]].

There is no authority for that conclusion. The regulations explicitly link materiality with timing. The authorities the Tax Court cited refute its conclusion. *See* JA_[[Op. 123]]. In *Rankin v. CIR*, 138 F.3d 1286 (9th Cir. 1998), the Ninth Circuit stated that "§481 concerns *only* tax errors that involve *when* income is reported—not those concerning how much income is reported, or whether a deduction would ever have been appropriate." *Id.* at 1288 (emphases added).

If an adjustment changes lifetime income, that adjustment cannot, as a matter of law, be solely attributable to a change in accounting method. *See* Treas. Reg. §1.446-1(e)(2)(ii)(b); *Wayne Bolt*, 93 T.C. at 510; *Hyatt Hotels*, T.C. Memo. 2023-122; *see also* JA_[[Op. 117, 123]]. Because lifetime income changed here, no change in accounting method occurred.

### C. The Tax Court's approach renders the statute of limitations meaningless.

As a limited exception to Section 6501's three-year statute of limitations, Section 481 cannot be expanded to swallow Section 6501's general

rule. The limited exception also must be used with restraint. *See Hyatt Hotels Corp.*, T.C. Memo. 2023-122, at *18. Courts cannot rewrite a statute of limitations or an accompanying exception "because they might deem its effects susceptible of improvement." *Badaracco v. CIR*, 464 U.S. 386, 398 (1984). Here, the Tax Court resisted the statutory text because it worried that applying Section 481 as written would allow GWA to avoid income. JA_[[Op. 126-27]]. The court's premise is false: GWA reported *all* of its income—just in 2009 and 2010, rather than throughout the 2003 to 2010 period—and *for the items it owned*, the BOCs. The premise is also one of the court's own making; it is the recast that attempts to tax income from closed years. Ironically, if GWA had under-reported income altogether, there would be no question that the statute of limitation's text would control.

Taken together, the Tax Court's approach—its recast of the BOCs and consequent application of Section 481—rewrites Section 481 and opens a gaping hole in the statute of limitations that could apply to all taxpayers and in a broad swath of cases. Imagine a taxpayer who, unlike GWA, *never* reported a particular item from a closed tax year. Following the Tax Court's approach, the IRS could recast the item into something reportable in an open tax year, assert that the taxpayer changed its method

of accounting for the recast, unreported item, and thereby impose a Section 481 adjustment for that item in the open year, completely sidestepping the statute of limitations. The Tax Court's policy-focused justification for this approach was myopic, as it will have negative consequences. For one thing, it gives the IRS broad discretion to use Section 481 to "correct errors of past years," which the court itself acknowledged Section 481 cannot do. JA_[[Op. 116]].

In the end, weighing the pros and cons of a different statute-of-limitations policy is Congress's job. Performing that job, Congress imposed tight limits on Section 481 adjustments, which the Tax Court violated. This Court's job is to vindicate Congress's choice and reverse.

## III. The Tax Court erred in imposing accuracy-related penalties.

Because GWA's taxes were accurate as filed, accuracy-related penalties for negligence and substantial understatement of income tax must be reversed. There are also independent errors in the Tax Court's penalties decision, which require reversal even if the Court sustains the Tax Court's recast and change-of-accounting-method rulings.

For penalties, the Tax Court asked the wrong question and reached the wrong conclusion. The court repeatedly focused on whether GWA

believed the BOCs were "genuine call options." JA_[[Op. 130-32]]. That is not the question; GWA's ability to "kn[o]w the differences between a genuine call option and a de facto prime brokerage account" is not relevant. JA_[[Op. 130]]. The question is whether GWA had authority for its position that the BOCs should be taxed as derivatives. The court's misstep undermines its *entire* penalties analysis. The court also erred for other, independent reasons.

