# 26-7 (L), 26-222 (XAP)

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

**GWA, LLC, MICHELE M. LANZONI, TAX MATTERS PARTNER,**

**Petitioner-Appellant/**
**Cross-Appellee**

**v.**

**COMMISSIONER OF INTERNAL REVENUE,**

**Respondent-Appellee/**
**Cross-Appellant**

**ON APPEAL FROM THE ORDER AND DECISION**
**OF THE UNITED STATES TAX COURT**

## PAGE PROOF BRIEF FOR THE APPELLEE/CROSS-APPELLANT


**BRETT A. SHUMATE**
***Assistant Attorney General***
**JOSHUA WU**
***Deputy Assistant Attorney General***

**CLINT A. CARPENTER** **(202) 514-4346**
**DOUGLAS C. RENNIE** **(202) 305-7546**
***Attorneys, Tax Litigation Branch***
***Civil Division, U.S. Department of Justice***
***Post Office Box 502, Washington, D.C. 20044***

## TABLE OF CONTENTS

Page

Table of contents ........ i
Table of authorities ........ v
Glossary ........ xiii
Statement of jurisdiction ........ 1
Statement of the issues ........ 2
Statement of the case ........ 3

A. GWA ........ 4

B. Option contracts generally ........ 5

C. GWA's MAPS Contracts ........ 7

D. The IRS and U.S. Senate identify MAPS as an abusive tax shelter ........ 14

E. GWA's tax reporting ........ 16

F. The present case ........ 17

Summary of argument ........ 20
Argument ........ 24

I. The Tax Court correctly decided the issues raised by GWA's appeal ........ 24

Standard of review ........ 24

A. The Contracts were not "options," and GWA owned the underlying securities ........ 25

1. The substance-over-form doctrine ........ 25

2. The Contracts were not options ........ 27

a. Legal characteristics of "options" ........ 27

b. The Tax Court's finding that the Contracts were not "options" was correct, not clearly erroneous ..................... 30

3. GWA was the beneficial owner of the underlying securities ........................................ 35

4. GWA's arguments to the contrary are unavailing ......................................................... 42

a. Sections 1234 and 1234A do not dictate a different result ....................................... 42

b. GWA's alleged desire for leverage is not determinative .......................................... 48

c. The Tax Court did not err by "disaggregating" the transactions ............. 51

d. The Tax Court did not err by citing *Webber* ....................................................... 53

e. GWA's factual attacks fail ......................... 54

B. The Tax Court properly determined that the recharacterization of the securities triggered a change in GWA's method of accounting that necessitated an adjustment under I.R.C. §481 ........... 56

1. Introduction ..................................................... 56

2. The Tax Court properly determined that Section 481 applied here .................................... 59

3. GWA's arguments are unavailing....................... 62

a. There was a "change" in GWA's accounting method .................................... 62

b. Recharacterizing an asset can cause a change in accounting method that necessitates a Section 481 adjustment ...... 64

c. The Tax Court's decision did not "render[ ] the statute of limitations meaningless" ...... 66

d. There was no change in the partnership's "lifetime income" ...... 67

e. Applying Section 1001 to GWA's securities does not merely correct an isolated "error" ...... 70

C. The Tax Court correctly determined that GWA was liable for penalties ...... 72

II. The Tax Court erred in determining that GWA's mark-to-market election was invalid ...... 76

Standard of review ...... 76

A. Introduction ...... 76

1. Legal framework ...... 76

2. Additional facts ...... 77

3. Tax Court's reasoning ...... 79

B. GWA's mark-to-market election was valid on its face, and GWA's subjective intent cannot cast doubt on it ...... 81

1. GWA's election was facially valid, and the IRS was entitled to treat it as such ...... 81

2. The Tax Court improperly relied on extrinsic evidence to invalidate GWA's election ...... 84

Conclusion........................................................................................87
Certificate of compliance ....................................................................88

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Altria Grp., Inc. v. United States*,
658 F.3d 276 (2d Cir. 2011) ............................... 26, 35-36, 47, 50-51
*Amalfitano v. Rosenberg*,
533 F.3d 117 (2d Cir. 2008) ............................................................ 56
*Anschutz Co. v. Commissioner*,
664 F.3d 313 (10th Cir. 2011) .......................................... 37-40, 55
*Bailey v. Commissioner*,
912 F.2d 44 (2d Cir. 1990) .............................................................. 35
*Baumer v. United States*,
580 F.2d 863 (5th Cir. 1978) ........................................................... 63
*BB&T Corp. v. United States*,
523 F.3d 461 (4th Cir. 2008) ....................................................... 26-27
*Bea v. Commissioner*,
761 F. App'x 863 (11th Cir. 2019) .................................................. 81
*Benenson v. Commissioner*,
910 F.3d 690 (2d Cir. 2018) .................................. 24, 26, 46, 48, 51
*Billy F. Hawk, Jr., GST Non-Exempt Marital Tr. v. Commissioner*,
924 F.3d 821 (6th Cir. 2019) ........................................................... 47
*Bloomberg L.P. v. United States Postal Serv.*,
118 F.4th 307 (2d Cir. 2024) ........................................................... 28
*Blue Cross Blue Shield of Mass., Inc. v. BCS Ins. Co.*,
671 F.3d 635 (7th Cir. 2011) ........................................................... 20
*Boise Cascade Corp. v. United States*,
329 F.3d 751 (9th Cir. 2003) ........................................................... 49
*Boynton v. Pedrick*,
228 F.2d 745 (2d Cir. 1955),
*aff'g*, 136 F. Supp. 888 (S.D.N.Y. 1954) ......................................... 75
*Branum v. Commissioner*,
17 F.3d 805 (5th Cir. 1994) ......................................... 76, 81, 85-86
*Burnet v. Logan*,
283 U.S. 404 (1931) ......................................................................... 61
*Calloway v. Commissioner*,
691 F.3d 1315 (11th Cir. 2012) .................................... 36, 38-40, 55

**Cases (cont'd):** **Page(s)**

*Cannon Corp. v. Commissioner*,
135 A.F.T.R.2d 2025-662 (2d Cir. 2025) .......................................... 70
*Cap. One Fin. Corp. v. Commissioner*,
659 F.3d 316 (4th Cir. 2011) ........................................................ 72
*Chicago Mercantile Exch. v. SEC*,
883 F.2d 537 (7th Cir. 1989) ....................................... 28-29, 31, 33
*Chock Full O' Nuts Corp. v. United States*,
453 F.2d 300 (2d Cir. 1971) ..................................................... 51-52
*Christoffersen v. United States*,
749 F.2d 513 (8th Cir. 1984) ........................................ 38-39, 41, 54
*Comdisco, Inc. v. United States*,
756 F.2d 569 (7th Cir. 1985) ........................................................ 49
*Commissioner v. Court Holding Co.*,
324 U.S. 331 (1945) .................................................................... 27
*Commissioner v. First Sec. Bank of Utah, N. A.*,
405 U.S. 394 (1972) .................................................................... 49
*CRI-Leslie, LLC v. Commissioner*,
882 F.3d 1026 (11th Cir. 2018) ................................................ 43-44
*Davis v. Commissioner*,
210 F.3d 1346 (11th Cir. 2000) .................................................... 61
*Dewees v. Commissioner*,
870 F.2d 21 (1st Cir. 1989) ........................................................... 29
*Diebold Found., Inc. v. Commissioner*,
736 F.3d 172 (2d Cir. 2013) .......................................................... 24
*Diebold, Inc. v. United States*,
891 F.2d 1579 (Fed. Cir. 1989) ..................................................... 60
*Estate of Dimen v. Commissioner*,
72 T.C. 198 (1979), *aff'd*, 633 F.2d 203 (2d Cir. 1980) ................. 41
*Exelon Corp. v. Commissioner*,
906 F.3d 513 (7th Cir. 2018) ........................................................ 51
*Fed. Home Loan Mortg. Corp. v. Commissioner*,
125 T.C. 248 (2005) ........................................................... 29-30, 63
*Federated Dep't Stores v. Commissioner*,
51 T.C. 500 (1968), *aff'd*, 426 F.2d 417 (6th Cir. 1970) ........... 64-65
*FPL Grp., Inc. v. Commissioner*,
115 T.C. 554 (2000) ..................................................................... 66

**Cases (cont'd):** **Page(s)**

*Frank Lyon Co. v. United States*,
435 U.S. 561 (1978) ........................26, 36, 44-45, 48-49, 55, 73, 75
*Graff Chevrolet Co. v. Campbell*,
343 F.2d 568 (5th Cir. 1965) ................................................58, 67
*Gregory v. Helvering*,
293 U.S. 465 (1935) ..........................................................26
*Greiner v. United States*,
122 Fed. Cl. 139 (2015), *aff'd,* 651 F. App'x 1000 (Fed. Cir. 2016) ..........................................................63
*Halle v. Commissioner*,
83 F.3d 649 (4th Cir. 1996) ..............................................27, 29-30
*Hamilton v. Commissioner*,
955 F.3d 1169 (10th Cir. 2020) ..........................................54
*Helvering v. Clifford*,
309 U.S. 331 (1940) ..........................................................53-54
*Helvering v. Gregory*,
69 F.2d 809 (2d Cir. 1934), *aff'd,* 293 U.S. 465 (1935) .................26
*Huffman v. Commissioner*,
126 T.C. 322 (2006), *aff'd*, 518 F.3d 357 (6th Cir. 2008)..........................................................56, 71
*Huffman v. Commissioner*,
518 F.3d 357 (6th Cir. 2008) ..............................................58-59, 67
*Kern Cnty. Land Co. v. Occidental Petroleum Corp.*,
411 U.S. 582 (1973) ..........................................................29
*Knight-Ridder Newspapers, Inc. v. United States*,
743 F.2d 781 (11th Cir. 1984) ............................................59
*Liberty Glob., Inc. v. United States*,
174 F.4th 1208 (10th Cir. 2026)..........................................46-47
*Mazzei v. Commissioner*,
998 F.3d 1041 (9th Cir. 2021) ............................................25, 46
*Estate of McKelvey v. Commissioner*,
161 T.C. 130 (2023)..............................................................61
*Estate of McKelvey v. Commissioner*,
906 F.3d 26 (2d Cir. 2018)....................................................30-31
*Mingo v. Commissioner*,
773 F.3d 629 (5th Cir. 2014) ..............................................57-60

**Cases (cont'd):** **Page(s)**

*Minn. Tea Co. v. Helvering*,
302 U.S. 609 (1938) ........................................................................ 27
*Nat'l Life Ins. Co. v. Commissioner*,
103 F.3d 5 (2d Cir. 1996) ................................................................. 57
*Neonatology Assocs., P.A. v. Commissioner*,
299 F.3d 221 (3d Cir. 2002) ............................................................... 73
*Newman v. Commissioner*,
902 F.2d 159 (2d Cir. 1990) ......................................................... 24, 49
*Pac. Nat. Co. v. Welch*,
304 U.S. 191 (1938) ........................................................................ 81
*Pilgrim's Pride Corp. v. Commissioner*,
779 F.3d 311 (5th Cir. 2015) ............................................................. 44
*Plumb v. Commissioner*,
97 T.C. 632 (1991) ................................................................ 80, 85-86
*PPL Corp. v. Commissioner*,
569 U.S. 329 (2013) ........................................................................ 25
*Rankin v. Commissioner*,
138 F.3d 1286 (9th Cir. 1998) ........................................................... 68
*RCA Corp. v. United States*,
664 F.2d 881 (2d Cir. 1981) ......................................................... 24, 57
*Sanford's Estate v. Commissioner*,
308 U.S. 39 (1939) .......................................................................... 54
*Saviano v. Commissioner*,
765 F.2d 643 (7th Cir. 1985) ............................................................. 64
*Sollberger v. Commissioner*,
691 F.3d 1119 (9th Cir. 2012) ........................................................... 36
*Southgate Master Fund, L.L.C. v. United States*,
659 F.3d 466 (5th Cir. 2011) ....................................................... 25, 27
*Stahl's Estate v. Commissioner*,
442 F.2d 324 (7th Cir. 1971) ............................................................. 61
*Estate of Streightoff v. Commissioner*,
954 F.3d 713 (5th Cir. 2020) ............................................................. 25
*Summa Holdings, Inc. v. Commissioner*,
848 F.3d 779 (6th Cir. 2017) ........................................................ 45-48
*Sun Oil Co. v. Commissioner*,
562 F.2d 258 (3d Cir. 1977) ............................................................... 39

**Cases (cont'd):** **Page(s)**

*Suzy's Zoo v. Commissioner*,
273 F.3d 875 (9th Cir. 2001) .......... 58-59
*Thor Power Tool Co. v. Commissioner*,
439 U.S. 522 (1979) .......... 57
*Tucker v. Commissioner*,
766 F. App'x 132 (5th Cir. 2019) .......... 47
*U.S. Freight Co. v. United States*,
422 F.2d 887 (Ct. Cl. 1970) .......... 34
*Unger v. Commissioner*,
936 F.2d 1316 (D.C. Cir. 1991) .......... 69
*United States v. Eurodif S.A.*,
555 U.S. 305 (2009) .......... 25
*United States v. Helmsley*,
941 F.2d 71 (2d Cir. 1991) .......... 81
*United States v. Regan*,
937 F.2d 823 (2d Cir. 1991) .......... 36
*Van Raden v. Commissioner*,
71 T.C. 1083 (1979), *aff'd*,
650 F.2d 1046 (9th Cir. 1981) .......... 69
*W.U. Tel. Co. v. Brown*,
253 U.S. 101 (1920) .......... 27, 29
*Webber v. Commissioner*,
144 T.C. 324 (2015) .......... 39, 41, 53
*Wells Fargo & Co. v. United States*,
641 F.3d 1319 (Fed. Cir. 2011) .......... 37
*Witte v. Commissioner*,
513 F.2d 391 (D.C. Cir. 1975) .......... 60
*Woodbury v. Commissioner*,
900 F.2d 1457 (10th Cir. 1990) .......... 81
*Yosha v. Commissioner*,
861 F.2d 494 (7th Cir. 1988) .......... 29
*Young v. Commissioner*,
783 F.2d 1201 (5th Cir. 1986) .......... 81

**Statutes:** **Page(s)**

Internal Revenue Code (26 U.S.C.):

§ 167 .......... 47
§ 172(b)(3) .......... 85
§ 318(a)(4) .......... 47
§ 404(k) .......... 49
§ 446 .......... 19, 22
§ 446(a) .......... 56
§ 446(b) .......... 22, 56-57
§ 451 .......... 62
§ 461 .......... 62
§ 475 .......... 23, 79
§ 475(d)(3)(A) .......... 76
§ 475(f) .......... 3, 5, 80
§ 475(f)(1) .......... 76-77, 80
§ 475(f)(1)(A) .......... 76-77, 84
§ 475(f)(1)(A)(i) .......... 76
§ 475(f)(1)(B) .......... 76, 83-84
§ 475(f)(1)(D) .......... 76
§ 475(f)(3) .......... 76, 82, 87
§ 481 .......... 3, 19, 22-23, 56-59, 62, 64, 66-67, 69-73, 75
§ 481(a) .......... 19, 22, 58, 75
§ 482 .......... 49
§ 734(b) .......... 67
§ 754 .......... 67, 69
§ 1001 .......... 61-64, 70
§ 1001(b) .......... 63
§ 1001(c) .......... 63
§ 1234 .......... 28, 42, 46, 73-74
§ 1234(a) .......... 42-43, 45-46
§ 1234A .......... 42-46, 73-74
§ 1260 .......... 47
§ 6221-6234 .......... 1
§ 6226 .......... 1
§ 6226(a) .......... 1
§ 6226(b) .......... 1