### A. The Tax Court erroneously applied penalties to an issue of first impression.

The Tax Court completely ignored a basic rule of penalties: Accuracy-related penalties do not apply to an issue of first impression. *See Neonatology Assocs., P.A. v. CIR*, 299 F.3d 221, 235 n.24 (3d Cir. 2002) ("[C]ourts have overlooked negligence penalties in cases of first impression ...."); *Everson v. United States*, 108 F.3d 234, 238 (9th Cir. 1997) ("When a legal issue is unsettled, or is reasonably debatable" a negligence penalty is generally not appropriate); *Patel v. CIR*, 138 T.C. 395, 417 (2012) (refusing to impose penalties when the law is uncertain or unsettled); *Webber*, 144 T.C. at 379 ("Where a case is one of first impression with no clear authority to guide the decision makers as to the major and complex issues, a negligence penalty is inappropriate.") (internal

quotation marks and citation omitted); *Matthies v. CIR*, 134 T.C. 141, 154 (2010) ("The negligence penalty may be inappropriate where an issue to be resolved by the Court is one of first impression involving unclear statutory language.").

Whether and how Sections 1234A, 1234(a), 1222, and 1001 or the substance-over-form doctrine apply to derivatives like the BOCs are issues of first impression. GWA identified multiple statutes and cases that support its positions. In claiming that GWA's authorities provide "no guidance," JA_[[Op. 132-33]], the Tax Court identified no authority directly addressing derivatives like the BOCs. Exotic options and derivatives are inherently customizable, so the court's attempt to find law *directly* addressing the BOCs, a bespoke derivative, was guaranteed to fail. *See* JCT, 110th Cong., *Present Law and Analysis Relating to the Tax Treatment of Derivatives*, JCX-21-08, at 12-13 (Mar. 4, 2008).

The Tax Court's penalties decision and rejection of GWA's penalty defenses rests on the court's finding that there was no authority for treating the BOCs as "options" whose gain is taxed under Section 1234(a). The court completely ignored the distinct question whether GWA reasonably treated BOCs as non-option derivatives whose gain is taxed under

Section 1234A—a characterization which even the Tax Court itself acknowledged was a close call. *See* JA_[[Op. 45 n.14]].

### B. The Tax Court erroneously determined that GWA acted negligently.

The Tax Court imposed negligence penalties, finding that GWA failed to make a reasonable attempt to comply with the Code or exercise ordinary and reasonable care in the preparation of its returns. *See* JA_[[Op. 129-133]]. The court found GWA negligently treated the BOCs as "options," a position the court decried as "too good to be true." JA_ [[Op. 133]]. In making that finding, the court relied on two events that, though they happened in 2009 and 2010, supposedly should have put GWA on notice that relying on the statutory text for reporting the treatment of derivatives was incorrect starting back in 2003. *See* JA_[[Op. 130-131]]. Penalties cannot rest on a chronological error.

According to the court, information DB[7] and the IRS provided in 2009 and 2010 should have signaled to GWA that it could not reasonably treat

7 The Tax Court erroneously asserts that "[c]oncerned about the Barrier [Option] Contracts' financial and legal risks, Deutsche Banks in 2007-2008 proposed revised terms ...." JA_[[Op. 131]]. That is not true. DB raised concerns internally in 2007 and 2008 about the *economic* risks (*not tax* risks) in the BOCs. JA_ [[Tr. at

(footnote continued on next page)

the BOCs as options for its tax returns in 2009 and 2010. *See* JA_[[Op. 131]]. On that view, GWA should have responded by treating its ownership of the BOCs as ownership of the Basket Securities. Logically, GWA could only respond *in 2009 and 2010*. Yet the Tax Court based GWA's penalty, not on amounts GWA underreported in 2009 and 2010, but on amounts GWA underreported from 2003 through 2008—before the 2009 and 2010 information even existed. That's a clear anachronism, and all penalties based on pre-2009 underreporting must be wiped out as a matter of law.

Penalties for 2009 and 2010 must be wiped out as well. GWA's treatment of the BOCs as derivatives caused it to report *more* income in 2009 and 2010 than GWA would have reported if it had owned the Basket Securities. Because those are the only years for which penalties could even possibly be available, and because GWA did not underreport income in those years, penalties for 2009 and 2010 must be zero.

Finally, the Tax Court treated 2009 and 2010 *together* even though the IRS's 2010 legal advice memorandum post-dated GWA's 2009 return.

---

731:3-14]]. After the financial crisis, around 2008 or 2009, GWA began negotiations with DB for a derivative that would pose less *economic* risk to DB. JA_[[Tr. at 916:18-23]].