**Statutes (cont'd):** **Page(s)**

Internal Revenue Code (26 U.S.C.)(cont'd):

§ 6226(f) .......... 1
§ 6662 .......... 3, 17
§ 6662(a) .......... 72, 75
§ 6662(b)(1) .......... 72
§ 6662(b)(2) .......... 72
§ 7442 .......... 1
§ 7482(a)(1) .......... 2
§ 7483 .......... 2

Bipartisan Budget Act of 2015,
Pub. L. No. 114-74, 129 Stat. 584 .......... 1

Tax Equity and Fiscal Responsibility Act of 1982,
Pub. L. No. 97-248, 96 Stat. 324 .......... 1

**Regulations:**

12 C.F.R. §220.122 .......... 51

Treasury Regulations (26 C.F.R.):

§1.446-1(a)(1) .......... 56-57
§1.446-1(a)(2) .......... 56
§1.446-1(e)(1)(2)(ii)(a) .......... 68
§1.446-1(e)(2)(ii)(a) .......... 59, 63, 66
§1.446-1(e)(2)(ii)(b) .......... 65, 71
§1.446-1(e)(2)(ii)(d)(2) .......... 60
§1.446-1(e)(2)(ii)(d)(5)(iii) .......... 60
§1.446-1(e)(2)(iii) .......... 60, 71
§1.481-2(c)(5)(i) .......... 69
§1.6662-3(b)(1)(ii) .......... 73

**Miscellaneous:** **Page(s)**

*Black's Law Dictionary* (4th ed. 1951) .................................... 28-29, 32

Fed. R. App. P. 13(a)(1)(A) ................................................................ 2

*Funk & Wagnalls New Standard Dictionary of the English Language* (1946) ........................................................ 28-29

Mark P. Gergen, *Afterword Apocalypse Not?*, 50 Tax L. Rev. 833 (1995) ............................................................ 31

John C. Hull, *Options, Futures, & Other Derivatives* (4th ed. 2000) ............................................................ 5, 31

IRS Chief. Couns. Atty. Mem. 2010-005, 2010 WL 4572692 (Nov. 12, 2010) ................................ 14

7 *Oxford English Dictionary* (1933) ............................................. 28-29

Rev. Proc. 99-17, 1999-1 C.B. 503 ................................................ 77, 82

S. Permanent Subcommittee on Investigations, *Abuse of Structured Financial Products: Misusing Basket Options to Avoid Taxes and Leverage Limits* (July 22, 2014) ........................................................... 15-16

## GLOSSARY

| *Abbreviation* | *Definition* |
|---|---|
| Amicus Br. | Brief of Amicus Curiae the American College of Tax Counsel |
| Associates | George Weiss Associates, Inc. |
| Br. | GWA's opening brief on appeal |
| Code | Internal Revenue Code (26 U.S.C.) |
| Contracts | Agreements between DB and GWA labeled as "barrier option transaction[s]" and referred to by the Tax Court as the "Barrier Contracts" and by GWA as the "BOCs" (JA__[Exs.23J to 32J]) |
| DB | Deutsche Bank AG and Deutsche Bank AG-London Branch |
| Doc. | Document in the Tax Court record, as numbered by the Clerk of the Tax Court |
| Ex. | Exhibit |
| FPAA | Notice of Final Partnership Administrative Adjustment |
| GWA | GWA, LLC, the partnership at issue, acting through its tax matters partner |
| I.R.C. | Internal Revenue Code (26 U.S.C.) |
| IRS | Internal Revenue Service |
| JA | Joint Appendix |
| MAPS | DB's "Managed Account Product Structure" tax shelter |

| *Abbreviation* | *Definition* |
|---|---|
| NAV | “Net asset value” barriers in the Contracts |
| OGI | OGI Associates, LLC, a single-member LLC wholly owned by GWA |
| Op. | Tax Court Memorandum Opinion (JA__[Doc.347]) |
| Quaker | Quaker Partners, LLC |
| RBC | Royal Bank of Canada |
| Tr. | Trial transcript (JA__[Doc.331 to Doc.340]) |
| Treas. Reg. | Treasury Regulations (26 C.F.R.) |
| WMSA | Weiss Multi-Strategy Associates, LLC |

## STATEMENT OF JURISDICTION

On December 3, 2018, the IRS mailed notices of final partnership administrative adjustment ("FPAA") under §6226 of the Internal Revenue Code ("I.R.C." or "Code")[1] to the tax matters partner for GWA, LLC ("GWA") for the 2009 and 2010 tax years. (JA__[Ex.161J; Ex.162J].) On May 1, 2019, George A. Weiss, who was both the "tax matters partner" and a "notice partner," filed a petition in the Tax Court challenging the FPAA.[2] (JA__[Doc.1 at 2].) The petition was timely under I.R.C. §6226(b). The Tax Court had jurisdiction under I.R.C. §§6226(f) and 7442.

[1] Unless otherwise indicated, all statutory and regulatory references are to the Code and Treasury Regulations, as amended and in effect for the time in question. During that period, IRS audits of certain partnerships (including GWA) were governed by the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. No. 97-248, §402(a), 96 Stat. 324, 648 (1982) (codified as amended at I.R.C. §§6221-6234). Congress repealed those partnership procedures for tax years after 2017. *See* Bipartisan Budget Act of 2015, Pub. L. No. 114-74, §1101, 129 Stat. 584, 625.

[2] Partners are authorized to challenge an FPAA on behalf of the partnership. I.R.C. §6226(a)-(b). The Tax Court amended the caption when Michele Lanzoni replaced Weiss as the tax matters partner. (JA__[Doc.356].) For simplicity's sake, this brief refers to "GWA" as the petitioner because the formal distinction between GWA and its partners is not material to the issues before this Court.

On October 7, 2025, the Tax Court issued an order and decision disposing of all parties' claims. (JA__[Doc.362].) On December 30, 2025, petitioner filed its notice of appeal. (JA__[Doc.363].) On January 30, 2026, the IRS filed its notice of cross-appeal. (JA__[Doc.363].) The appeals were timely under I.R.C. §7483 and Fed. R. App. P. 13(a)(1)(A). This Court has jurisdiction pursuant to I.R.C. §7482(a)(1).

## STATEMENT OF THE ISSUES

This case concerns the federal tax consequences of a series of purported "barrier option" contracts (the "Contracts") that GWA entered into between 2003 and 2006. The Contracts were labeled in a manner to resemble traditional option contracts but, in substance, were abusive tax shelters. The issues are:

### *GWA's appeal*

1. Whether the Tax Court correctly determined that the "option" form of the Contracts should be disregarded under the substance-over-form doctrine and that GWA should be treated as the owner of the underlying portfolios (i.e., "baskets") of securities for tax purposes.

2. Whether the Tax Court correctly determined that the adjustments to GWA's taxable income necessitated by that treatment caused a change in GWA's method of accounting that required an adjustment under I.R.C. §481 to prevent the omission of income from prior, otherwise-closed tax years.

3. Whether the Tax Court correctly determined that accuracy-related penalties under I.R.C. §6662 applied.

***Commissioner's cross-appeal***

4. Whether the Tax Court erred in holding that GWA's mark-to-market election under I.R.C. §475(f) was invalid.

## STATEMENT OF THE CASE

This case arises from GWA's participation in a scheme called "MAPS" through which GWA sought to apply the lower tax rate for long-term capital gains to more than $500 million in short-term gains and to defer taxation on $337 million of those gains. The IRS issued FPAAs disallowing the claimed effects of the scheme and imposing penalties. GWA challenged the FPAAs in the Tax Court. The Tax Court ruled for the IRS on most issues, including the true characterization of the MAPS Contracts and ownership of the

underlying securities, the resulting accounting-method change, and penalties. But the court agreed with GWA that its mark-to-market election was invalid. These cross-appeals followed.

### A. GWA

GWA is part of a family of entities affiliated with George Weiss and George Weiss Associates, Inc. ("Associates"). (JA__ [Doc.290 at 2-5].) Other relevant entities included OGI Associates, LLC ("OGI"), Quaker Partners, LLC ("Quaker"), and Weiss Multi-Strategy Advisers, LLC ("WMSA"). (JA__[*Id.* at 2].) OGI was wholly owned by GWA and is a disregarded entity for tax purposes, meaning it is treated for federal income tax purposes as having no separate existence from GWA, its owner. (JA__[Doc.189 at 5; Ex.71J at 829].)

Associates originally operated as a hedge fund. (JA__[Ex.1065J at 988].) Associates initially focused on using investors' money in a proprietary investment strategy involving trading in long/short, market-neutral strategies regarding the utility industry. (JA__[Ex.1065J at 988; Tr.492-94, 516-17.) GWA was subsequently formed and it, as well as the business in general, increasingly focused on managing the capital of the partners using a variation of that

strategy. (JA__[Tr. 146-47; Ex. 70J at 206; Ex.1065J at 988].) GWA characterized itself in its 1998 tax return as an "investment company" that also engaged in trading activity through its wholly owned subsidiary (i.e., OGI). (JA__[Doc.189 at 3; Ex.151J at 703].) With that same 1998 return, GWA also filed a mark-to-market election under I.R.C. §475(f) (JA__[Ex.152J]), which we discuss *infra*, pp. 76-87.

**B. Option contracts generally**

The present case involves putative "call option" contracts. "There are two basic types of options." John C. Hull, *Options, Futures, & Other Derivatives* 6 (4th ed. 2000). A "call option" gives the buyer the right, but not the obligation, to purchase a specified asset at a "strike" price. (JA__[Ex.3010R at 27-28].) In contrast, a "put option" gives a purchaser the right to sell at the strike price. (*Id.*)

If a call-option buyer exercises the option, the seller must deliver the asset at the strike price or provide the buyer with the difference in cash. (JA__[*Id.* at 28 & n.108].) If the asset value is higher than the strike price, it is "in the money," and if the value is lower than the strike price, it is "out of the money." (JA__[*Id.* at 28].) A "European" option is one that can only be exercised at the expiration date and not

before then. (JA__[*Id.*].) In contrast, an "American" option can be exercised at any point during the term of the contract. (JA__[*Id.* n.111].)

In exchange for the option, a buyer will pay a price to the seller called a "premium." (JA__[*Id.* at 29].) A premium is determined by many factors, including the strike price, the current value of the asset, the volatility of the returns for the asset, the asset's dividends, the interest rate, the term of the option, and other characteristics of the option (e.g., European or American). (JA__[*Id.* at 29-30].) Because those factors vary over time, the same option will likely be priced differently at distinct points in time. (JA__[Ex.3013R at 27].)

A "vanilla" option is "a basic or standard option with no special features." (JA__[Ex. 3010R at 28].) An "exotic" option is one involving non-standard features, such as a "barrier." (JA__[Ex.2100P at 20].) "Barrier" features trigger certain results if the underlying asset hits a specified threshold—for example, the option could terminate if the underlying asset's value falls below a specific level. (JA__[Ex.3010R at 29].) A barrier that terminates the option if breached is called a "knock-out" barrier. (JA__[*Id.* at 30].) Some exotic-barrier options will provide

a partial "rebate" of the premium to the option buyer in a loss scenario (i.e., when an option "knocks out"). (JA__[Ex.3011R at 6-7]; Op.48-49.) But even with exotic-barrier options, the premium, knock-out level, and term typically do not change. (JA__[Ex. 3013R at 29].)

Option buyers do not have rights of economic ownership of the underlying asset. (JA__[Ex.3010R at 29].) Thus, the buyer of an option to purchase stock, for example, would not have the right to receive dividends or vote the shares. (*Id.*)

### C. GWA's MAPS Contracts

In 2002, Deutsche Bank AG ("DB") approached GWA about DB's "MAPS" product. (JA__[Tr.185].) "MAPS" stood for "managed account products" structure. (JA__[Tr.361].) MAPS provided the investor with "delta-1" (i.e., dollar-for-dollar) exposure to an underlying portfolio or "basket" of securities. (JA__[Ex.411J at 209-210; Ex.23J at 915].) GWA had previously used a similar Royal Bank of Canada ("RBC") product. (JA__[Ex.239J]).

Beginning in 2003, GWA began trading securities through MAPS using GWA's proprietary strategies. (*See* JA__[Ex.280J at 6015].) To that end, GWA and DB's London branch entered into a series of

agreements (eventually 10 in total) labeled "barrier option transaction[s]" (i.e., the "Contracts"). (JA__[Exs.23J to 32J (capitalization omitted).) Though labeled as European-style "Call – Barrier Option[s]" (*see id.*), the Contracts had numerous unusual features:

1. *Term.* Each Contract's purported term was unusually lengthy: approximately 12 years. For example, the first Contract (Contract #1) had a 12-year term, with an expiration date of April 30, 2015. (JA__[Ex.23J at 916].) But, as indicated in the table below, each Contract terminated long before its expiration date.

2. *Termination.* GWA was able to terminate several of the contracts by creating a "Cash Event." (*E.g.*, JA__[*id.* at 919].) Under the Contracts, if the underlying basket consisted of 100% cash or cash equivalents, DB would owe interest, accruing daily, at 5% over the prevailing rate. (*Id.*) At that point, DB could either pay that "above-market return" or terminate the contract. (JA__[Tr.253].) In practice, both GWA and DB treated this as a "right[ ]" to terminate the options. (JA__[Ex.491J at 848; *see also* JA__[Ex. 483J].)

In fact, GWA did cause several of the Contracts to terminate and then managed to replicate its positions in new Contract "baskets." For Contract #2, GWA did not actually create a cash event and simply asked DB to generate a report showing a cash event. (JA__[Ex.483J; Ex.418J].) Similarly, for Contracts #3-6, GWA asked DB to terminate them and then entered into four substantially similar Contracts (#7-10). (JA__[Ex.491J at 848; Ex.419J].) GWA's positions in the baskets for Contracts #3-6 were rolled into its positions for Contracts #7-10 via position journaling (JA__[Ex.491J at 848]), which allowed it to move its positions between the accounts without executing market trades. (JA__[Tr.1083, 1086]). GWA similarly asked to terminate Contract #1 in 2009 and Contracts #7-10 in 2010. (JA__[Ex.447J at 480; Ex.451J at 954-55; Ex.493J at 397].) DB complied. (JA__[Ex.420J; Ex.434J; Ex.497J at 822-24].)