Again, universal logic prevents the court from using that 2010 notice as a basis for penalizing GWA for its 2009 position. GWA reasonably responded and obtained a tax memorandum from its outside counsel on June 13, 2011—*after* the IRS issued the generic legal advice memorandum and *before* GWA filed its 2010 tax return—to determine the proper tax treatment of the BOCs. JA_[[Ninth Stip. ¶¶786-789; Fifth Stip. ¶226; Ex. 413-J]]. On June 15, 2011, GWA also sent the tax memorandum to its tax return preparer, Rothstein Kass, before Rothstein Kass filed GWA's 2010 return in September 2011. JA_[[Ninth Stip. ¶¶786-89; Ex. 160-J at GWA ADMIN 00083711]].

The Tax Court asserted that GWA should have "suspected" that the BOCs were "too good to be true." JA_[[Op. 130]]. But the evidence the court cited doesn't bear the weight of the court's inference. Mr. Doucette's handwritten notes from a conversation he had with Joe Russo, a *Merrill Lynch* employee, are hearsay and don't even relate to the BOCs. *See* JA_[[Ex. 304-J at GWA-00170118; Tr. 308:12-309:13]]. And the GWA's partners' financial services experience is *not* tantamount to sophistication with tax issues. *See* JA_[[Op. 130]].

At bottom, the question for penalties is whether the taxpayer did what a reasonable person in the same circumstances would have done.

*Matthies*, 134 T.C. at 154. Here, the Tax Court ignored that GWA and its partners exercised more than ordinary and reasonable care in determining their tax positions for the BOCs, including conducting extensive due diligence, maintaining comprehensive financial and tax workpapers, employing competent in-house accountants and attorneys, engaging qualified third-party tax professionals to prepare GWA's returns, and obtaining multiple legal memoranda related to the proper characterization and reporting of the BOCs. JA_[[Fifth Stip. ¶¶105-106; Seventh Stip. ¶757; Ninth Stip. ¶¶778-789; Tr. 141:6-14, 122:11-123:9, 511:1-512:16, 755:22-756:2, 780:14-19, 839:6-12, 844:10-16, 848:12-17, 856:13-857:2, 882:12-16]].

### C. The Tax Court committed legal error in determining that GWA lacked substantial authority.

The Tax Court ignored key authority in holding that GWA lacked substantial authority for its tax return positions. JA_[[Op. 129-34]].

For the substantial authority defense to accuracy-related penalties to apply, a taxpayer must have substantial authority for a position that is supported by a well-reasoned construction of the applicable legal authority. Treas. Reg. §1.6662-4(d)(3)(ii). Legal authority includes statutes, regulations, case law, legislative history, and certain IRS guidance. *See*

Treas. Reg. §1.6662-4(d)(3)(iii). The substantial authority standard is "less stringent than the more likely than not standard." Treas. Reg. §1.6662-4(d)(2); *see also Est. of Kluener v. CIR*, 154 F.3d 630, 639 (6th Cir. 1998) (finding substantial authority when the IRS's authority did not "overwhelm" the taxpayer's authority).

Here, statutory text and Supreme Court precedent were GWA's authorities. GWA reasonably followed the language of Sections 1234A, 1234(a), 1222, and 1001 when it reported the gain from the BOCs as long-term capital gain in 2009 and 2010. And GWA reasonably understood *Frank Lyon* as requiring the court to respect a "genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features." *See Frank Lyon*, 435 U.S. at 583-84.

In its nearly 150-page opinion, the Tax Court disregarded the text of the Code and construed *Frank Lyon* in novel ways. Its conclusion that none of these authorities "plausibly supports the positions GWA took on its returns" is ludicrous. JA_[[Op. 132-134 & n.62]]. One would not expect

an issue with "no authority" to generate one of the longest Tax Court opinions in recent memory.[8]

Given the authority that existed during the years at issue, Sections 1234A, 1234(a), 1222, 1001, and *Frank Lyon*, provide substantial authority for GWA's reporting positions.[9] GWA's authority cannot possibly be "overwhelmed" by the IRS's authority—because the IRS offered no contrary authority. *See Est. of Kluener*, 154 F.3d at 639.