3. *Premiums.* Premiums were set as a percentage of the total notional value. (*See* JA__[Ex.411J at 214].) For Contract #1, the premium was $50 million—i.e., 10% of the notional amount ($500 million). (JA__[Ex.23J at 916].) Part of the premium was "fixed" and

12% of it was "amortizable" ($44 million and $6 million, respectively, for Contract #1). (*Id.*)

Upon expiration or termination, however, GWA would receive a "Cash Settlement Amount" consisting of an amount calculated based on the basket securities' performance and a "Premium Settlement Amount." (JA__[*Id.* at 917-18, 922].) And even though some of the amortizable premium was supposedly excluded from the "Premium Settlement Amount" (*see id.* at 922), DB returned the difference as a "Financial Differential." (*E.g.*, JA__[Ex. 1025J; Ex. 1030J].) Contracts #1-2 required this by reducing the amount of the amortized daily premium ($1,364) from GWA's ultimate payout (as part of the calculation of "Basket Base Performance"). (*E.g.*, JA__[Ex.23J at 922].) Contracts #3-10 did the same thing in a slightly different manner. (*E.g.*, JA__[Ex.25J at 3052 (including the "Total Amortized Premium" in the amount of "Basket Income and Expenses"); Doc.100 at 33].) Thus, for all 10 Contracts, the full amount of the premium was returned to GWA at termination. (JA__[Ex.3010R at 32].)

4. *Barrier*. The barrier was calculated with reference to an "NAV" (net asset value), where the original account value was indexed

to 100. (JA__[Ex.23J at 917].) If the NAV hit the "Expiration Price Notice Level" of 97, GWA would have to pay additional premium ($15 million for Contract #1) or the contract would expire. (JA__[*Id.* at 917, 920-21].) Similarly, the contract would expire if the NAV hit the "Expiration Price" level of 94. (*Id.*)

5. *Investment manager.* Although DB purportedly held title, the securities were managed by Quaker, which subcontracted its authority to Associates and later to WMSA. (JA__[Ex.33J; Ex.34J; Ex.35J; Ex.38J; Ex.39J]; *see also, e.g.*, JA__[Ex.25J at 3055] (listing Quaker as the "Investment Advisor").) Quaker had no other activities or employees. (JA__[Tr.292; Doc.290 at 7].) Quaker's fees, which were below market (JA__[Ex.3013R at 51-52 ¶102]), were then deducted from the payout to GWA (*see* JA__[Ex.23J at 923] ("investment advisory fees" deducted with "Basket Losses and Expenses"); JA__[Tr.893]).

6. *Seller's compensation.* Although DB returned the premiums to GWA, DB was compensated. GWA paid DB various fees for services related to the Contracts, including "Ticket Charges" of $3 per trade, which was the same rate DB charged for prime-brokerage accounts.

(JA__[Ex.393J].) DB also charged fees for leverage that were identical to its charges for prime-brokerage accounts. (*Id.*)

*7. Economic ownership.* Under the Contracts, the settlement amount GWA would receive on termination included the amount of any dividends for long positions and subtracted dividends on short positions. (*E.g.*, JA__[Ex.23J] at 922-23 (calculation of "Basket Base Performance").) GWA also filed claims in class action lawsuits for securities in the baskets and deposited proceeds into its accounts. (JA__[Tr.658-59, 904-05].)

The last of the Contracts terminated in 2010, thus ending GWA's use of the Contracts to trade securities. Key terms for each Contract are summarized below.

| ***Contract*** | ***Notional value (millions)*** | ***Premium (millions)*** | ***Trade date*** | ***Expiration date*** | ***Actual termination*** | ***Cite*** |
|---|---|---|---|---|---|---|
| #1 | $500 | $50.0 | 4/15/2003 | 4/30/2015 | 4/30/2009 | JA__[Ex.23J; Ex.420J] |
| #2 | $500 | $52.8 | 5/22/2003 | 4/30/2015 | 12/21/2005 | JA__ [Ex.24J; Ex.418J] |
| #3 | $184 | $18.4 | 12/21/2005 | 12/21/2017 | 12/22/2006 | JA__ [Ex.25J; Ex.419J] |
| #4 | $276 | $27.6 | 12/21/2005 | 12/21/2017 | 12/22/2006 | JA__ [Ex.26J; Ex.419J] |
| #5 | $184 | $18.4 | 12/21/2005 | 12/21/2017 | 12/22/2006 | JA__ [Ex.27J; Ex.419J] |
| #6 | $276 | $27.6 | 12/21/2005 | 12/21/2017 | 12/22/2006 | JA__ [Ex.28J; Ex.419J] |
| #7 | $184 | $18.4 | 12/12/2006 | 12/18/2018 | 5/14/2010 | JA__ [Ex.29J; Ex.429J at 5013] |
| #8 | $276 | $27.6 | 12/12/2006 | 12/18/2018 | 5/14/2010 | JA__ [Ex.30J; Ex.429J at 5014] |
| #9 | $184 | $18.4 | 12/12/2006 | 12/18/2018 | 5/21/2010 | JA__ [Ex.31J; Ex.434J] |
| #10 | $276 | $27.6 | 12/12/2006 | 12/18/2018 | 5/14/2010 | JA__ [Ex.32J; Ex.429J at 5015] |

Around the same time that GWA entered the first Contracts, its wholly owned (and disregarded for tax purposes) subsidiary, OGI, opened a prime-brokerage account with DB. (JA__[Ex.48J; Ex.71J at 829].) GWA, OGI, and DB then entered into a "Master Netting Agreement" that allowed for the cross-collateralization of the accounts. (JA__[Ex.40J; Ex.41J].) That allowed OGI to borrow against the value of the basket securities and use the proceeds for other purposes. (JA__[Tr.243-44].)

### D. The IRS and U.S. Senate identify MAPS as an abusive tax shelter

As time went on, DB's legal department became concerned about MAPS and wanted to make changes to it. (JA__[Tr.731].) DB and GWA discussed a new version of MAPS, but GWA did not find it appealing. (JA__[Tr.258-59, 916].)

The legal department's concerns were warranted. In 2010, the IRS Office of Chief Counsel issued a memorandum addressing the tax treatment of "Hedge Fund Basket Option Contracts." IRS Chief. Couns. Atty. Mem. 2010-005, 2010 WL 4572692 (Nov. 12, 2010). In it, the IRS addressed a highly analogous scenario involving a taxpayer that "entered into a contract styled as an option to purchase a basket of securities that the taxpayer's general partner also actively managed and controlled while the contract remained open" giving the taxpayer the "opportunity for full gain and income and substantially all risk of loss." *Id.* The IRS concluded that the "contract does not function like an option, and should not be treated as such," and that the contract provided the taxpayer with "beneficial ownership of the securities for tax purposes." *Id.* DB forwarded the memorandum to GWA within days of its issuance. (JA__[Ex.412J; Ex.413J.)

Shortly thereafter, DB entered into a nonprosecution agreement with the Department of Justice in which DB promised to stop promoting fraudulent tax shelters. S. Permanent Subcommittee on Investigations, *Abuse of Structured Financial Products: Misusing Basket Options to Avoid Taxes and Leverage Limits* 78 (July 22, 2014) [hereinafter *Senate Report*]. In 2013, it disclosed the MAPS transactions to the Department, but only after the Federal Reserve insisted that it do so. *Id.* at 79.

In 2014, the Senate Permanent Subcommittee on Investigations specifically identified MAPS as a scheme that GWA (among others) used "to avoid federal taxes and leverage limits on buying securities with borrowed funds." *Senate Report*, *supra*, at 1. The underlying securities trades were primarily "short-term transactions," "some of which lasted only seconds." *Id.* "Yet the resulting short-term profits were frequently cast as long-term capital gains subject to a 20% tax rate (previously 15%) rather than the ordinary income tax rate (currently as high as 39%) that would otherwise apply to investors in hedge funds engaged in daily trading." *Id.* "[I]n essence, the banks loaned the hedge funds money to finance their trading and allowed them to trade for

themselves in highly leveraged positions in the banks' proprietary accounts and reap the resulting profits." *Id.*

**E. GWA's tax reporting**

GWA reported the proceeds from the Contract terminations—totaling $526 million—as long-term capital gain on its tax returns for the years 2009 and 2010, which were the last two years in which any of the Contracts terminated. (JA__[Doc.189 at 6-7]; *see* p. 13, *supra*.) GWA also reported proceeds from class action settlements as long-term capital gain. (JA__[Tr.905-06].)

After an audit, the IRS issued FPAAs for GWA's 2009 and 2010 tax years determining that, for federal tax purposes, the Contracts were not options and GWA was the owner of the basket securities. (JA__[Ex.161J; Ex.162J].) The IRS also determined that the mark-to-market election that GWA filed with its 1998 return applied to all securities held by GWA, including the basket securities. (*See id.*) And it determined that treating GWA as the owner of the securities resulted in a change to its method of accounting, precluding GWA from deferring or avoiding taxation on $337 million in gains on those securities in the

years 2003 through 2008. (*Id.*) The IRS also applied accuracy-related penalties under I.R.C. §6662. (*Id.*)

### F. The present case

GWA challenged the FPAAs in the Tax Court. (JA__[Doc.1].) After a 10-day trial, the court (Judge Albert G. Lauber) issued a memorandum opinion ruling in part for the IRS and in part for GWA. (JA__[Doc.347].)

The court agreed with the IRS that the Contracts were not options and that GWA was the owner of the basket securities. (JA__[Op.6, 45-70].) In doing so, the court applied the doctrine that "substance, not form, determines the proper characterization of a transaction" for tax purposes. (JA__[Op.45].) In substance, "GWA held and traded the basket securities through a prime brokerage account, and [DB] financed GWA's investment in those securities by extending a margin loan at 10-to-1 leverage, with the putative 'premium' serving as collateral for that loan.'" (JA__[Op.47].) The court based that determination on its exhaustive analysis of numerous factors, including the consideration paid, pricing, term, underlying assets, early termination, treatment of dividends, absence of risk to DB, and lack of optionality to GWA.

(JA__[Op.47-70].) And the court determined that GWA was the owner of the underlying securities because GWA bore the risk of loss, enjoyed the opportunity for upside gains, had control, had other benefits and burdens of ownership (i.e., dividends and other costs), had the ability to extract cash, and used that ability in conjunction with OGI's prime-brokerage account to maintain its proprietary strategies. (JA__[Op.70-88].)

In reaching those conclusions, the court found the testimony of Professor Paul Glasserman, an IRS expert, to be particularly "persuasive" and "reliable," in contrast to GWA's expert. (JA__[Op.64, 73].) And the court rejected GWA's argument that the "option" form of the Contracts should be respected merely because they were intended in part to secure greater leverage than was permissible with a prime-brokerage account. (JA__[Op.88-92].)

In light of the court's determinations that the Contracts were not options and that GWA owned the basket securities, GWA should have accounted for all items of income and expense associated with the securities on an annual basis. (JA__[Op.6, 114-27.) As a result, the court concluded that most (up to $337 million) of the income GWA had

reported for 2009 and 2010 ($526 million) should have been reported for the years 2003-2008—*i.e.*, the years before 2009 in which GWA owned and traded basket securities. (JA__[Op.114, 127].) Although those earlier years were not before the court (because the FPAAs were for 2009 and 2010), the court agreed with the IRS that the adjustments to GWA's income necessitated by its substantive ownership of the basket securities constituted a change in GWA's "method of accounting" within the meaning of I.R.C. §§446 and 481. (JA__[Op.6, 114-27].) And the court agreed further that this change in accounting method necessitated an adjustment under I.R.C. §481(a) to GWA's income for 2009 in order to prevent the income that GWA should have reported for 2003-2008 from being forever omitted. (Op.120-21.)

As we discuss more fully *infra*, pp. 72-75, the court also agreed with the IRS that accuracy-related penalties applied. (JA__[Op.127-36].) But as we discuss more fully *infra*, pp. 76-87, the court rejected the IRS's position that GWA was required to mark all of its securities to market. Instead, the court agreed with GWA's argument that its 1998 mark-to-market election was invalid. (JA__[Op.6, 92-113].) The court

subsequently issued an order and decision detailing the adjustments required by its opinion. (JA__[Doc.362].)[3]

## SUMMARY OF ARGUMENT

> Abraham Lincoln once was asked how many legs a donkey has if you call its tail a leg. His answer was four: calling a tail a leg does not make it one.

*Blue Cross Blue Shield of Mass., Inc. v. BCS Ins. Co.*, 671 F.3d 635, 637 (7th Cir. 2011) (Easterbrook, J.) (citation omitted).

This case concerns the MAPS tax shelter, a scheme concocted by Deutsche Bank and used by GWA to defer taxes and claim favorable tax rates on hundreds of millions of dollars. Key to its hoped-for success was the label GWA and DB attached to their MAPS Contracts: "options." But the Contracts were "options" in name only. Nearly every aspect of the "options" functioned, in reality, as a prime-brokerage account without the borrowing limits mandated by the Federal Reserve. The IRS audited the scheme, and recognizing it for what it was, made significant adjustments to GWA's tax reporting. GWA challenged the

---

[3] The Court did not address several arguments the IRS raised in the alternative. (*See, e.g.*, JA__[Op.118 n.49]; JA__[Doc.310 at 270-87].) If this Court were to reverse on any of the issues raised by GWA, it would need to remand for the Tax Court to address those issues.

adjustments in the Tax Court. The court ruled, in large part, for the IRS, but agreed with GWA that its mark-to-market election was invalid.

1. In its appeal, GWA insists that the MAPS scheme was legitimate and must be respected for tax purposes. But calling the Contracts "options" does not make them so. The Tax Court was correct to apply the substance-over-form doctrine and recharacterize the transactions for what they were. That doctrine is well-founded in Supreme Court precedent and this Court's caselaw. The court here correctly applied the law to the evidence and determined that the Contracts were not "options" and that GWA was the true owner of the underlying securities.

The statutes that GWA cites do not compel a different result, nor is this case akin to instances where Congress has explicitly provided tax benefits for non-substantive transactions. GWA's post-hoc effort to relabel the "options" as "derivatives" does not help it either as the latter term has no statutory significance. Nor does the fact that GWA allegedly hoped to use the MAPS Contracts to end-run the Federal Reserve's margin regulations change the outcome. And its remaining

attacks on the court's opinion amount to disputes with the court's factual findings, which were far from clearly erroneous.

2. The Tax Court correctly held that accurately characterizing GWA as the owner of the securities underlying the Contracts effected a change in GWA's accounting method under I.R.C. §§446 and 481. GWA had used the "open transaction" method to defer taxation on its trading gains. But that method was predicated on treating the Contracts as options and thus did not "clearly reflect" GWA's income as the owner of the underlying securities. I.R.C. §446(b). Consequently, the IRS was entitled to change GWA's accounting method to properly reflect its gains and other items on an annual basis. And to prevent the omission of income from prior years that were not at issue, I.R.C. §481(a) required that the income be taken into account for GWA's 2009 year. Nothing about that result violates the statute of limitations—the whole point of I.R.C. §481 is to prevent windfalls when a change in accounting method would cause the omission or duplication of income that the IRS is time-barred from adjusting directly. GWA's arguments to the contrary are without merit.

3. GWA's attacks on the court's decision to impose accuracy-related penalties also fail. Although this is the first appellate case involving the MAPS tax shelter, it involves well-settled principles of taxation. GWA was run by sophisticated professionals who should have known that the Contracts were not legitimate options. Moreover, none of the authorities GWA cites stands for the proposition that financial instruments resembling the Contracts should be treated as "options" for tax purposes. Nor is there any rule that precludes the imposition of accuracy-related penalties on Section 481 adjustments.