---

8 The Tax Court also erroneously relied on isolated statements of potential tax risks disclosed in GWA's private placement memorandum ("PPM") and related addenda. But the SEC requirements that guide PPM disclosures have *nothing* to do with whether a derivative should be respected for tax purposes. *See I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 763 (2d Cir. 1991) (finding counsel's inclusion of certain risk statements to be entirely reasonable because they give caution to potential investors rather than encourage optimism); *Kushner v. DBG Prop. Invs., Inc.*, 793 F. Supp. 1161, 1172 (S.D.N.Y 1992) (as is typical of all PPMs, the "tax [risk] described is an opinion of counsel only.") In any event, GWA's PPM articulates 16 different categories of risks including tax risk related to an investment in GWA. JA_[[Ex. 70-J at GWA-00007222-27]].

9 Substantial authority also exists for GWA's position that it did not have a change in accounting method. *See* 26 U.S.C. §§446, 481; Treas. Reg. §1.446-1(e)(2); *Federated Dep't Stores, Inc.*, 51 T.C. at 513-14; *Standard Oil*, 77 T.C. 349.

## D. GWA also had a reasonable basis for its tax positions.

A return position will satisfy the reasonable basis standard if it is reasonably based on one or more legal authorities, and the standard is less stringent than the substantial authority standard. *See* Treas. Reg. §1.6662-3(b)(3); Treas. Reg. §1.6662-4(d)(2). For all of the reasons GWA had substantial authority for its return positions, it also had a reasonable basis for its return positions.

## E. The Tax Court erred in holding that accuracy-related penalties apply to Section 481(a) adjustments relating to involuntary changes in an accounting method.

Section 6662 imposes penalties on certain "underpayment[s] of tax required to be shown on a return." *See also* Treas. Reg. §1.6662-2(a). A Section 481(a) adjustment by its very nature cannot be "*required* to be shown on a return" because those adjustments require a change in method and respondent must consent to any change in method. *See* 26 U.S.C. §446(e); *Cap. One Fin. Corp. v. CIR*, 659 F.3d 316, 323 (4th Cir. 2011) ("a taxpayer remains obliged to secure consent even when changing from an improper to a proper method."). The Tax Court's imposition of a penalty tied to the Section 481 adjustment erroneously assumes that GWA could have made that adjustment itself on its 2009 return.

The Tax Court reasoned that, "[b]ecause Congress has directed that such adjustments 'shall be taken into account' [under Section 481] for the year of the change, the adjustments necessarily constitute tax 'required to be shown on [the] return' for the year of the change." JA_[[Op. 135-36]]. The court's logical leap cannot stand scrutiny and is circular at best. The three cases the Tax Court relied on, *Boynton v. Pedrick*, 228 F.2d 745, 746 (2d Cir. 1955), *Basic Eng'g, Inc. v. CIR*, T.C. Memo. 2017-026, *Welter v. CIR*, T.C. Memo. 2003-299, do not answer *whether* Section 481(a) adjustments initiated by an involuntary change in accounting method are subject to penalties. Nothing in the record of those cases indicates that this threshold question was even raised.

# CONCLUSION

The Tax Court's judgment should be reversed.

Respectfully submitted,

/s/ Bryan Killian

Bryan Killian
Sheri A. Dillon
James G. Steele, III
Eric J. Albers-Fiedler
Brendan J. Anderson
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T: 202-739-3000

April 13, 2026

# CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(g)(1), I certify that PAGE PROOF BRIEF ON BEHALF OF APPELLANTS meets the type-volume limitations of Rule 32(a)(7)(B) and Circuit Rule 32(e)(1) because it contains 13,981 words.

/s/ Bryan Killian

# CERTIFICATE OF SERVICE

I certify that, on this April 13, 2026, I electronically filed PAGE PROOF BRIEF ON BEHALF OF APPELLANTS with the Clerk for the United States Court of Appeals for the Second Circuit. I used the Court's CM/ECF system, which serves registered CM/ECF users. All attorneys in this case are registered CM/ECF users and were served accordingly.

/s/ Bryan Killian