4. The court's lone error was in concluding that GWA's mark-to-market election under I.R.C. §475 was invalid. The court improperly relied on extrinsic evidence that was not available to the IRS when GWA filed the election with its 1998 return—namely, the fact that GWA held and traded securities outside of OGI. And whether GWA had an uncommunicated, subjective intent to limit the election in an impermissible manner is irrelevant. The election was made by GWA, not OGI, was valid on its face when filed, and the objective manifestation of GWA's unequivocal intent to make that election is all that matters.

# ARGUMENT

## I. The Tax Court correctly decided the issues raised by GWA's appeal

### Standard of review

This Court reviews legal conclusions of the Tax Court "de novo and findings of fact for clear error." *Diebold Found., Inc. v. Commissioner*, 736 F.3d 172, 182 (2d Cir. 2013). Mixed questions of law and fact are reviewed "de novo to the extent that the alleged error is in the misunderstanding of a legal standard and clear error to the extent the alleged error is in a factual determination." *Id.* at 174.

Thus, "[t]he proper characterization of a transaction for tax purposes is a legal question that [the Court reviews] *de novo*." *Benenson v. Commissioner*, 910 F.3d 690, 697 (2d Cir. 2018). But the "factual findings underlying that determination" are reviewed for clear error. *Newman v. Commissioner*, 902 F.2d 159, 162 (2d Cir. 1990). And the IRS's decision to disallow a taxpayer's accounting method is reviewed for abuse of discretion. *RCA Corp. v. United States*, 664 F.2d 881, 882 (2d Cir. 1981).

### A. The Contracts were not "options," and GWA owned the underlying securities

#### 1. The substance-over-form doctrine

Virtually all sophisticated tax shelters are labeled so as to satisfy the relevant tax rules. But it is a "black-letter principle" that, in construing and applying the tax laws, courts "follow substance over form." *PPL Corp. v. Commissioner*, 569 U.S. 329, 340 (2013); *see also United States v. Eurodif S.A.*, 555 U.S. 305, 317-18 (2009) (when reading tax statutes, "form should be disregarded for substance and the emphasis should be on economic reality" (citation omitted)). The doctrine serves as "a sort of 'preamble to the Code, describing the framework within which all statutory provisions are to function.'" *Mazzei v. Commissioner*, 998 F.3d 1041, 1054 (9th Cir. 2021) (citation omitted). This is "no schoolboy's rule"; it has been called "the cardinal principle of income taxation." *Southgate Master Fund, L.L.C. v. United States*, 659 F.3d 466, 478-79 (5th Cir. 2011) (citation omitted).

"The substance over form doctrine permits a court to determine a transaction's characterization according to [the] 'underlying substance of the transaction rather than its legal form.'" *Estate of Streightoff v. Commissioner*, 954 F.3d 713, 719 (5th Cir. 2020) (citation omitted). It

thus "guards against 'labeling-game shams' by 'attending to economic realities' in deciding, for example, whether words used in the tax code, such as 'income, reorganization, and debt, contribution or dividend,' cover particular transactions." *Benenson*, 910 F.3d at 699 (citation and alteration marks omitted). Thus, "even if a transaction's form matches 'the dictionary definitions of each term used in the statutory definition' of the tax provision, 'it does not follow that Congress meant to cover such a transaction' and allow it a tax benefit." *Altria Grp., Inc. v. United States*, 658 F.3d 276, 284 (2d Cir. 2011) (quoting *Helvering v. Gregory*, 69 F.2d 809, 810 (2d Cir. 1934), *aff'd,* 293 U.S. 465 (1935)). "In applying this doctrine of substance over form, the Supreme Court has looked to the objective economic realities of a transaction rather than to the particular form the parties employed." *Id.* (quoting *Frank Lyon Co. v. United States*, 435 U.S. 561, 573 (1978)) (brackets omitted).

Substance-over-form allows the IRS "to recognize [the transaction] for what it [i]s, not what [the taxpayer] professe[s] it to be." *BB&T Corp. v. United States,* 523 F.3d 461, 477 (4th Cir. 2008). Thus, in the seminal decision in *Gregory v. Helvering*, 293 U.S. at 468, the Supreme Court disregarded a transaction that complied with "every element

required by" the relevant law. Thereafter, the Supreme Court and courts of appeals similarly recharacterized transactions that failed to reflect their true nature. *E.g., Commissioner v. Court Holding Co.*, 324 U.S. 331, 332-34 (1945); *Minn. Tea Co. v. Helvering*, 302 U.S. 609, 611-14 (1938); *Southgate*, 659 F.3d at 491-92; *BB&T*, 523 F.3d at 472-74.

**2. The Contracts were not options**

The Tax Court properly concluded that the Contracts were not "options." (JA__[Op.45-70].) GWA contends that the court erred by applying the substance-over-form doctrine and recasting the transaction. (Br.23-24.) It couches its challenge as a legal one but also attacks the court's underlying factual findings. (Br.6, 16-20, 29-30.) The Tax Court's conclusion was legally and factually sound.

**a. Legal characteristics of "options"**

The term "option" has long been understood to mean "a privilege given by the owner of property to another to buy the property at his election." *W.U. Tel. Co. v. Brown*, 253 U.S. 101, 110 (1920). "It secures the privilege to buy and is not of itself a purchase. The owner does not sell his property; he gives to another the right to buy at his election." *Id.*; *see also Halle v. Commissioner*, 83 F.3d 649, 654 (4th Cir. 1996).

GWA relies on I.R.C. §1234, which discusses the tax treatment of "options" but does not define the term. "When a statute does not define a specific term, [courts] 'look to its ordinary meaning found in contemporary dictionary definitions.'" *Bloomberg L.P. v. United States Postal Serv.*, 118 F.4th 307, 317 (2d Cir. 2024) (citation omitted). Section 1234 dates to 1954. I.R.C. §1234 (1952 supp. II) (referring to "a privilege or option"). Dictionaries in use at that time are in accord with the caselaw.[4]

Thus, "options"—be they "vanilla" or "exotic"—have fundamental characteristics as a matter of law. *See Chicago Mercantile Exch. v.*

---

[4] "Option," 7 *Oxford English Dictionary* 164 (1933) ("The privilege (acquired on some consideration) of executing or relinquishing, as one may choose, within a specified period a commercial transaction on terms now fixed; esp. that of calling for the delivery, or making delivery, or both, within a specified time, of some particular stock or produce at a specified price and to a specified amount.") [hereinafter *Oxford*]; "Option," *Funk & Wagnalls New Standard Dictionary of the English Language* 1733 (1946) ("The purchased privilege of either delivering a specified amount of something (generally securities, commodities, or land) at a specified price within a specified time (a put), or calling for and receiving such delivery (a call).") [hereinafter *Funk*]; "Option," *Black's Law Dictionary* 1245 (4th ed. 1951) ("A privilege existing in one person, for which he has paid money, which gives him the right to *buy* certain merchandise or certain specified securities from another person, if he chooses, at any time within an agreed period, at a fixed price, or to *sell* such property to such other person at an agreed price and time.") [hereinafter *Black's*].

*SEC*, 883 F.2d 537, 546 (7th Cir. 1989). First, options must be "acquired on some consideration." *Oxford*, *supra*, at 164. This is a "premium" that economics will dictate as informed by expert opinion. *Kern Cnty. Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582, 604 (1973). Second, options have a term—they remain "open for a defined period." *Halle*, 83 F.3d at 654. This is typically "a limited time." *Yosha v. Commissioner*, 861 F.2d 494, 495 (7th Cir. 1988). Third, they involve the right to buy underlying property, *W.U. Tel.*, 253 U.S. at 110, generally, "a commodity," *Yosha*, 861 F.2d at 495, "certain merchandise[,] … certain specified securities," *Black's*, *supra*, at 1245, "or land," *Funk*, *supra*, at 1733. Fourth, and most critically, an option involves a "*choice*." *Halle*, 83 F.3d at 654; *accord Dewees v. Commissioner*, 870 F.2d 21, 23 (1st Cir. 1989) (Breyer, J.) ("When one buys an option on future silver, one does not have to exercise it; one merely has a *right* to exercise it.").

In sum, "[a] contract is an option contract when it provides (A) the option to buy or sell, (B) certain property, (C) at a stipulated price, (D) on or before a specific future date or within a specified time period, (E) for consideration." *Fed. Home Loan Mortg. Corp. v. Commissioner*, 125

T.C. 248, 261 (2005) (citations omitted); (*accord* Br.38.) To determine whether a contract is an option, courts have "carefully examine[d] both the language and economic substance of the agreement." *Halle*, 83 F.3d at 654.

**b. The Tax Court's finding that the Contracts were not "options" was correct, not clearly erroneous**

The Tax Court found that the Contracts were not "options" because they "lacked the essential economic and legal characteristics of options." (JA__[Op.46].) Key features of the Contracts show that finding was correct—specifically, the treatment of consideration, pricing, term, underlying property, termination, dividends, risk, and choice (or "optionality").

*(1.)* *Consideration*. (JA__[Op.47-49].) As the Tax Court explained, the "premium compensates the optionor for accepting the investment risk that the stock, at a future date, will be called away from him for less than the stock is then worth." (JA__[Op.47].) But here, the premium was returned to GWA in full. (*See* pp. 9-10, *supra*.)

*(2.)* *Pricing*. (JA__[Op.49-51].) Pricing an option is generally a very complicated process reflecting numerous risk factors. *See Estate of*

*McKelvey v. Commissioner*, 906 F.3d 26, 36 (2d Cir. 2018); (JA__[Ex.3004R at 7; Ex.3010R at 29-31]). Here, however, the options were generally priced at a flat 10% of the notional amount. (*See* p. 13, *supra*.) Moreover, DB could demand "additional premium" if the NAV hit the initial barrier (NAV 97). (*E.g.*, JA__[Ex.23J at 917, 920-21].) This "retroactive increase to the agreed-upon price" effectively deprived "the optionee of the benefit of his bargain." (JA__[Op.51].)

*(3.)* *Term.* (JA__[Op.52].) Option terms are "limited." *Chicago Mercantile*, 883 F.2d at 546; *see also* Hull, *supra*, at 279; Mark P. Gergen, *Afterword Apocalypse Not?*, 50 Tax L. Rev. 833, 841 (1995). But the terms of the Contracts were 12 years or longer. (*See* p. 13, *supra*.) As the court explained, "call options with 12-year terms are unicorns because no investor could rationally price them using established option pricing methods." (JA__[Op.52].) Indeed, once DB's legal department realized the problems with MAPS, it proposed much shorter terms for new MAPS contracts—13 to 18 months, or 24 months at most. (*See* JA__[Ex.342J].)

*(4.)* *Underlying property.* (JA__[Op.52-55].) An option generally involves the right to buy specified commodities, merchandise, or

securities. *E.g.*, *Black's*, *supra*, at 1245. But here, the composition of the securities baskets was "constantly changing." (JA__[Ex.3011R at 9 n.20].) On average, GWA's affiliates traded 268 unique securities each day—nearly half a million trades in total over an eight-year period. (JA__[Ex.3010R at 12].) Thus, the court properly found that "GWA traded the securities with such gusto that the contents of the reference baskets changed daily, hourly, or minute by minute." (JA__[Op.53].) "A purported option whose underlying property is ill defined or constantly changing cannot be a true option if it is impossible to assign that option a rational market price." (*Id.*)

*(5.)* *Termination.* (JA__[Op.55-59].) All of the Contracts were terminated before their expiration date. (*See* p. 13, *supra.*) DB treated most of these Contracts as being terminated due to a "Cash Event." (JA__[Ex.418J; Ex.419J; Ex.422J; Ex.499J].) But, in several instances, no "Cash Event" had actually occurred. (*E.g.*, JA__[Ex.483J].) Additionally, DB terminated Contract #1 using the "Early Expiration Event" provision that gave it unilateral authority to terminate the Contract early. (*See* JA__[Ex.420J; Ex.23J at 916].) GWA could manufacture a cash event by liquidating the positions in the basket (*see*

JA__[Ex.342J; Ex.491J at 848]) and DB could do so by cancelling its agreement with Quaker (JA__[Ex.33J at 5, 7]). In effect, either DB or GWA could terminate the Contracts at any time using those provisions. (JA__[Op.55-57].)

*(6.)* *Dividends.* (JA__[Op.59].) Generally, the seller of an option "retains dividends" during its term. *Chicago Mercantile*, 883 F.2d at 546. This is because the seller continues to own the property. (*See* JA__[Ex.3010R at 29].) But here, GWA would receive any dividends in its payout. (*E.g.*, JA__[Ex.23-J at 922].) GWA thus "received the economic value of all dividends paid on stock held in the reference baskets," indicating "that GWA, not [DB], in substance owned those shares." (JA-_[Op.59].)

*(7.)* *Risk.* (JA__[Op.60-67].) Generally, an option buyer has no downside risk beyond the purchase price of the option. (JA__[Ex.3004R at 30].) In contrast, the seller bears the risk of loss. (*Id.*) But here, as demonstrated by the IRS's experts and acknowledged by DB itself, DB bore little risk. (JA__[Ex.3010R at 22-27, 41; Tr.684].) In particular, Professor Glasserman demonstrated that—based on analysis that the court found "most persuasive" (JA__[Op.64])—it was "implausible" that

DB had "any risk of loss" associated with the Contracts (JA__[Ex.3004R at 49]). That was because the barrier provisions would terminate the Contracts before DB incurred any loss. (JA__[*Id.* at 27-31].) Similarly, DB bore no "upside" risk that might occur if it chose not to "hedge" or buy the securities at issue because the Contracts prohibited that possibility. (JA__[Op.61; Ex.23J at 915; Tr.379-81, 2041-46].)

*(8.)* *Choice.* (JA__[Op.67-70].) A contract is not an "option" if it is "not discretionary." *U.S. Freight Co. v. United States*, 422 F.2d 887, 895 (Ct. Cl. 1970). Obviously, GWA would exercise the "options" if they were "in the money." But, as the court explained, "GWA would also choose to exercise if the basket securities had declined in value (loss scenario), because the premium refund would more than offset its investment loss." (JA__[Op.67].) GWA would always get money back by exercising the option as long as the NAV did not drop below 90. (JA__[Tr.1715-16].) And there was "essentially zero chance of that happening" (JA__[Op.68]) due to the early-expiration barriers, "which prevent[ed] the contract from going out of the money" and thereby "eliminated the economic structure of a call option" (JA__[Ex.3004R at 25]; *accord* JA__[Op.70; Ex.3011R at 20-21].)

These features, "while making no sense for a genuine [European] call option, make perfect sense" if the Contracts are viewed in their true light—i.e., as providing leverage for GWA to pursue its proprietary trading strategy with the premium acting as collateral for the loan and the additional-premium/early-expiration feature functioning as a margin call. (JA__[Op.48, 51, 58].) The court thus properly found that the Contracts were not genuine call options. (JA__[Op.70].)

### 3. GWA was the beneficial owner of the underlying securities

After determining that the Contracts were not options, the court addressed whether GWA owned the securities in substance and "was thus required to realize and recognize its trading profits on an annual basis." (JA__[Op.70].) Evaluating the "benefits and burdens of ownership," the court concluded that GWA did own the securities. (JA__[Op.70-95].)

"The determination of ownership of an asset for tax purposes is to be based on an analysis of many different factors indicative of ownership, not always on the bare legal title." *Bailey v. Commissioner*, 912 F.2d 44, 47 (2d Cir. 1990); *accord Altria*, 658 F.3d at 285. "[F]or Federal income tax purposes, the owner of property must possess

meaningful burdens and benefits of ownership." *United States v. Regan*, 937 F.2d 823, 826 (2d Cir. 1991).

"[T]he Supreme Court expressly declined to identify particular factors that would determine 'the substance and economic realities of the transaction.'" *Altria*, 658 F.3d at 285 (quoting *Frank Lyon*, 435 U.S. at 582). Thus, a trier of fact may consider "all the relevant facts and circumstances" in making that determination, with no single factor being dispositive. *See id.* at 286 (affirming jury instruction regarding transfer-and-leaseback arrangement). Although many factors have been identified as potentially relevant to the question of ownership, the factors that are "most relevant" will depend on the "peculiar attributes" of the transaction. *Calloway v. Commissioner*, 691 F.3d 1315, 1329, 1331 (11th Cir. 2012). No "exclusive list of factors" controls; rather, courts "apply a flexible, case-by-case analysis of whether the burdens and benefits of ownership have been transferred." *Sollberger v. Commissioner*, 691 F.3d 1119, 1124 (9th Cir. 2012); *accord Frank Lyon*, 435 U.S. at 584 ("What those attributes are in any particular case will necessarily depend upon its facts.").

Here, the court considered the following factors: (a) risk of loss; (b) opportunity for gain; (c) control over assets; (d) receipt of dividends; (e) receipt of class action payments; (f) ability to hypothecate; (g) the right to vote the shares; and (h) ability to extract cash. (JA__[Op.72-88].) Based on those factors, the court correctly found that GWA was the true owner of the securities.

*(a.)* *Risk of loss.* (JA__[Op.73-74].) In determining ownership questions, courts have considered whether the party in question "bears the risk of loss." *Anschutz Co. v. Commissioner*, 664 F.3d 313, 324, 327 (10th Cir. 2011). As noted above, Professor Glasserman demonstrated that DB had virtually no risk of loss. (JA__[Ex.3004R at 49]). Even GWA's expert, who the court deemed less reliable than Professor Glasserman (JA__[Op.73]; *see also* JA__[Tr.1741-46]), found that the chance of DB bearing a loss was as low as 0.34%. (JA__[Ex.2205P at Ex.15].) *Cf. Wells Fargo & Co. v. United States*, 641 F.3d 1319, 1326 (Fed. Cir. 2011) ("Characterization of a tax transaction based on a highly probable outcome may be appropriate, particularly where the structure of the transaction is designed to strongly discourage alternative outcomes.").

*(b.)* *Opportunity for gain*. (JA__[Op.74-75].) Courts have also considered which party bears the opportunity for gain. *Anschutz*, 664 F.3d at 324, 327. As the court here explained, DB's "only possibility for investment gain would be through the 'option premium.'" (JA__[Op.74].) But, as discussed above, that was not possible since DB returned the full premium to GWA for each Contract. (*See* pp. 9-10, *supra*.) DB's compensation consisted of the fees it charged GWA for leverage and trades (JA__[Ex.393J]), and the use of GWA's collateral during the term of the Contracts. In contrast, GWA had the full opportunity for gain with delta-1 exposure. (*See* JA__[Ex.3005R at 13; Ex.411J at 210].)

*(c.)* *Control over assets*. (JA__[Op.76-79].) A party's ability to control the assets in question is a key factor that courts have considered, particularly the ability to sell or exchange the assets. *See Christoffersen v. United States*, 749 F.2d 513, 514, 516 (8th Cir. 1984) (taxpayers owned assets in purported "annuity" account when, inter alia, they directed investment decisions, including reinvestment of dividends); *Calloway*, 691 F.3d at 1329 (highlighting the true owner's right, without notice or consent, "to assign, transfer, … and/or sell

outright some or all of the securities"); *Webber v. Commissioner*, 144 T.C. 324, 361-65 (2015) (taxpayer's power to direct decisions "to buy, sell, and exchange securities and other assets" demonstrated ownership). Here, "GWA had complete power to direct trades in the securities baskets without [DB's] prior approval." (JA__[Op.77].) The investment decisions were purportedly made by Quaker as the "Investment Advisor" (*e.g.*, JA__[Ex.25J at 3055]), which delegated that task first to Associates and later to WMSA (*see* JA__[Ex.38J; Ex.39J]). The court thus found that GWA possessed "the power to select and trade the securities" in the baskets. (JA__[Op.79].)

*(d.)* *Dividends.* (JA__[Op.80].) The right to receive dividends has also been considered as a factor. *Calloway*, 691 F.3d at 1329; *Anschutz*, 664 F.3d at 328; *Christoffersen*, 749 F.2d at 516. Here, GWA would receive any dividends as part of its payout. (*E.g.*, JA__[Ex.23-J at 922-23].)

*(e.)* *Other costs and payments.* (JA__[Op.80-81].) Courts have also considered the parties' responsibility for other transaction costs and the right to other payments associated with the asset. *E.g.*, *Sun Oil Co. v. Commissioner*, 562 F.2d 258, 263-64 (3d Cir. 1977). Here, in

addition to dividends, GWA also received payments from class-action settlements regarding the basket securities. (JA__[Tr.658-59, 904-05].) And the costs GWA paid were indistinguishable from those paid by DB's prime-brokerage clients. (JA__[Ex.393J].)

*(f.)* *Hypothecation*. (JA__[Op.81-82].) The right to hypothecate (or lend out) shares may also be a relevant consideration. *Anschutz*, 664 F.3d at 329. The court here found the evidence "inconclusive" as to whether DB had that right. (JA__[Op.81].) Significantly, the Contracts *prohibited* DB from doing so without GWA's consent. (*E.g.*, JA__[Ex.23J at 926].) And although some DB employees testified that it regularly hypothecated shares held in customer accounts, they appeared to be referring to DB's general practices regarding prime-brokerage accounts. (JA__[Tr.417-18].) There is no other evidence suggesting that DB did so here, and the structure of the transactions would have prevented it as a practical matter. (JA__[Tr.2041-46].)

*(g.)* *Voting*. (JA__[Op.82].) Courts have also considered the ability to vote shares as a relevant factor. *Calloway*, 691 F.3d at 1329; *Anschutz*, 664 F.3d at 327-28. GWA could instruct DB on how to vote the shares held in the baskets. (JA__[Ex.1016J].) But the court found

that the "record includes very little evidence concerning the frequency with which GWA issued such instructions or the regularity with which [DB] followed them," and accordingly, gave this factor "little weight." (JA__[Op.82].)

*(h.)* *Ability to extract cash.* (Op. 82-86.) Courts have also found that the true owner's power to obtain cash from the securities is significant. *Webber*, 144 T.C. at 365; *see also Estate of Dimen v. Commissioner*, 72 T.C. 198, 203, 206 n.12 (1979) (considering the "right to borrow money against the policy" as an incident of ownership), *aff'd*, 633 F.2d 203 (2d Cir. 1980); *Christoffersen*, 749 F.2d at 515-16 (taxpayers owned assets when they could "withdraw any or all of [the] investment upon seven days notice"). Here, GWA could extract cash in two ways. First, as GWA's own witnesses acknowledged, OGI could borrow against the securities and "pay that out to GWA to allow [it] to fund operating expenses." (JA__[Tr.243-44].) Second, GWA could create a "Cash Event" causing the termination of a Contract. (*See* pp. 8-9, *supra*.) In fact, it did so on several occasions, generating payments of $130 million (for Contract #2) and $124 million (for Contracts #3-6). (JA__[Ex.491J at 840].) Contract #2's positions were rolled into

Contracts #3-6, which in turn were rolled in Contracts #7-10. (JA__[Ex.483J; Ex.491J at 848; Op.85].) And GWA was able to use its accounts "synergistically" to further benefit its own bottom line. (JA__[Op.86-87].)

Accordingly, the Tax Court concluded that although DB held "nominal title to the basket securities, GWA owned those securities in substance for the life of each [Contract]." (JA__[Op.87].) GWA bore all of the risk, had "complete control" over the securities, and enjoyed all economic benefits from them. (*Id.*) Thus, "GWA owned the basket securities in substance and was required to recognize its net trading gains and related investment income annually." (JA__[Op.88].)

#### 4. GWA's arguments to the contrary are unavailing

##### a. Sections 1234 and 1234A do not dictate a different result

GWA argues that the court's analysis ran afoul of I.R.C. §§1234(a) and 1234A. (Br.23.) It contends that these statutes "command[ ] that the [Contracts] be respected and that GWA's gain on termination be treated as capital gain." (Br.36.) The Tax Court correctly rejected this argument.

Sections 1234(a) and 1234A provide that gains and losses from options or other rights "with respect to property" may receive capital-gains treatment. Specifically, Section 1234(a) provides that gain or loss from the sale of, or failure to exercise, "an option to buy or sell property shall be considered gain or loss from the sale or exchange of property which has the same character as the property to which the option relates has in the hands of the taxpayer." And "Section 1234A says that any gain or loss that results from the termination of an agreement to buy or sell property that is properly classified as a 'capital asset' will, notwithstanding the termination, be treated as a gain or loss from a consummated sale." *CRI-Leslie, LLC v. Commissioner*, 882 F.3d 1026, 1029 (11th Cir. 2018).

But these statutes do not support GWA treating its profits from the Contracts as long-term capital gain. First, although Section 1234(a) uses the term "option," it does not define it. GWA argues that "the elements of an 'option' are few and the Contracts have them" (Br.38), but as shown above, the Contracts were not "options" in any way other than name. (*See* Part I.A.2.a, *supra*.) The ordinary meaning of "option" supports the Tax Court's decision (*see* p. 28, n.4, *supra*), and labels do

not control, *Frank Lyon*, 435 U.S. at 583-84. Nor does the statute distinguish between "bespoke" or "complex options" (i.e., "exotic" options) and "vanilla" options. (Br.29, 38-39.) All "options" necessarily have some fundamental elements (*see* Part I.A.2.a, *supra*) or else the term is meaningless.

Second, Section 1234A did not apply because there was no termination of "a right or obligation … with respect to property." The statute was enacted to prevent abusive straddle transactions "in which taxpayers acquire offsetting contractual positions to obtain tax benefits without any economic risk." *Pilgrim's Pride Corp. v. Commissioner*, 779 F.3d 311, 314 (5th Cir. 2015). As the Tax Court noted, Section 1234A "would presumably govern" the termination of a true long-term option contract. (JA__[Op.45 n.14].) But GWA did not own "a right … with respect to property," I.R.C. §1234A—i.e., an agreement to buy or sell property, *CRI-Leslie*, 882 F.3d at 1029. Rather, it "owned the *basket securities themselves*." (JA__[Op.70 n.23]). And Section 1234A "does not apply" to GWA's sales of the basket securities. *Pilgrim's Pride*, 779 F.3d at 315.

Third, characterizing the Contracts as "derivatives" (Br.35) does not meaningfully change the analysis. "Derivative" is not a statutory term (*see* JA__[Op.70 n.23]), and merely characterizing the Contracts as some sort of derivative does not support GWA's argument that Section 1234A controls the treatment of the Contracts. In any case, GWA owned the basket securities themselves, not derivatives.

Fourth, GWA's (Br.32-39) reliance on formalism (i.e., that the statutes require the form of the Contracts to be respected) does not work either. Sections 1234(a) and 1234A do not explain what an "option" is or how to distinguish ownership of a "right … with respect to property" from ownership of the property itself. If GWA is correct, a taxpayer can simply label any transaction an "option" and receive capital-gains treatment. That is not the law. *Frank Lyon*, 435 U.S. at 583-84.

GWA relies on (Br.31-32) caselaw involving complex transactions that Congress has explicitly approved, despite a lack of substance. *See Summa Holdings, Inc. v. Commissioner*, 848 F.3d 779, 786 (6th Cir. 2017) (Code authorized the creation of "DISC" entities "as shell corporations … that have no economic substance at all. By

congressional design, DISCs are all form and no substance, making it inappropriate to tag [the taxpayer] with a substance-over-form complaint with respect to its use of DISCs." (citations omitted)); *Benenson*, 910 F.3d at 700-01 (similar); *Mazzei*, 998 F.3d at 1055 ("Congress has expressly decreed that FSCs can engage in transactions, with commonly controlled entities, that lack any economic substance and that are assigned hypothetical values determined according to statutory formulas that bear no relationship to any underlying real-world valuation."). These transactions involved "highly reticulated" modern provisions. *See Summa*, 848 F.3d at 789.

If Congress had explicitly blessed "option" transactions with the unique features of the Contracts here (*see* pp. 8-12, *supra*), then GWA would have an argument. But Sections 1234(a) and 1234A are decades-old, broadly phrased provisions—they do not set forth a "mathematic[ly] precis[e]" scheme permitting long-term capital gain treatment for short-term transactions lacking the substance of options. *Cf. Summa*, 848 F.3d at 789. Nothing in I.R.C. §§1234 and 1234A "evidences any similar intent to provide massive tax benefits" for the bogus "options" at issue here. *Liberty Glob., Inc. v. United States*, 174 F.4th 1208, 1216

n.10 (10th Cir. 2026) (distinguishing *Summa*); *accord Tucker v. Commissioner*, 766 F. App'x 132, 139 (5th Cir. 2019) (distinguishing *Summa* in case where Congress did not contemplate taxpayer's "calculated manipulation of the tax code").[5]

In circumstances like the present, courts—even this Court and even in modern times—have applied the substance-over-form doctrine to recharacterize transactions. *E.g.*, *Altria*, 658 F.3d at 284-91 (transfer made to take advantage of depreciation deduction under I.R.C. §167 could be disregarded when transferor maintained "the benefits and burdens of ownership"). Thus, "[w]hile taxpayers are free to arrange their affairs to minimize taxes, they must do so in real ways—ways that give a transaction economic teeth and do not merely place tax-avoiding labels on tax-owing transactions." *Billy F. Hawk, Jr., GST Non-Exempt Marital Tr. v. Commissioner*, 924 F.3d 821, 825, 831 (6th Cir. 2019).

[5] Nor do the statutes GWA cites (Br.36) as providing examples of Congress "ignor[ing] a derivative and treat[ing] its owner as owning the underlying property" change this analysis. *See* I.R.C. §318(a)(4) (providing that an option may be ignored for the purposes of attributing corporate distributions but nowhere indicating that it may be ignored for income tax purposes); I.R.C. §1260 (providing special rules for the treatment of contracts regarding an interest in a "pass-thru" entity that necessarily respect the form of the transaction for tax purposes).

In short, this is not an instance of GWA buying cows "to gain cow subsidies." *Summa*, 848 F.3d at 788 (citation omitted). Rather GWA is "call[ing] a dog a cow and then seek[ing] a subsidy provided by statute for cows." *Id.* at 787 (citation omitted). "[T]he obvious response is that this is not what the statute means." *Id.* at 787-88 (citation omitted). In such circumstances, "'form properly gives way to substance." *Benenson*, 910 F.3d at 699 (citation omitted).

**b. GWA's alleged desire for leverage is not determinative**

GWA argues that it had a legitimate business purpose to pursue the transactions—obtaining greater leverage—which prevented the court from recharacterizing them. (Br.39-42.) The court correctly rejected this argument. (JA__[Op.88-92].)

GWA relies (Br.39) on *Frank Lyon*, 435 U.S. 561. There, the Court held that the substance of a sale-and-leaseback transaction matched its form and thus, should be respected. The Court summarized the result by stating that when "there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that

have meaningless labels attached," it should be respected. *Id.* at 583-84. But in reaching its conclusion, the Court reviewed numerous factors that showed that the transaction was what it purported to be. *Id.* at 582-83. Those included the reasonableness of the pricing, risks borne by the parties, the lack of any predetermination that the options would be exercised, and the absence of any differential in tax rates or special tax circumstances. *Id.* Such factors favor disregarding the transaction's label here. (*See* Part I.A.2-3, *supra.*)[6]

---

[6] The other cases GWA cites (Br.39-40) also do not support its arguments here. *See Commissioner v. First Sec. Bank of Utah, N. A.*, 405 U.S. 394, 407 (1972) (income could not be reattributed under I.R.C. §482 regulations from an insurance company to affiliated banks that were prohibited from receiving it when no distortion of "true" income had occurred); *Boise Cascade Corp. v. United States*, 329 F.3d 751, 756 (9th Cir. 2003) (payments were deductible as dividends under I.R.C. §404(k) because they were paid to plan trustee, rather than plan participants, given various factors including right to vote stock, right to receive dividends, direct investment of assets, and provision that would convert preferred stock to common stock on transfer to participants); *Comdisco, Inc. v. United States*, 756 F.2d 569, 578 (7th Cir. 1985) (applying "an analysis that looks at the economic substance of the transaction" and determining that taxpayer was entitled to investment tax credit under statute when its "transactions [met] in substance a clear expression of Congressional intent"); *Newman*, 902 F.2d at 163-64 (indicating that the presence of "a legitimate non-tax business reason" for transaction was one factor under *Frank Lyon* and applying several others relevant to the facts of the case).

GWA criticizes the Tax Court for "recast[ing]" the Contracts "into an unlawful transaction." (Br.41.) It says that it was "trying to comply with" (Br.25; *see also* Br.40) the Federal Reserve's margin regulations by obtaining through "options" an amount of leverage otherwise unavailable through a prime-brokerage account. But the presence of a business purpose is not determinative in applying the substance-over-form doctrine. *See Altria*, 658 F.3d at 286-90.

Moreover, GWA could have obtained more leverage in a number of legitimate ways that it did not pursue. (JA__[Op.91]; *see also* JA__[Tr.288, 631-35].) And the court observed that "circumventing margin rules by relabeling a prime brokerage account as an 'option' account is not a legitimate business purpose." (JA__[Op.90] (quoting *Senate Report*, *supra*, at 81 (alteration marks omitted)).) Nor did that conclusion represent a "pivot" from the court's comments during trial. (*Compare* Br.41, *with* JA__[Tr.2213-14] (noting the issue was whether the Contracts should be characterized as a prime-brokerage account that "was magically exempt" from the margin regulations).) Moreover, the Federal Reserve has indicated that a "deep in the money" option

that is certain to be exercised can violate its regulations. *See* 12 C.F.R. §220.122.

GWA also emphasizes that the transactions here "had economic substance" (Br.42), but that fact is irrelevant. As this Court has recognized, "[t]he substance-over-form doctrine is related to, but distinct from, the 'economic substance' doctrine," which applies when a "transaction lacks economic substance." *Benenson*, 910 F.3d at 699 n.8. The question at issue here—"whether the form of the transaction[ ] … reflects economic reality, *i.e.*, substance"—is thus distinct from whether the transaction is "lacking in economic substance." *Id.*; *accord Altria*, 658 F.3d at 291 (doctrines "are independent bases to deny" claimed tax benefits); *Exelon Corp. v. Commissioner*, 906 F.3d 513, 523-24 (7th Cir. 2018) (argument that transactions "were driven by business considerations and tax advantages" was "properly directed to the 'economic substance doctrine,'" not the substance-over-form doctrine).

#### c. The Tax Court did not err by "disaggregating" the transactions

Relying on *Chock Full O' Nuts Corp. v. United States*, 453 F.2d 300 (2d Cir. 1971), and related authorities, GWA accuses the court of

improperly "disaggregating" the Contracts "into theoretical components." (Br.43-45.) But *Chock* has no relevance here.

In *Chock*, the taxpayer sought to deduct the purported discount on its issuance of "convertible" corporate bonds, which could be redeemed or converted to common stock. *Id.* at 301-02. This Court agreed with the Government in rejecting the deduction. *Id.* The taxpayer argued that the treatment it sought for the convertible bonds at issue was analogous to that required for "bond-warrant investment units," which were commonly sold "as a package" but consisted of "independent and separable obligations." *Id.* at 304-05. This Court rejected the argument because the convertible bonds were "indivisible unit[s]." *Id.* at 305.

Thus, *Chock* simply rejected a taxpayer's analogy, it did not promulgate a broad anti-"disaggregation" principle that applies in substance-over-form cases, as GWA suggests. And the cases GWA says "recognize" this rule (Br. 43-44 n.5) merely cite *Chock*. Regardless, viewing GWA as the owner of the securities does not "disaggregate" the Contracts; it merely characterizes the rights provided by the Contracts for what they are in substance.

#### d. The Tax Court did not err by citing *Webber*

GWA also asserts that the Tax Court improperly relied on the "investor-control doctrine" as discussed in *Webber*, 144 T.C. 324, which it contends only applies in the "insurance or annuities context." (Br.45-47.) But the court cited *Webber* as part of its ownership analysis (JA__Op.71-72, 76-79]), which considered many factors, and there are no set factors for the benefits-and-burdens test (pp. 35-36, *supra*).

In any event, the court's analysis was correct. As the court recognized, *Webber* is grounded in Supreme Court precedent. (JA__[Op.72 n.24] (citing 144 T.C. at 351-53). In particular, *Webber* relied on *Helvering v. Clifford*, 309 U.S. 331, 335-36 (1940), where the Court held that the grantor of a trust remained its owner when he retained "dominion and control" over the underlying investment and made his wife the beneficiary, thereby "retain[ing] the substance of full enjoyment of all the rights." Based on that precedent, *Webber*, 144 T.C. at 357, determined that the "power to decide what specific investments will be held in the account" is a significant factor in determining ownership of assets held in an account underlying a variable life insurance policy.

As the Tax Court noted here, there was no good reason to limit *Webber*'s application to annuities and life insurance (JA__[Op.72 n.24]) and other precedent also supported considering that factor here (JA__[Op.76-77] (citing, inter alia, *Christoffersen*, 749 F.2d at 515-16, and *Clifford*, 309 U.S. at 335); *accord* pp. 41-42, *supra*.) Indeed, it is fundamental that "taxation is not so much concerned with the refinements of title as it is with the actual command over the property taxed." *Hamilton v. Commissioner*, 955 F.3d 1169, 1173 (10th Cir. 2020) (quoting *Sanford's Estate v. Commissioner*, 308 U.S. 39, 43 (1939)).

**e. GWA's factual attacks fail**

Though casting its appeal as presenting legal issues, GWA also attempts to challenge the Tax Court's factual findings in several respects. These challenges fail.

First, GWA makes various factual claims in a chart that is largely unchanged from its briefing below. (Br.18-20; JA__[Doc.312 at 125-26].) In doing so, GWA ignores that many of its claims in this chart were explicitly rejected by the Tax Court. (JA__[Op.51] (additional premium feature was equivalent to a margin call); JA__[Op.55-59] (GWA could

terminate by creating "Cash Events"); JA__[Op.75] (DB was compensated through ticket charges and in other ways instead of by the premium, which was returned); JA__[Op.80] (GWA had a right to receive dividends upon termination); JA__[Op.82] (GWA occasionally instructed DB on how to vote shares); JA__[Op.82-86] (GWA could extract cash).) GWA has not shown that the court's findings were erroneous and its assertions to the contrary should be rejected.

Second, the Tax Court was correct to consider the "risk" to the parties under the Contracts. (*Cf.* Br.39.) The evidence indicated that true options do allocate risk (*e.g.*, JA__[Ex.3004R at 30]) and many cases have considered the risks to the parties as part of their assessment of the substance of a transaction. *E.g.*, *Anschutz*, 664 F.3d at 324, 327; *Calloway*, 691 F.3d at 1327, 1330. Even *Frank Lyon*, on which GWA places great reliance, considered the risks to the parties. 435 U.S. at 582-83. Moreover, GWA's suggestion that risk was "outside of [its] control" is meritless given that it was a party to the Contracts and was fully capable of negotiating different terms.

Third, GWA also attacks the court's hypothecation finding. (Br.17 & n.1.) The court heard the testimony GWA cites and determined that

the witnesses were referring to DB's general practice regarding prime-brokerage accounts. (JA__[Op.81].) That finding is entitled to deference. *See Amalfitano v. Rosenberg*, 533 F.3d 117, 123 (2d Cir. 2008) (this Court does not "second-guess either the trial court's credibility assessments or its choice between permissible competing inferences"). And GWA ignores the fact that the Contracts prohibited hypothecation (*e.g.*, JA__[Ex.23J at 926]) and other evidence showed that it was impractical (JA__[Tr.2041-46]).

### B. The Tax Court properly determined that the recharacterization of the securities triggered a change in GWA's method of accounting that necessitated an adjustment under I.R.C. §481

#### 1. Introduction

The computation of taxable income depends, in part, on the taxpayer's accounting method. By law, "[a] taxpayer computes its taxable income in accordance with its method of accounting," and that method must "clearly reflect[] income." *Huffman v. Commissioner*, 126 T.C. 322, 339-40 (2006), *aff'd*, 518 F.3d 357 (6th Cir. 2008) (citing I.R.C. §446(a)-(b) and Treas. Reg. §1.446-1(a)(2)). Accounting methods "include not only the taxpayer's overall method of accounting but also the taxpayer's accounting treatment of 'any item.'" *Id.* (citing Treas.

Reg. §1.446-1(a)(1)). "[I]f a taxpayer's method of accounting does not clearly reflect her taxable income, the Secretary shall determine the method of accounting that does clearly reflect her taxable income." *Mingo v. Commissioner*, 773 F.3d 629, 633 (5th Cir. 2014) (citing I.R.C. §446(b)). The IRS "has broad powers in determining whether accounting methods used by a taxpayer clearly reflect income." *RCA*, 664 F.2d at 886 (quoting *Thor Power Tool Co. v. Commissioner*, 439 U.S. 522, 532 (1979)).

Changing an accounting method in one tax year can have ripple effects in other years. *Nat'l Life Ins. Co. v. Commissioner*, 103 F.3d 5, 7 (2d Cir. 1996). I.R.C. §481 is designed to ensure accurate computation of income in cases where a taxpayer's accounting method changes from one year to the next. It provides:

> In computing the taxpayer's taxable income for any taxable year (referred to in this section as the "year of the change")–
>
> (1) if such computation is under a method of accounting different from the method under which the taxpayer's taxable income for the preceding taxable year was computed, then
>
> (2) there shall be taken into account those adjustments which are determined to be necessary solely by reason of the change in order to prevent amounts from being duplicated or omitted, except there shall not be taken

> into account any adjustment in respect of any taxable year to which this section does not apply unless the adjustment is attributable to a change in the method of accounting initiated by the taxpayer.

I.R.C. §481(a). Thus, if a taxpayer computes its income under a method "different from the method" it used in prior years, the IRS "shall" make any adjustments to the taxpayer's income for the year of the change that are necessary to prevent the omission or duplication of income from prior years. *Id.*

"The purpose of a § 481(a) adjustment is to prevent income from being double-taxed, or not taxed at all, due to a change in accounting method." *Mingo*, 773 F.3d at 636 n.4. "Section 481 addresses these difficulties by authorizing the [IRS] to adjust a taxpayer's income in an open year to reflect amounts attributable to years for which the applicable statute of limitations has expired." *Huffman*, 518 F.3d at 364. Indeed, Section 481 "would be virtually useless if it did not affect closed years." *Id.* at 364 (quoting *Graff Chevrolet Co. v. Campbell*, 343 F.2d 568, 572 (5th Cir. 1965)).

Thus, Section 481 authorizes an adjustment "in the year a taxpayer changes its method of accounting, whether initiated by the taxpayer or the [IRS]." *Suzy's Zoo v. Commissioner*, 273 F.3d 875, 883

(9th Cir. 2001). "In so doing, § 481 'prevent[s] either a distortion of taxable income or a windfall to the taxpayer arising from a change in accounting method when the statute of limitations bars reopening of the taxpayer's earlier returns.'" *Huffman*, 518 F.3d at 364 (quoting *Suzy's Zoo*, 273 F.3d at 883).

### 2. The Tax Court properly determined that Section 481 applied here

The court's determination that GWA owned the underlying securities resulted in a change to its method of accounting. (JA__[Op.114-21].) A "change in the method of accounting includes a change in the overall plan of accounting for gross income or deductions or a change in the treatment of any material item used in such overall plan." *Huffman*, 518 F.3d at 364 (quoting Treas. Reg. §1.446-1(e)(2)(ii)(a)). "The essential characteristic of a 'material item' is that it determines the timing of income or deductions." *Knight-Ridder Newspapers, Inc. v. United States*, 743 F.2d 781, 798 (11th Cir. 1984). "The change of a single item may trigger section 481 adjustments." *Id.*

Recharacterizing an asset can result in a change to the method of accounting under I.R.C. §481. (Op.119-20 & n.52.) In *Mingo*, 773 F.3d at 632-33, for example, the IRS determined that part of the proceeds

from the sale of the taxpayer's partnership interest had to be characterized as proceeds from the sale of unrealized receivables. Consequently, income the taxpayer reported as capital gain in 2007 should have been reported as ordinary income in an earlier tax period. *Id.* Because the installment method that the taxpayers had used could not apply to those proceeds, the IRS was entitled to change the accounting method so that the income from the unrealized receivables would be taken into account in 2003 rather than 2007. *Id.* at 634-35.[7]

Here, as the Tax Court explained, GWA accounted for the Contracts using the "open transaction" method during the 2003-2010 tax years. (Op. 117-18.) That method applies "where the realization of income is so uncertain or contingent as to prevent accurate gain or loss

---

[7] *See also Diebold, Inc. v. United States*, 891 F.2d 1579, 1583 (Fed. Cir. 1989) (changing characterization of replacement parts from nondepreciable inventory to depreciable capital assets caused a change in accounting); *Witte v. Commissioner*, 513 F.2d 391, 392-93 (D.C. Cir. 1975) (change from characterizing land-sale transactions as resulting in "deferred payment[s]" to viewing it as a "completed transaction" constituted a change in method of accounting); Treas. Reg. §1.446-1(e)(2)(ii)(d)(2) ("a change in the treatment of an asset from nondepreciable or nonamortizable to depreciable or amortizable, or vice versa, is a change in method of accounting"), (e)(2)(ii)(d)(5)(iii) (similar), (e)(2)(iii) (example 11) (a "change in the treatment of the equipment from inventory to a depreciable asset is a change in method of accounting").

calculations." *Estate of McKelvey v. Commissioner*, 161 T.C. 130, 144 (2023) (citing *Burnet v. Logan*, 283 U.S. 404 (1931)); *accord Davis v. Commissioner*, 210 F.3d 1346, 1348 (11th Cir. 2000); *Stahl's Estate v. Commissioner*, 442 F.2d 324, 329 (7th Cir. 1971). Using it allowed GWA to defer income from all items associated with the Contracts until the Contracts were terminated. (*See* JA__[Doc.109 at 5-7].)

But when the IRS determined that GWA owned the underlying securities, that necessarily caused a change in accounting method because the gain from the transactions had to be recognized in the years when they occurred, as closed transactions, under I.R.C. §1001. (JA__[Op.120-21].) Thus, for example, GWA deferred taxes on the securities in Contract #1 until that contract was terminated in 2009. (JA__[Doc.189 at 6].) But as the owner of the underlying securities, which it traded with great frequency (JA__[Ex.3010R at 12]), GWA had to account for those gains on an annual basis when they occurred (i.e., during the 2003 through 2009 years) under Section 1001. (JA__[Op.121].) Similarly, GWA had to account for other items of income and expense (such as dividends and trading fees) on an annual basis since it was an accrual-method taxpayer. (JA__[Op.118] (citing

I.R.C. §§451, 461).) Although the 2003-2008 tax years were closed by the statute of limitations, the Tax Court recognized that Section 481 "was designed to prevent" those gains from being omitted. (*Id.*) Consequently, the adjustment was warranted.

### 3. GWA's arguments are unavailing

#### a. There was a "change" in GWA's accounting method

GWA initially argues that Section 481 is inapplicable because its "accounting method never changed." (Br.50-52; *see also* Amicus Br.10-11.) Although it says it has "no quarrel" with the conclusion that it should have used Section 1001, it claims that it was using the Section 1001 method all along and that "[t]he open transaction method *is* the Section 1001 method." (Br.51-52 n.6.) Alternatively (and contradictorily), it argues that it did not adopt an accounting method for the basket securities at all. (Br.51-52.) Both contentions are meritless.

GWA plainly did not apply Section 1001 to the basket securities. Those securities were traded extensively in transactions that were completed (usually in minutes) within the tax years. (*See* JA__[Ex.3010R at 12].) Section 1001 required the amounts realized from those trades to be recognized at that time as closed transactions.

I.R.C. §1001(b)-(c). But GWA consistently deferred recognition of the gains for years under the "open transaction" method, avoiding recognition under Section 1001. As the Tax Court recognized, a multi-year "pattern of consistent treatment" is sufficient to establish a method of accounting. (JA__[Op.118] (citing, inter alia, Treas. Reg. §1.446-1(e)(2)(ii)(a)).) Thus, changing from the "open transaction" method to closed transactions under the Section 1001 method is necessarily a change. *See Greiner v. United States*, 122 Fed. Cl. 139, 147, 150-52 (2015) (switching from "open transaction method of accounting" to a "closed transaction method of accounting" constituted a change), *aff'd,* 651 F. App'x 1000 (Fed. Cir. 2016).

Indeed, the "open transaction" method would have been consistent with the ownership of a true option because "the outcome of the transaction is uncertain at the time the payments are made." *Fed. Home*, 125 T.C. at 267. And there is no reason that rule would not apply to both the seller and the buyer of a real option. *Compare Baumer v. United States*, 580 F.2d 863, 885 (5th Cir. 1978) (method can apply to employee stock options), *with* Amicus Br.11. But one cannot use that method by labelling a contract an "option" when there is no

real contingency. *Saviano v. Commissioner*, 765 F.2d 643, 654 (7th Cir. 1985).

In contrast, Section 1001 does not permit gain from completed securities transactions to be deferred beyond the year they are realized. And that method is not the same as the open-transaction method that GWA used. (JA__[Op.120].)

### b. Recharacterizing an asset can cause a change in accounting method that necessitates a Section 481 adjustment

GWA also claims that a recharacterization of an asset cannot cause a change in accounting method. (Br.53-55; Amicus Br.17-20.) But the authorities say otherwise—an incorrect characterization of an asset may require an accounting-method change (*see* pp. 59-60, *supra*), which in turn, may require adjustments under Section 481.

GWA relies on *Federated Dep't Stores v. Commissioner*, 51 T.C. 500, 500 (1968), *aff'd*, 426 F.2d 417 (6th Cir. 1970), for the proposition that Section 481 does not apply to a "'new' accounting method for a different transaction." (Br.54-55.) *Federated*, 51 T.C. at 503, concerned the taxpayer's sale of accounts receivable to a bank in 1964. The court held that the taxpayer's deferred-service charges, which were included

in the accounts receivable, had to be recognized as income at the time the accounts were sold. *Id.* at 505. The taxpayer argued that this constituted a change in its method of accounting because it had treated the deferred service charges differently when it made sales to banks in prior years. *Id.* at 513. The court rejected the argument because "the pre-1964 transactions" differed "materially" from the 1964 sale. *Id.* at 514.

GWA claims that *Federated* is analogous because the recharacterization of the transaction resulted in a "different transaction, factually and legally." (Br.54-55.) But GWA ignores that the pre-1964 transactions in *Federated* actually were different transactions—they arose from different underlying facts, in a different time period, and involving different property. There was no recharacterization of the 1964 sale itself—i.e., the transaction at issue. Accordingly, the Tax Court correctly found that *Federated* "has no relevance here." (JA__[Op.126 n.59].)

Similarly, there is no "change in underlying facts" to which Treas. Reg. §1.446-1(e)(2)(ii)(b) would apply. (Br.55.) The terms of the Contracts, and the rights and obligations they created, were not

changed by the court's analysis. The court simply interpreted the rights provided by those agreements, gave the transactions their correct label, and applied the law to those transactions. *FPL Grp., Inc. v. Commissioner*, 115 T.C. 554, 575 (2000) (recharacterization of expenditures was not a "change in underlying facts").

**c. The Tax Court's decision did not "render[ ] the statute of limitations meaningless"**

GWA argues that the Tax Court's decision will allow the IRS to "recast" an item from a closed year that would never be reported "into something reportable in an open tax year, assert that the taxpayer changed its method of accounting for the recast, unreported item, and thereby impose a Section 481 adjustment for that item in the open year, completely sidestepping the statute of limitations." (Br.61-62; *see also* Amicus Br.7-9, 21.) GWA is mistaken.

An item that will "*never*" be reported (Br. 61) could not be a "material item" and cannot result in a method change. *See* Treas. Reg. §1.446-1(e)(2)(ii)(a). But here, the IRS's claim that GWA's method of accounting did not clearly reflect income arose in 2009 (i.e., the year of change), when the offending item *was* reported, albeit incorrectly.

Thus, "[t]here is no necessary conflict between section 481 and the statute of limitations." *Huffman*, 518 F.3d at 364 n.8 (quoting *Graff*, 343 F.2d at 572). "The statute of limitations is directed toward stale claims" while "Section 481 deals with claims which do not even arise until the year of the accounting change." *Id.* (citation omitted). "Section 481, therefore, does not hold the taxpayer to any income which he has any reason to believe he has avoided, and does not frustrate the policy that men should be able, after a certain time, to be confident that past wrongs are set at rest." *Id.* (citation omitted).

#### d. There was no change in the partnership's "lifetime income"

GWA argues that Section 481 is inapplicable here because the IRS's adjustment increased its "lifetime income" by $537,855. (Br.57-60.) The difference cited by GWA results from the operation of I.R.C. §734(b). (JA__[Ex.161J at 73].) In 2009, GWA made distributions to four partners who withdrew from the partnership. (JA__[Ex.159J at 701-03].) Under Section 734(b), GWA then made corresponding adjustments to its basis in the Contracts (*id.*) because it had elected such treatment under Section 754 (JA__[Doc.189 at 3]). GWA does not dispute that the total income due to the adjustments is otherwise

unchanged. (JA__[Op.119 n.51].) The Tax Court correctly rejected this argument for multiple reasons. (JA__[Op.121-25].)

First, for the purposes of determining whether there has been a change of accounting method, the regulations provide that "[a] material item is any item that involves the proper time for the inclusion of the item in income or the taking of a deduction." Treas. Reg. §1.446-1(e)(1)(2)(ii)(a). Courts have thus explained that "material items" are those that "alter the timing of income recognition" rather than changing the "lifetime quantity of income recognized." *Rankin v. Commissioner*, 138 F.3d 1286, 1289 (9th Cir. 1998).

But here, as the Tax Court explained, changing the method of accounting for the material items (gain, loss, income, and expense from the Contracts) only changed the timing, not the income of those items. (JA__[Op.123-24].) Advancing the recognition of those items to the years during which they actually occurred is thus a timing question and they are properly considered "material items." *Accord Rankin*, 138 F.3d at 1289.

Once those amounts are properly accounted for during the years when they should have been recognized, the flow-through tangential

effects of the adjustments cause the change that GWA complains about. But "[t]he departure of four partners in 2009 was a wholly adventitious event that is logically irrelevant in deciding whether the IRS adjustments change GWA's method of accounting." (JA__[Op.124].) A different result would mean that "a partnership with a section 754 election in place could avoid a change in method of accounting even though the Regulations explicitly provide that a change has occurred." (JA__[Op.125].)

Second, the overall amount of income did not change, merely the allocation between the partnership and departing partners (whose gain would be offset by the same amount). (JA__[Op.123 & n.55].) Unlike corporations, partnerships are considered "no more than an aggregation of individual partners" for some purposes. *Unger v. Commissioner*, 936 F.2d 1316, 1318 (D.C. Cir. 1991). Section 481 applies at the partnership level. *Van Raden v. Commissioner*, 71 T.C. 1083, 1103 (1979), *aff'd*, 650 F.2d 1046 (9th Cir. 1981); *see also* Treas. Reg. §1.481-2(c)(5)(i). Thus, to the extent that it matters at all, it is entirely appropriate to consider

the partnership and partners together for this purpose, and from that perspective, there was no change in overall income.[8]

Moreover, this Court's rejection of a building designer's attempt to combine its own lifetime income with that of the building owner (a separate taxpayer) for the purposes of the test is not analogous as that argument had no basis in the law. *Cannon Corp. v. Commissioner*, 135 A.F.T.R.2d 2025-662, 665 (2d Cir. 2025). GWA's arguments to the contrary should be rejected.

**e. Applying Section 1001 to GWA's securities does not merely correct an isolated "error"**

GWA next contends that Section 481 does not apply because its failure to apply its "established accounting method for securities" to the basket securities was an isolated error. (Br.56-57.) The Tax Court implicitly rejected this argument by holding that the items of gain, loss, income, and expense associated with the basket securities were material items. (JA__[Op.117-18].)

[8] In passing, GWA argues that partnership income may have also changed "owing to the dividends received deduction and ownership of passive foreign investment company stock," but GWA never substantiated these claims. (JA__[Doc.342 at 378-80].)

A correction of a mathematical or posting error is generally not a change in a method of accounting. Treas. Reg. §1.446-1(e)(2)(ii)(b). For example, if a taxpayer deducts an expense as a business expense that is really a nondeductible personal expense, correcting the mistake does not change the taxpayer's method of accounting. *See id.* The cases GWA cites (Br.56-57) are additional examples of this rule.

But that does not mean that every "correction" falls outside Section 481. *See* Treas. Reg. §1.446-1(e)(2)(iii) (examples 6-8). Indeed, "the correction of an error" may "result[ ] in a change in accounting method" when the treatment has persisted for multiple tax years. *Huffman*, 126 T.C. at 354-55. Thus, only "a short-lived deviation from an already established method of accounting need not be viewed as establishing a new method of accounting." *Id.* at 354.

That is not what occurred here. GWA consistently applied the open-transaction method and deferred recognition of the items associated with the Contracts for "an eight-year pattern of consistent treatment." (JA__[Op.117-18].) Those items of "gain, loss, income, and expense" were "material items." (JA__[Op.118].) "Treatment of a material item consistently in two or more consecutively filed tax returns

constitutes a method of accounting." *Cap. One Fin. Corp. v. Commissioner*, 659 F.3d 316, 326 (4th Cir. 2011). GWA cannot avoid this result by claiming that (Br.57) it had an "established" accounting method for other, unspecified, securities that it mistakenly "failed to apply" to the basket securities. *Cf. Cap. One*, 659 F.3d at 325 (rejecting attempt to "raise the level of generality for defining 'item' of income").

In short, GWA did not make a mistake and the exception it invokes does not give it "carte blanche to reverse a deliberate accounting choice." *Id.* at 327.

### C. The Tax Court correctly determined that GWA was liable for penalties

The court concluded that a 20% accuracy-related penalty applied because GWA's underpayment was attributable to negligence under I.R.C. §6662(a), (b)(1). (JA__[Op.129-33].) Alternatively, it held that a "substantial understatement" penalty under I.R.C. §6662(b)(2) applied. (JA__[Op.133-34].) It further rejected GWA's argument that the penalties could not apply insofar as they were attributable to the Section 481 adjustment. (JA__[Op.134-36].)

On appeal, GWA argues that penalties cannot apply because this case involves issues "of first impression," it was not "on notice" that its

position was “too good to be true” until 2009 or 2010, and it had “substantial authority” and a “reasonable basis” for its position (namely, Sections 1234 and 1234A, and *Frank Lyon*). (Br.62-72.) And it repeats its argument that the penalties could not apply to the Section 481 adjustment. (Br.71-72.) The Tax Court correctly rejected these arguments.

First, this is not a case of “first impression involving unclear statutory language.” (Br.64.) This case involves a blatant tax shelter. Although there may not be “direct precedent” addressing the MAPS shelter, “this case does not involve novel questions of law but rather is concerned with the application of well-settled principles of taxation.” *Neonatology Assocs., P.A. v. Commissioner*, 299 F.3d 221, 235 (3d Cir. 2002). And GWA “should have been apprehensive when [it] examined the scheme, for experience shows that when something seems too good to be true that probably is the case.” *Id.*; *accord* Treas. Reg. §1.6662-3(b)(1)(ii).

Second, the court found GWA was negligent because “GWA’s key partners were sophisticated financial services professionals with decades of industry experience.” (JA__[Op.130].) They “surely knew

the differences between a genuine call option and a de facto prime brokerage account." (*Id.*) And nowhere did the court suggest that the issue presented a "close call." (Br.65.) Indeed, GWA admitted to prospective investors that there was "no assurance" that its tax position would be sustained. (JA__[Ex.70J at 216].) The court also emphasized that the negotiations with DB over the "new" MAPS product and issuance of the 2010 IRS memorandum occurred before GWA filed its 2010 tax return—i.e., enough time for it to "reconsider[ ]" its position. (JA__[Op.131].) And contrary to its suggestion (Br.65-66 n.7), GWA knew DB's changes to MAPS were "desirable from the standpoint of a tax analysis" so that it would look more like "a 'true' option." (JA__[Ex.388J]; *see also* JA__[Tr.326-27; Ex.292J] (noting that DB "was under a lot of pressure from the tax people").)

Third, the authorities GWA cites had "no bearing on whether the [Contracts] were 'options' in the first place." (JA__[Op.130].) As discussed above, Sections 1234 and 1234A do not address financial instruments with the unique features of the Contracts. (Part I.A.4.a, *supra*.) And to the extent that GWA was researching substance-over-

form caselaw (i.e., *Frank Lyon*) at all (Br.69), that would suggest it suspected that the Contracts should not be treated as "options."

Fourth, as the court explained, "[a]djustments to income under section 481(a) reflect the fact that income should have been recognized and reported by the taxpayer for a prior year." (JA__[Op.135].) If GWA had used the correct method of accounting, the tax would have been "required to be shown on" the prior returns. (*Id.* (quoting I.R.C. §6662(a)).) Because Section 481 requires the adjustments "shall be taken into account" for the year of the change, they are "required to be shown on" the return. (*Id.* (quoting I.R.C. §§481, 6662(a)).) And the court noted that this Court has sustained accuracy-related penalties in analogous circumstances. (JA__[Op.136] (citing, inter alia, *Boynton v. Pedrick*, 228 F.2d 745, 746 (2d Cir. 1955), *aff'g*, 136 F. Supp. 888 (S.D.N.Y. 1954).) Thus, the court correctly imposed accuracy-related penalties here.

## II. The Tax Court erred in determining that GWA's mark-to-market election was invalid

### Standard of review

The Tax Court's determination whether an election is effective is a conclusion of law subject to de novo review. *Branum v. Commissioner*, 17 F.3d 805, 808 (5th Cir. 1994).

### A. Introduction

#### 1. Legal framework

Section 475(f)(1) of the Code provides that a "trader in securities" may elect to recognize gain or loss on any security held at the close of any taxable year as if that security had been sold for its fair market value on the last business day of that year. I.R.C. §475(f)(1)(A)(i). The gain or loss so recognized, and any gain or loss from dispositions during the year, is treated as ordinary income or loss rather than capital gain or loss. I.R.C. §475(d)(3)(A), (f)(1)(D). And, as relevant here, a Section 475(f)(1) election applies to *all* securities held by the trader in that capacity. I.R.C. §475(f)(1)(A)-(B). "[O]nce made," a mark-to-market election "appl[ies] to the taxable year for which made and all subsequent taxable years unless revoked with the consent of the [IRS]." I.R.C. §475(f)(3).

The only statutory prerequisite for making a mark-to-market election under Section 475(f)(1) is that the "person" who makes it must be "engaged in a trade or business as a trader in securities." I.R.C. §475(f)(1)(A). The IRS prescribes the time and manner for making the election, and as applicable here, the IRS published the "exclusive procedure" in Revenue Procedure 99-17, §1, 1999-1 C.B. 503, 504. That procedure provided only for a "taxpayer" to make the election, and it generally required the taxpayer to attach to its return a statement describing the election being made, the first taxable year for which the election would be effective, and the trade or business for which the election was made. *Id.* at 504-05, §§5.02, 5.04. No action by the IRS was required for a taxpayer's mark-to-market election to become effective. *See id.*

**2. Additional facts**

The election statement that GWA filed with its 1998 tax return stated as follows:

GWA, LLC
ONE STATE STREET
HARTFORD, CT 06103

FEDERAL I.D. NUMBER: [redacted]

TAX YEAR ENDED DECEMBER 31, 1998

ELECTION UNDER INTERNAL REVENUE CODE SECTION 475(f)
FOR OGI, LLC (A WHOLLY OWNED LIMITED LIABILITY COMPANY OF GWA, LLC.)

OGI, LLC is engaged in a trade or business as a trader in securities and elects to have Internal Revenue Code Section 475(f)(1) apply to such trade or business.

OGI, LLC shall recognize gain or loss on any security held in connection with such trade or business at the close of any taxable year as if such security were sold for its fair market value on the last business day of such taxable year, and any gain or loss shall be taken into account for such taxable year.

(JA__[Ex.152J].) The redacted "Federal I.D. Number" was GWA's own employer identification number. (JA__[Doc.341 at 316].)

Elsewhere on its 1998 return, GWA stated that its "primary business activity is as an investment company" but that it "also engage[d] in a trader activity operated through a wholly owned limited liability company." (JA__[Ex.151J at 703].) GWA reported various "ordinary gains," "other investments," and "income" on that return that did not differentiate between OGI's and GWA's holdings, including "Merrill Lynch securities," a "note receivable," "nonmarketable securities, at fair value," and "unrealized gains on investments." (JA__[Ex.151J at 623, 629, 631 (capitalization omitted).)

After the IRS began auditing its 2009-2010 returns, GWA acknowledged that "[i]n 1998, GWA[ ] made an election under section 475 to report its trading gains and losses on the mark-to-market method." (JA__[Ex.280J at 6015].) It further admitted that for 1998 and subsequent years, it "(through OGI) directly traded equity and debt securities." (*Id.*) It also asserted that it "made the mark-to-market election on behalf of its wholly-owned, disregarded subsidiary, OGI." (JA__[Ex.281J at 806].) It claimed that it "believed that … it could make a 'separate' mark-to-market election for its trading business conducted through OGI." (*Id.*) But it admitted to having misread the statute, and stated that unless the Contracts met an exception (which is not at issue here), "they were subject to the mark-to-market election made by GWA[ ] on behalf of OGI." (*Id.*)

Only when this case was in litigation in the Tax Court did GWA reverse course and claim that its own election, made more than 20 years earlier, was invalid.

### 3. Tax Court's reasoning

As noted above, the Tax Court held that GWA was *not* required to mark the basket securities to market. (JA__[Op.113].) The court

agreed with the IRS that GWA was the relevant "person" entitled to make a Section 475(f) election, and that GWA, not OGI, made the election attached to GWA's own 1998 return. (JA__[Op.95-108].) The court also concluded that the election statement satisfied the procedural and technical requirements for making a valid Section 475(f) election. (JA__[Op.96-97].)

Nevertheless, the court concluded that "[GWA's] election statement"—which the court claimed to "examine[ ] within its four corners"—"shows that GWA was attempting to make an election that was legally unavailable" because it "purported to limit [GWA's] election to a subset of [its] trading"—"namely, trading of securities held in accounts denominated in OGI's name." (JA__[Op.110].) Thus, in the court's view, "GWA was attempting to make a mark-to-market election that excluded securities it held directly." (*Id.*) Because Section 475(f)(1) generally contemplates that a mark-to-market election will apply to *all* of a trader's securities, the court concluded that GWA's attempted limitation of its election rendered the election invalid. (JA__[Op.110-11] (citing *Plumb v. Commissioner*, 97 T.C. 632, 640 (1991)).)

### B. GWA's mark-to-market election was valid on its face, and GWA's subjective intent cannot cast doubt on it

#### 1. GWA's election was facially valid, and the IRS was entitled to treat it as such

"Once the taxpayer makes an elective choice, he is stuck with it." *United States v. Helmsley*, 941 F.2d 71, 86 (2d Cir. 1991) (citation omitted). Thus, "a taxpayer who makes a conscious election may not, without the consent of the Commissioner, revoke or amend it merely because events do not unfold as planned." *Id.* (citing, inter alia, *Pac. Nat. Co. v. Welch*, 304 U.S. 191, 195 (1938)).

In determining whether a taxpayer has made a valid election, "substantial compliance" with the legal requirements is sufficient. *Woodbury v. Commissioner*, 900 F.2d 1457, 1460 (10th Cir. 1990). On the other hand, a taxpayer's uncommunicated, subjective intent is "irrelevant." *Young v. Commissioner*, 783 F.2d 1201, 1206 (5th Cir. 1986); *accord Bea v. Commissioner*, 761 F. App'x 863, 866 (11th Cir. 2019). Thus, there is no requirement for the IRS to look outside the taxpayer's return to determine the validity of an election. *Branum*, 17 F.3d at 811.

GWA's mark-to-market election was valid on its face. The election: (1) was made by GWA, attached to GWA's return, under GWA's own name, address, and taxpayer ID number; (2) could not have been made by OGI because OGI was disregarded as an entity separate from GWA for tax purposes; and (3) complied with the procedural and technical requirements prescribed in Revenue Procedure 99-17 for making a mark-to-market election. (JA__[Op.41, 96-97, 108, 113].) GWA's election did not require any consent or approval by the IRS; it became effective upon filing. *See* I.R.C. §475(f)(3); Rev. Proc. 99-17 §5.02, 1999-1 C.B. at 504.

Although GWA's statement described it as an election "for OGI" (JA__[Ex.152J] (emphasis omitted)), nothing in the "four corners" (JA__[Op.110]) of the statement suggested that OGI's securities-trading business did not comprise the entirety of GWA's securities-trading business. In fact, GWA implied on its 1998 return that it conducted all of its securities trading through OGI, explaining that GWA "engages in a trader activity operated through a wholly-owned limited liability company." (JA__[Ex.151J at 703].) And even in the Tax Court, GWA

represented that it (as opposed to OGI) "was not engaged in a securities trading business during any relevant year." (JA__[Doc.312 at 198].)

The court suggested the IRS should have inferred that GWA was engaging in trading activities and not marking those activities to market from a passing reference to "unrealized gains on investments" in GWA's return. (JA__[Op.110-11 & n.45].) But the IRS would have had no way to know the source of those "unrealized gains on investments" without further inquiry. Moreover, even if the "investments" were securities held by GWA, the unrealized gains on those investments could have related to securities excepted from mark-to-market treatment under Section 475(f)(1)(B).

At most, GWA was using its phony RBC "options" (*see* p. 7, *supra*), just as it later did with the MAPS Contracts, to disguise what was, in substance, securities trading. (*See* JA__[Op.12, 17-18].) However, even after a full trial, the court itself admitted that it was "not entirely clear" from the record whether the reference to "investments" in GWA's 1998 return referred to those "options." (JA__[Op.111 n.45].) Moreover, the reference was not specific to OGI or GWA, nor would it override the return's explicit representation that GWA was an "investment

company" and OGI was its wholly owned subsidiary that "engage[d] in trader activity." (JA__[Ex.151J at 703].) In any event, even if it had referred to trading activity, it could have reflected simply an improper implementation of the mark-to-market election rather than an intent to impermissibly limit it.

Thus, GWA's mark-to-market election was valid on its face and effective when filed. GWA accordingly was "engaged in a trade or business as a trader in securities" and "elect[ed] to have [mark-to-market accounting] apply to [that] trade or business." I.R.C. §475(f)(1)(A). Accordingly, GWA was obligated by statute to mark-to-market *all* of its securities not excepted under Section 475(f)(1)(B).

#### 2. The Tax Court improperly relied on extrinsic evidence to invalidate GWA's election

After "[c]onsidering all the evidence," the court was "convinced" that GWA's "intent was to make an impermissibly selective election." (JA__[Op.111, 113].) It emphasized that an election applying to all of GWA's securities would have meant that it had to mark its RBC "options" to market, thereby "undermin[ing]" its "tax-deferral objective." (JA__[Op.113].)

But, as the court acknowledged elsewhere, that information did not "appear[ ] in the return itself," much less on the face of the election statement. (JA__[Op.111].) And the IRS would have had no other way to know about GWA's fake RBC "options." Moreover, "oversight, poor judgment, and ignorance of the law all fail to mitigate the binding effect of an otherwise proper election." *Branum* 17 F.3d at 808.

Looking beyond the four corners of the election statement was error. The court relied on *Plumb*, 97 T.C. at 640, to conclude otherwise, but that reliance was misplaced. (JA__[Op.111-13 & n.46].) *Plumb* concerned an election to waive a carryback period with respect to a net-operating loss. 97 T.C. at 640-42. Under I.R.C. §172(b)(3), such an election must "relinquish the entire carryback period." The taxpayers had both a "regular" net-operating loss and an alternative-minimum-tax net-operating loss. *Plumb*, 97 T.C. at 633-34. But the taxpayers' election stated that the taxpayers "elect to forego [sic] the carryback period for the REGULAR NOL." *Id.* at 634 (brackets original). Thus, they expressly waived the carryback period only for regular-tax purposes and not alternative-minimum-tax purposes, which "made clear their intent to make a limited election" that the court concluded "was

unavailable to them" under the statute. *Id.* at 641-42. The court emphasized that "the elections [at issue] consisted of explicit statements made by petitioners on their returns for those years, and both such statements contained the underlined word 'regular.'" *Id.* at 642. Thus, the election statements themselves "made clear [the taxpayers'] intent to make a limited election that was unavailable to them." *Id.*

Here, in contrast, there was no way to tell from the face of GWA's election statement that OGI's trading activities did not encompass the entirety of GWA's securities-trading business. More on point than *Plumb* is the Fifth Circuit's decision in *Branum*, 17 F.3d 805, which held in the same carryback-election context that a facially valid election could not be invalidated by the taxpayer's separate actions that were inconsistent with the election. *Id.* at 809-11. As the Fifth Circuit explained, a taxpayer's "subjective intent ultimately is irrelevant. We are concerned only with the objective manifestation of his ... unequivocal intent to make an election." *Id.* at 811.

GWA objectively manifested the unequivocal intent to make a mark-to-market election, and consequently, it was required to mark-to-market all of its securities. Whether or not that consequence ultimately

worked to its advantage, GWA should not now be heard to challenge the validity of its election. *See* I.R.C. §475(f)(3).

Sound tax administration favors certainty and finality in tax elections. The Tax Court's reliance on GWA's subjective intent, as demonstrated by extrinsic evidence, to override its deliberate choice was error, and the court's decision in that regard should be reversed.

## CONCLUSION

The decision of the Tax Court should be affirmed in all respects, except with respect to the validity of GWA's mark-to-market election. On that issue only, the decision should be reversed and remanded to the Tax Court for recomputation using mark-to-market accounting.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*
JOSHUA WU
*Deputy Assistant Attorney General*

/s/ *Douglas C. Rennie*

CLINT A. CARPENTER (202) 514-4346
DOUGLAS C. RENNIE (202) 305-7546
*Attorneys, Tax Litigation Branch*
*Civil Division, U.S. Department of Justice*
*Post Office Box 502, Washington, D.C. 20044*

JUNE 26, 2026

## CERTIFICATE OF COMPLIANCE

### Certificate of Compliance With Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

1. This document complies with the word limit of Local Rule 28.1.1(b) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

[X] this document contains 16,494 words, **or**

[ ] this brief uses a monospaced typeface and contains _____ lines of text.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[X] this document has been prepared in a proportionally spaced typeface using Word for Microsoft 365 in Century Schoolbook 14, **or**

[ ] this brief has been prepared in a monospaced typeface using _____________________ with ________________.

(s) /s/ *Douglas C. Rennie*

Attorney for the Commissioner of Internal Revenue

Dated: June 26, 2026